# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| FRED WATSON, | ) |
| Plaintiff, | ) Case No. 4:17-cv-2187-RLW |
| v. | ) |
| CITY OF FERGUSON, MISSOURI, et al. | ) |
| Defendants. | ) |

## DEFENDANTS' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS

COME NOW Defendants City of Ferguson ("City") and Eddie Boyd III ("Officer Boyd") (collectively, "Defendants"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, and submit the following as and for their statement of material, undisputed facts in support of their Joint Motion for Summary Judgment.

### Events of August 1, 2012

1. In his lawsuit, Plaintiff Freddie "Fred" Watson ("Plaintiff" or "Watson") purports to assert various claims under 42 U.S.C. § 1983, including claims against Defendant Eddie Boyd ("Officer Boyd") for Unlawful Search and Seizure (Count I); Unlawful Retaliation (Count II); and Malicious Prosecution (Count III); and a claim against the City for *Monell* municipal liability (Count IV), all resulting from an incident occurring on August 1, 2012. (*See* Plaintiff's First Amended Complaint "FAC") (Doc No. 35), *passim*).

2. On August 1, 2012 Officer Boyd was patrolling at Forestwood Park, where there had been a spate of recent car break-ins. (*See* Eddie Boyd Deposition ("Boyd Dep."), attached hereto as Exhibit 1, at 195:9–196:16; Deposition of Freddie Watson ("Watson Dep."), attached hereto as Exhibit 2 at 83:8–84:1).

3. At approximately 8:17 p.m., Officer Boyd observed a vehicle with excessively tinted windows and no front license plate, backed into a parking space against a tree line, idling, headlights on, near a playground where children were playing. (*See* Boyd Dep. 14:23–15:24; 16:19–25; 17:10–25; 26:14–28:25; 35:15–36:3; Watson Dep. 74:18-25; 81:17-83:15; Deposition of Bevis Schock ("Schock Dep"), attached hereto as <u>Exhibit 3</u>, at 38:5–17; 62:4–64:13; 194:9–20).

4. Based on these observations, and in light of the recent break-ins at the park, Officer Boyd decided to investigate, pulling his police cruiser adjacent to the vehicle and then approaching the car on foot. (*See* Boyd Dep. 18:23–19:20; 26:14–28:25; Watson Dep. 83:8–84:5).

5. Officer Boyd testified that the tinted windows on Watson's car were so dark that he was unsure whether the vehicle was occupied until he exited his vehicle and walked up to it, at which time he saw movement in the car, (*see* Boyd Dep. at 19:21–20:4), which was Watson's intent, as he thought tinted windows would reduce racial profiling (*see* Watson Dep. 358:24–359:2; Schock Dep. 232:20–22, 233:19–24); Watson's attorney even advised Watson that the tint was illegal under Missouri law and that this fact gave Officer Boyd probable cause to arrest Watson. (*See* Schock Dep. at 63:4–64:13).

6. Watson's attorney also acknowledged how the existence of tinted windows would raise a justifiable safety concern for any police officer. (*See* Schock Dep. at 62:4–63:7).

7. Watson was the occupant of that vehicle, where he was sitting in the driver's seat without wearing a seat belt. (*See* Boyd Dep. 38:14–23, 43:3–8; Watson Dep. 83:23–84:1).

8. Officer Boyd requested Watson to provide his pedigree information, including his name and address, as well as his driver's license and proof of insurance. (*See* Boyd Dep. 47:21–48:22; 57:5–58:25).

9. Watson never provided Officer Boyd with proof of insurance. (*See* Boyd Dep. 43:24–44:7).

10. Watson never provided Officer Boyd with a driver's license. (*See* Boyd Dep. 43:24–44:7).

11. Despite Watson's claim that he told Officer Boyd his Florida driver's license was located in the back of the car (Watson Dep. 113:11–19), and that the Florida driver's license remained in the car until he picked it up the following morning, August 2, 2012, from the impound lot (Watson Dep. 137:25–138:5, 143:1–3), credit union records reveal that Watson used his driver's license to make a $2,100 cash withdrawal from his credit union the morning of August 2, 2012, shortly before he went to pick up his vehicle where the driver's license was purported located. (*See* Deposition Transcript of Ayse Alexander, attached hereto as Exhibit 4, at 14:3–15:12, 16:5–12).

12. Watson provided Officer Boyd with the name "Fred Watson" when he admittedly knew that if Officer Boyd performed a search under that name, nothing would come up in the system. (*See* Watson Dep. 9:22-10:25; 97:17-102:6).

13. Watson also provided Officer Boyd with a Florida address when he knew he did not reside in Florida. (*See* Watson Dep. 193:23-194:23; 455:1–456:4).

14. During the stop, Officer Boyd attempted to locate Watson's name in REJIS, a computer system used by law enforcement agencies to identify individuals, including locating their driver's license information. (*See* Boyd Dep. 60:21–61:3; 65:1–65:6).

15. Officer Boyd reviewed the REJIS system and could not locate an individual with the name "Fred Watson" with the information provided by Watson. (*See* Boyd Dep. 64:19–65:23).

16. Officer Boyd testified that he may have asked Watson for his social security number after he could not find Watson's name in the REJIS system. (*See* Boyd Dep. 58:18–25; 60:8–12).

17. Watson refused to provide Officer Boyd with his social security number. (*See* Watson Dep. 85:25-88:20).

18. Watson claims that at this point, he asked Officer Boyd for his name and badge number. (*See* FAC ¶21; Watson Dep. 197:14–25).

19. Watson then reached for his cell phone, which he claims he planned to use to call 911. (*See* Boyd Dep.; 203:13–204:19; Watson Dep. 104:3-106:5; 198:22–6; FAC ¶25).

20. For officer safety purposes, Officer Boyd directed Watson not to use the phone and to keep his hands on the steering wheel. (*See* Boyd Dep. 203:13–204:19; Watson Dep. 104:3-106:5).

21. Watson claims that at this time, Officer Boyd pulled out his gun and pointed it at Watson (*See* Watson Dep. 200:1–200:25) while Boyd testified that he never pulled a gun on Watson. (*See* Boyd Dep. 95:3–5).

22. Officer Boyd then directed Watson to throw his keys out of the car window, which Watson repeatedly refused to do. (*See* Watson Dep. 103:11-17; 201:15-203:12; FAC ¶¶28–29).

23. Officer Boyd repeatedly ordered Watson to exit his vehicle, but Watson refused. (*See* Boyd Dep. 55:15–56:5; 68:20–69:7; FAC ¶¶20, 28–29).

24. Because of Watson's refusal to exit the vehicle despite requests, Officer Boyd requested backup and two Ferguson officers responded, Officer Mink and Officer Casem. (*See* Boyd Dep. 54:16–56:13, 189:19–23; Watson Dep. 114:19–115:11; 201:23-202:8; FAC ¶¶29).

25. After the arrival of Officers Mink and Casem, and after Officer Boyd requested that Watson exit the vehicle multiple times, Watson finally exited the vehicle. (*See* Boyd Dep. 211:7–212:16; Watson Dep. 116:5–22; FAC ¶34).

26. While exiting the vehicle and before he was fully handcuffed, Watson used his leg to kick the car door closed, which Officer Boyd interpreted as an attempt to conceal something in the vehicle. (*See* Boyd Dep. 212:8–12; Watson Dep. 120:6-121:2; FAC ¶34).

27. Watson admits he kicked the door shut with his foot to prevent the officers from searching his vehicle. (*See* Watson Dep. 120:6–121:20).

28. Officer Boyd searched the vehicle in accordance with his training at the academy, both to conduct an inventory search incident to the vehicle being towed and because he believed Watson was attempting to conceal contraband in the vehicle. (*See* Boyd Dep. 169:19–170:6, 170:17–25; 175:21–176:15; 178:23–179:13; 212:8–12).

29. During the subsequent search of the vehicle, Officer Boyd located documentation indicating that Watson's real name was "Freddie Watson," and Officer Boyd was thereafter able to locate his name in REJIS. (*See* Boyd Dep. 212:21–213:6; 217:7–22).

30. REJIS indicated that Watson was a Missouri resident, that he had never surrendered his Missouri license, and that his license was expired. (*See* Boyd Dep. 217:7–22).

31. Officer Boyd was not able to locate a valid driver's license for Watson in Missouri, Illinois, or Florida, although the car was registered in Florida. (*See* Boyd Dep. 216:14–217:6).

32. Watson's vehicle did not have an inspection sticker. (*See* Boyd Dep. 164:14–20).

33. Officer Boyd issued Watson the following citations: (1) driving without operator's license in possession; (2) violation of financial responsibility ordinance; (3) vision-reducing materials applied to windshield (illegal window tint); (4) failure to register vehicle (because he

believed Watson to be a Missouri resident and the car was registered in Florida); (5) no inspection sticker (safety & emission testing); (6) no seatbelt; (7) expired driver's license (as reflected by the REJIS report); (8) failure to comply (for failing to provide pedigree information and refusing to exit vehicle when advised he was under arrested); and (9) making a false statement (giving the name "Fred Watson" and stating that he did not have identification, but a government ID was later located in the vehicle). (*See* Boyd Dep. 128:16–129:11, 218:16–219:2, Exhibit 4, Exhibit 6).

### **Watson's Purported Damages**

34. At the time of his arrest, Watson was employed by a contractor for the National Geospatial-Intelligence Agency ("NGA") called NJVC, LLC, and he had a security clearance from the NGA. (*See* FAC ¶¶87–94; Watson Dep. 50:17–51:18, 57:20–58:10; 262:24–263:15).

35. As a result of the citations he received on August 1, 2012, Plaintiff received a conditional security clearance (which did not constrain his access to classified information), but the conditions placed on his security clearance would have been satisfied and his full clearance would have been reinstated had he provided documentation showing the citations were resolved, such as by pleading guilty and paying a fine to the existing charges. (*See* Tracy Thornton Deposition Transcript ("Thornton Dep."), attached hereto as Exhibit 5, at 11:21–15:7; 54:23–56:16).

36. It was not necessary that Watson be exonerated from the charges to maintain his conditional security clearance or obtain a full security clearance. (*See* Thornton Dep. 11:21–15:7; 54:23–56:16).

37. The NGA unequivocally testified that the real reason Watson's security clearance was ultimately suspended was not the pendency of any charges by the City but rather solely because he made the following statement to an NGA personnel security officer: "What if I went

out there and started telling the Government's secrets on my time? Do you think they would go to court with me then." (*See* Thornton Dep. 15:13–17:13; 58:23–59:13).

38. Because the security officer and the Chief of NGA's Adjudication Branch understood Watson's statement to be a serious threat to national security, the NGA suspended his security clearances. (*See* Thornton Dep. 15:13–17:13; 32:3–21; 58:23–59:13).

39. Because his security clearances were suspended, NJVC terminated Watson's employment. (*See* Patrick O'Neil Deposition Transcript, attached hereto as <u>Exhibit 6</u>, at 37:14 – 23).

40. During his deposition, Watson was unable to testify as to what damages he is seeking, instead stating that he was requesting "whatever the law sees fit for this situation." (*See* Watson Dep. 183:18–184:12).

41. Watson asserts only that he has "suffered all of the types of damages set forth in the First Amended Complaint." (*See* Pl.'s Obj. and Supp. Ans. To Def's First Set of Interrogatories ("Supp. Rog. Response"), attached hereto as <u>Exhibit 7</u>, at No. 7).

42. Watson has failed to itemize his damages and has offered no evidence of any physical or mental injuries. (*See* Supp. Rog. Response No. 7).

43. Plaintiff has failed to identify evidence demonstrating Officer Boyd's acted with an evil motive or was reckless indifference to Watson's rights when stopping, arresting, and citing Watson on August 1, 2012. (*See* Supp. Rog. Response No. 19).

**Additional Evidence**

44. Watson admits that the City's purported conduct was not taken pursuant to an official policy but rather is based upon "informal and unwritten policies in the form of customs,

patterns, practices and usage. . . These are not formally enacted policies established by a particular person . . ." (*See* Supp. Rog. Response No. 12).

45. Watson alleges that the City's failure to screen is based upon its decision to hire Officer Boyd when Boyd had purportedly engaged in prior misconduct, including "a history of filing false reports and lying in police investigations," having his Missouri Peace Officer Standards and Training License revoked, and being a party to a lawsuit related to his duties as an officer, as well as because the City did not request Officer Boyd' personnel files from previous employers. (*See* Supp. Rog. Response No. 12).

46. Officer Boyd received his Class A License from the Missouri Department of Public Safety following his graduation from the St. Louis City Police Academy and completing the requirements of Missouri law (R.S.Mo. §§ 590.100–180). (*See* Boyd Dep. 244:3-5; Boyd license and graduation certificate, Watson_01505–06, attached hereto as Exhibit 8).

47. Officer Boyd receives continuing education training through POST-approved continuing education programs. (*See* Boyd Dep. 169:7; Boyd Training Records, FERG-WAT 571–612, attached hereto as Exhibit 9).

48. Officer Boyd's Class A License from the Missouri Department of Public Safety, has never suspended or revoked. (*See* Boyd Dep. 291:25–292:7).

49. Officer Boyd's conduct was the subject of an administrative hearing instigated by the Missouri Department of Public Safety wherein it sought to have Officer Boyd's license revoked, but the Department of Public Safety's decision to revoke Officer Boyd's license was stayed (*see* Preliminary Injunction, BOYD-WAT 00415, attached hereto as Exhibit 10) and ultimately the case was dismissed. (*See* Dismissal, Watson_01122, attached hereto as Exhibit 11; Boyd Dep. 291:25–292:7).

50. Officer Boyd was the defendant in a lawsuit stemming from the same allegations, but Officer Boyd was exonerated for his conduct in a case stemming from conduct during his employment by the St. Louis Metropolitan Police Department, with a jury finding in favor of Officer Boyd on both a federal claim for excessive force and a state law claim of battery. (*See C.L.D. ex rel. Dixon v. Eddie Boyd, III*, et al., No. 4:08-CV-788 CAS, Judgment (Doc. # 149) (E.D. Mo. July 15, 2010), attached hereto as Exhibit 12).

51. Watson has wholly failed to produce evidence demonstrating that the City's training was inadequate and that the City was deliberately indifferent to the rights of others. (*See* Supp. Rog. Response No. 12).

52. Watson has failed to produce evidence demonstrating that the City's supervision or discipline practices were inadequate and that the City was deliberately indifferent to the rights of others, instead offering only conclusory allegations lacking factual support. (*See* Supp. Rog. Response No. 12).

53. Plaintiff asserted that the City was on notice of Officer Boyd's purported "dishonesty and unconstitutional practices" and his "dishonesty and retaliation against citizens (including assaulting them)," and that Ferguson did not take "any affirmative steps to provide greater training or supervision to Defendant Boyd despite his repeated constitutional violations." (*See* Supp. Rog. Response No. 12).

54. Prior to August 1, 2012, Officer Boyd was the subject of four internal affairs investigations at the City of Ferguson, each of which was investigated, with two being found "not sustained" and two found to be "unfounded." (*See* Deposition of Harry Dilworth, attached hereto as Exhibit 13, at 190:17–191:11, Ex. 27).

55. Watson has failed to produce evidence demonstrating that the City engaged in an unconstitutional custom and was deliberately indifferent to or tacitly authorized such conduct, instead offering only conclusory allegations lacking factual support. (*See* Supp. Rog. Response No. 12).

56. Watson has not named any expert witnesses to testify with regard to any of the claims or theories that form the basis of this case. (*See* Supp. Rog. Response No. 23–24).

### **Relevant City Code**

57. On August 1, 2012, Ferguson Code of Ordinances ("City Code") 44-404 provided as follows:

**Sec. 44-404. - Vision-reducing material applied to windshield or windows.**

(a) Any person may operate a motor vehicle with front sidewing vents or windows located immediately to the left and right of the driver that have a sun screening device, in conjunction with safety glazing material, that has a light transmission of thirty-five (35) percent or more plus or minus three (3) percent and a luminous reflectance of thirty-five (35) percent or less plus or minus three (3) percent. Except as provided in subsection (c) of this section, any sun-screening device applied to front sidewing vents or windows located immediately to the left and right of the driver in excess of the requirements of this section shall be prohibited without a permit pursuant to a physician's prescription as described below. A permit to operate a motor vehicle with front sidewing vents or windows located immediately to the left and right of the driver that have a sun-screening device, in conjunction with safety glazing material, which permits less light transmission and luminous reflectance than allowed under the requirements of this subsection, may be issued by the department of public safety to a person having a serious medical condition which requires the use of a sun-screening device if the permittee's physician prescribes its use. The director of the department of public safety shall promulgate rules and regulations for the issuance of the permit. The permit shall allow operation of the vehicle by any titleholder or relative within the second degree by consanguinity or affinity, which shall mean a spouse, each grandparent, parent, brother, sister, niece, nephew, aunt, uncle, child, and grandchild of a person, who resides in the household. Except as provided in subsection (b) of this section, all sun-screening devices applied to the windshield of a motor vehicle are prohibited.

(b) This section shall not prohibit labels, stickers, decalcomania, or informational signs on motor vehicles or the application of tinted or solar screening material to recreational vehicles as defined in RSMo 700.010, provided that such material does not interfere

with the driver's normal view of the road. This section shall not prohibit factory-installed tinted glass, the equivalent replacement thereof or tinting material applied to the upper portion of the motor vehicle's windshield which is normally tinted by the manufacturer of motor vehicle safety glass.

(c) Any vehicle licensed with a historical license plate shall be exempt from the requirements of this section.

(d) Any person who violates the provisions of this section is guilty of an ordinance violation.

(*See* Exhibit 14, attached hereto).

58. On August 1, 2012, City Code 44-81 provided as follows:

**Sec. 44-81. - License required.**

(a) It shall be unlawful for any person to drive any motor vehicle or motorized bicycle in the city unless such person shall have a driver's license or chauffeur's license as required by state law, and shall have such license in possession at all times while so driving on the streets of the city.

(b) It shall be unlawful for the owner of any motor vehicle or motorized bicycle to permit any person to drive such vehicle on the streets of the city unless such driver shall have a driver's license or chauffeur's license as required by state law, and shall have such license in possession at all times while so driving on the streets of the city.

(c) Failure to produce a driver's or chauffeur's license upon lawful demand shall give a police officer probable cause to arrest the driver for driving a motor vehicle or motorized bicycle on the streets of the city without a state driver's or chauffeur's license, as required under subsection (a) or (b) above.

(d) Any person whose license and driving privilege as a resident or a nonresident has been canceled, suspended, or revoked under the laws of this state or the issuing state who drives any motor vehicle in the city while such license and privilege is canceled, suspended, or revoked and before an official reinstatement notice is issued or limited driving privileges granted by state officials, is guilty of a violation of an ordinance of this city

(*See* Exhibit 14, attached hereto).

59. On August 1, 2012, City Code 29-16 provided as follows:

**Sec. 29-16. - Failure to obey, obstructing, resisting, etc., city officials.**

It shall be unlawful for any person to willfully and knowingly obstruct, resist, oppose or fail to obey a lawful command of any police officer or city official charged with enforcement of this Code, or any other person duly authorized in executing or attempting to execute and carry into effect any provision of this Code or other ordinances of the city or order passed or made by the proper authorities of this city, or in serving or attempting to serve any legal writ, warrant, process or order issued by the mayor or other officer of the city.

(*See* Exhibit 14, attached hereto).

60. On August 1, 2012, City Code 44-66 provided as follows:

**Sec. 44-66. - Financial responsibility required in operation of motor vehicles.**

(a) No person shall operate a motor vehicle registered in this state, whether owned by such operator or by another, upon the streets, alleys, or highways of this city, unless such operator, or the owner of the vehicle, maintains financial responsibility which covers the operation of that vehicle by such operator.

(b) No person shall operate a motor vehicle registered in this state, whether owned by such operator or by another, upon the streets, alleys, or highways of this city unless such operator exhibits proof of financial responsibility upon demand of a police officer, which proof covers the operation of that vehicle by such operator.

(c) For purposes of this section, the term "financial responsibility" shall mean the ability to respond in damages for liability occurring after the effective date of proof of such financial responsibility arising out of the ownership, maintenance, or use of a motor vehicle in the amount of twenty-five thousand dollars ($25,000.00) because of bodily injury to or death of one (1) person in any one (1) accident, and subject to said limit for one (1) person, in the amount of fifty thousand dollars ($50,000.00) because of bodily injury to or death of two (2) or more persons in any one (1) accident, and in the amount of ten thousand dollars ($10,000.00) because of injury to or destruction of property of others in any one (1) accident.

(d) Proof of financial responsibility may be shown by any of the following:

(1) An insurance identification card issued by a motor vehicle insurer, or by the Director of Revenue of the State of Missouri for self insurance, as provided by RSMo 303.024. A motor vehicle insurance policy, a motor vehicle liability insurance binder, or receipt which contains the name and address of the insurer, the name and address of the named insured, the policy number, the effective dates of the policy, and a description by year and make of the vehicle, or at least five (5) digits of the vehicle identification number, or the word "fleet" if the insurance policy covers five (5) or more vehicles, shall be satisfactory evidence of insurance in lieu of an insurance identification card.

(2) A certificate of the Treasurer of the State of Missouri of a cash deposit as provided by RSMo 303.240.

(3) A surety bond filed with the Director of Revenue of the State of Missouri as provided by RSMo 303.230.

(e) Proof of financial responsibility shall be carried at all times in the insured motor vehicle, or by the operator of the motor vehicle if the proof of financial responsibility is effective as to the operator rather than to the vehicle. The operator of the motor vehicle shall exhibit the proof of financial responsibility on the demand of any police officer who lawfully stops such operator while that officer is engaged in the performance of the duties of his/her office.

(f) No person shall alter a legitimate document evidencing the financial responsibility required and described in this section. No person shall produce, manufacture, sell or otherwise distribute a fraudulent, altered, or counterfeit document intended to serve as an insurance identification card or document. No person shall possess a fraudulent, altered or counterfeit document intended to serve as an insurance identification card or document.

(g) Penalty. Any person who shall violate any provision of this section shall, upon conviction thereof, be deemed guilty and subject to punishment as described in section 1-15 of this Municipal Code.

(*See* Exhibit 14, attached hereto).

61. On August 1, 2012, City Code 44-387 provided as follows:

**Sec. 44-387. - License plates required.**

(a) It shall be unlawful for any person to operate or park a motor vehicle on any roadway in this city unless there is an unexpired, valid state license plate or temporary permit/tag registered to that vehicle and displayed on such vehicle in accordance with state law.

(b) It shall be unlawful for any person to operate or park a motor vehicle within this city if such license plate or temporary permit/tag is wholly or partially obscured, is not reasonably clean, is not properly fastened or is not properly lit as required by state law.

(c) No person shall operate or park a motor vehicle or trailer on which there is displayed on the front or rear thereof any other plate, temporary permit/ tag or placard bearing any number except the plate furnished by the state director of revenue or appropriate official of the issuing state, nor shall there be displayed on any motor vehicle or trailer a placard, sign or tag bearing the words "license lost," "license applied for," or words of similar import, as a substitute for such number plates or permit/tag.

(d) No person shall alter a legitimate license plate or temporary permit/tag required and described in this section. No person shall produce, manufacture, sell or otherwise distribute a fraudulent, altered, or counterfeit license plate or temporary permit/tag

13

intended to serve as a license plate or temporary permit/tag as required by this section. No person shall possess a fraudulent, altered or counterfeit license plate or temporary permit/tag or display such fraudulent, altered or counterfeit license plate or temporary permit/tag on any motor vehicle within this city.

(*See* Exhibit 14, attached hereto).

62.     On August 1, 2012, City Code 44-406 provided as follows:

**Sec. 44-406. - State safety and emissions testing required; display of inspection stickers required**.

(a) It shall be unlawful for any person to operate a motor on the streets of the city of for any owner of a motor vehicle to have his motor vehicle parked on the streets of the city unless such vehicle has been subject to all safety and emissions testing as required for such vehicle under state law.

(b) All motor vehicles required to undergo safety and emissions testing shall display current inspection stickers as required by state law.

(c) No person shall alter a legitimate document, report, certificate or sticker evidencing the safety and emissions inspections required and described in this section. No person shall produce, manufacture, sell or otherwise distribute a fraudulent, altered, or counterfeit document, report, certificate or sticker intended to serve as a safety or emissions inspection report, certificate or sticker. No person shall possess a fraudulent, altered or counterfeit document, report, certificate or sticker intended to serve as a safety or emissions inspection report, certificate or sticker.

(*See* Exhibit 14, attached hereto).

63.     On August 1, 2012, City Code 44-402 provided as follows:

**Sec. 44-402. - Seat belts.**

(a) As used in this section, the term "passenger car" means every motor vehicle designed for carrying ten (10) persons or less and used for the transportation of persons; except that, the term "passenger car" shall not include motorcycles, motorized bicycles, motor tricycles, and trucks with a licensed gross weight of twelve thousand (12,000) pounds or more. As used in this section, the term "truck" means a motor vehicle designed, used or maintained for the transportation of property.

(b) Each driver, except persons employed by the United States Postal Service while performing duties for that federal agency which require the operator to service postal boxes from their vehicles, or which require frequent entry into and exit from their vehicles, and front seat passenger of a passenger car manufactured after January 1, 1968, operated on a street or highway in this city, and persons less than eighteen (18)

years of age operating or riding in a truck, as defined in subsection (a) of this section, on a street or highway of this city shall wear a properly adjusted and fastened safety belt that meets federal National Highway, Transportation and Safety Act requirements. No person shall be stopped, inspected, or detained solely to determine compliance with this subsection. The provisions of this section and section 44-403 shall not be applicable to persons who have a medical reason for failing to have a seat belt fastened about their body, nor shall the provisions of this section be applicable to persons while operating or riding a motor vehicle being used in agricultural work-related activities. Noncompliance with this subsection shall not constitute probable cause for violation of any other provision of law. The provisions of this subsection shall not apply to the transporting of children under sixteen (16) years of age, as provided in section 44-403

(c) Each driver of a motor vehicle transporting a child less than sixteen (16) years of age shall secure the child in a properly adjusted and fastened restraint under section 44-403

(d) No person under the age of eighteen (18) years of age shall be permitted or allowed to ride in the unenclosed bed of a truck with a licensed gross weight of less than twelve thousand (12,000) pounds operated on a street or highway in the city.

(e) Except as otherwise provided for in section 44-403, each person who violates the provisions of subsection (b) of this section is guilty of an infraction for which a fine not to exceed ten dollars ($10.00) may be imposed. All other provisions of law and court rules to the contrary notwithstanding, no court costs shall be imposed on any person due to a violation of subsection (b) of this section.

(f) Each person who violates the provisions of subsection (d) of this section is guilty of an ordinance violation punishable under the general penalty provisions of this Code.

(g) If there are more persons than there are seat belts in the enclosed area of a motor vehicle, then the passengers who are unable to wear seat belts shall sit in the area behind the front seat of the motor vehicle unless the motor vehicle is designed only for a front-seated area. The passenger or passengers occupying a seat location referred to in this subsection is not in violation of this section. This subsection shall not apply to passengers who are accompanying a driver of a motor vehicle who is licensed under RSMo 302.178.

(*See* Exhibit 14, attached hereto).

64. On August 1, 2012, City Code 44-402 provided as follows:

**Sec. 1-15. - General penalty; continuing violations; violations declared nuisances.**

(a) Whenever in this Code or any ordinance of the city, or rule or regulation or order promulgated by an officer or agency of the city under authority duly vested in him or it, any act is prohibited or is declared to be unlawful, or an offense, or misdemeanor, or the doing of any act is required, or the failure to do any act is declared unlawful, or

an offense, or a misdemeanor, and no specific penalty is provided for the violation thereof, upon conviction of a violation of any provision of this Code or of any ordinance, rule, regulation, or order, the violator shall be punished by a fine not exceeding one thousand dollars ($1,000.00) or by imprisonment in the city jail not exceeding three (3) months, or by such fine and imprisonment.

(b) Each day any violation of this Code or any such ordinance, rule, regulation or order shall continue shall constitute, except where otherwise provided, a separate offense.

(c) In addition to the penalties provided in subsection (a), any condition caused or permitted to exist in violation of any of the provisions of this Code and the ordinances of the city shall be deemed a public nuisance and may be abated by the city as provided by law, and each day that any such offensive condition continues shall be regarded as a new and separate offense.

(*See* Exhibit 14, attached hereto).

    65.    On August 1, 2012, City Code 44-1 defined "street or highway" as follows:

*Street* or *highway* shall mean every way or place open for vehicular travel by the public and regardless of whether it has been legally established by constituted authority or used for the statutory period of time as a public highway.

(*See* Exhibit 15, attached hereto).

Respectfully submitted,

**LEWIS RICE LLC**

By: /s/ Ronald A. Norwood
    Ronald A. Norwood, #33841MO
    Aarnarian D. Carey, #58286MO
    Jacqueline K. Graves, #64875MO
    600 Washington Ave., Suite 2500
    St. Louis, Missouri 63101
    (314) 444-7759 (Telephone)
    (314) 612-7759 (Facsimile)
    rnorwood@lewisrice.com
    acarey@lewisrice.com
    jgraves@lewisrice.com

*Attorneys for Defendants City of Ferguson*

**MICKES O'TOOLE, LLC**

By: /s/ Geri Lynn Arrindell
    Geri Lynn Arrindell, #66357MO
    12444 Powerscourt Drive
    Suite 400
    St. Louis, MO 63131
    garrindell@mickesotoole.com

*Attorney for Defendant Eddie Boyd, III*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 7th day of June, 2019, a true copy hereof was electronically filed with the Clerk of the Court using the CM/ECF system, to be served by operation of the Court's electronic filing system on all counsel of record.

    /s/ Ronald A. Norwood