# Exhibit 1

## Page 1

```
 1               IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF MISSOURI
 2                        EASTERN DIVISION
 3     FRED WATSON,              )
                                 )
 4     Plaintiff,                )
                                 )
 5     vs.                       )  Case No. 4:17-cv-2187 RLW
                                 )
 6     EDDIE BOYD, ET AL.,       )
                                 )
 7     Defendants.               )
 8
 9
10
11          THE DEPOSITION OF EDDIE C. BOYD III
12
13
14            Taken on behalf of Plaintiff
15               November 29, 2018
16
17
18            ALARIS LITIGATION SERVICES
                 711 N. 11TH STREET
19               ST. LOUIS, MO 63101
                   (314) 644-2191
20
21
22
23
24
25
```

## Page 2

```
 1     I N D E X  O F  E X A M I N A T I O N
 2
 3     WITNESS:  EDDIE C. BOYD III
 4         Examination By Mr. Waldron ..........6
 5         Examination By Mr. Norwood ..........363
 6         Examination By Mr. Waldron ..........369
 7
 8
         I N D E X  O F  E X H I B I T S
 9
       Exhibit 1 ............................12
10        Map of Forestwood Park
11     Exhibit 2 ............................100
          Ferguson Police Department CAD Notes
12
       Exhibit 3 ............................112
13        REJIS Printout
14     Exhibit 4 ............................128
          Uniform Citations
15
       Exhibit 5 ............................186
16        Police Report
17     Exhibit 6 ............................218
          Complaint Form
18
       Exhibit 7 ............................230
19        Uniform Citation
20     Exhibit 8 ............................233
          Incident Report
21
       Exhibit 9 ............................249
22        Background Questionnaire
23     Exhibit 10 ...........................254
          Employee Charges/Disposition
24
       Exhibit 11 ...........................261
25        Administrative Reports Transmittal
          Sheet
25        Sheet
```

## Page 3

```
 1     Exhibit 12 ...........................269
 2        Consent to Recommend Disciplinary
          Punishment and Waiver of Board Trial
 3     Exhibit 13 ...........................276
          Incident Report
 4
       Exhibit 14 ...........................287
 5        Release
 6     Exhibit 15 ...........................294
          Letter
 7
       Exhibit 16 ...........................296
 8        Application of Employment
 9     Exhibit 17 ...........................308
          Performance Evaluation
10
       Exhibit 18 ...........................316
11        E-mails
12     Exhibit 19 ...........................330
          E-mails
13
       Exhibit 20 ...........................341
14        Collection of Documents
15     Exhibit 21 ...........................351
          Regional Justice Information
16
       Exhibit 22 ...........................369
17        Notice of Deposition
18
       The original exhibits were retained by the court reporter
19     to be attached to COUNSELS' transcripts.
20
21
22
23
24
25
```

## Page 4

```
 1               IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF MISSOURI
 2                        EASTERN DIVISION
 3     FRED WATSON,              )
                                 )
 4     Plaintiff,                )
                                 )
 5     vs.                       )  Case No. 4:17-cv-2187 RLW
                                 )
 6     EDDIE BOYD, ET AL.,       )
                                 )
 7     Defendants.               )
 8
 9
10
11          THE DEPOSITION OF EDDIE C. BOYD III,
12     produced, sworn, and examined on behalf of the
13     Plaintiff, November 29, 2018, between the hours of
14     eight o'clock in the forenoon and seven o'clock in the
15     afternoon on that day, at the law offices of Lewis
16     Rice, LLC, 600 Washington Avenue, Suite 2500, St.
17     Louis, Missouri 63101, before Rebecca L. Tuggle, a
18     Registered Professional Reporter, Certified Court
19     Reporter, and Certified Shorthand Reporter within and
20     for the State of Missouri.
21
22
23
24
25
```

EDDIE C. BOYD III  11/29/2018

## Page 13

1          (Exhibit 1, Map of Forestwood Park, was
2       marked for identification.)
3          MR. NORWOOD:  Just for the record, are we
4    calling it Boyd Exhibit 1, just so I can --
5          MR. WALDRON:  So I've marked it as -- as
6    Plaintiff's Exhibit 1.
7          MR. NORWOOD:  Plaintiff's Exhibit 1.
8          MR. WALDRON:  Is that all right?
9          MR. NORWOOD:  I think we have some
10   Plaintiff's Exhibit 1's, but that's fine.
11         MR. WALDRON:  Okay.
12      Q    (By Mr. Waldron) All right.  So,
13   Officer Boyd, do you recognize this?
14      A    The writing on it says "Forestwood Park."
15      Q    Okay.  And it appears to be a satellite
16   photograph; is that right?
17      A    Yes, it appears to be a satellite photo.
18      Q    And do you see at the -- at the bottom
19   left-hand part where it says "Ferguson Avenue"?
20      A    I got mine.  So it'd be the top right.  This
21   is where it makes sense for me.
22      Q    Oh, okay.  So you're going to flip?
23      A    Yes.
24      Q    All right.  I see.  So I'm going to flip
25   mine as well so that we're on the same page, so to

## Page 14

1    speak.
2          MR. NORWOOD:  Literally and figuratively.
3          MR. WALDRON:  That's right.
4      Q    (By Mr. Waldron) Okay.  So you see Ferguson
5    Avenue and that's in the upper right-hand corner of
6    your page; is that correct?
7      A    Yes.
8      Q    And having looked at this, does this align
9    with what you know about Forestwood Park?
10     A    It appears to.
11     Q    It appears to.  Okay.
12         So on August 1st of 2012, do you remember
13   any specific incidents before your interaction with my
14   client Mr. Watson?
15     A    No.
16     Q    Do you remember whether you had made any
17   arrests previously?
18     A    No.
19     Q    Okay.  I'd like you to describe for me what
20   your recollection is of your interaction with
21   Mr. Watson.
22     A    I don't understand the question.
23     Q    So I want you -- I'm asking you to please
24   describe -- do you recall having interaction with my
25   client Fred Watson, who's here at the table?

## Page 15

1      A    I do.
2      Q    Okay.  So I'm asking you to -- can you tell
3    me the very first thing you recall about the -- the
4    incident?
5      A    On August 1st?
6      Q    Yes, sir.
7      A    2012?
8      Q    Yes, sir.
9      A    With Mr. Watson?
10     Q    Yes, sir.
11     A    I observed his vehicle backed into a parking
12   space in the park along a tree line with the
13   headlights on and the engine idling, heavy tinted
14   windows.
15     Q    Okay.  And where were you when you observed
16   that?
17     A    I was in my patrol vehicle.
18     Q    Okay.  And were you driving your patrol
19   vehicle?
20     A    Yes.
21     Q    Okay.  And do you recall where he was in --
22   in Forestwood Park?  Where his car was parked?
23     A    About a third of the way down -- halfway
24   down the eastern parking spaces --
25     Q    I'm going to --

## Page 16

1      A    -- of the park.
2      Q    I'm going to hand you a black pen.  And I'm
3    just going to ask you to mark with an X, please, as
4    best you can -- I understand it's a color
5    photograph -- but as best you can, I'm going to just
6    ask you to mark with an X where Mr. Watson's car was
7    parked on that day.
8      A    Can I do a circle?
9      Q    Sure.  I was going to have something else be
10   a circle, but a circle is fine.
11         MR. WALDRON:  I note that, for the record,
12   Mr. Boyd is making a circle.
13     Q    (By Mr. Waldron) If you wouldn't mind,
14   Mr. Boyd, if you would just turn it around so I could
15   also see it.  Thank you.  And I'm going to just make a
16   similar marking so I understand where we're talking
17   about.
18         MR. WALDRON:  Got it?
19     Q    (By Mr. Waldron) Okay.  So now that we know
20   where we're talking about, you said that you observed
21   his vehicle headlights on, heavy tint.  And after you
22   observed this, what did you do?
23     A    Well, the vehicle was idling.
24     Q    The vehicle was idling?
25     A    Yes.

4 (Pages 13 to 16)

EDDIE C. BOYD III  11/29/2018

Page 17

1      Q    Okay.  And how were you able to tell that?
2      A    Once I approached it.
3      Q    Okay.  So you -- you didn't determine that
4  the vehicle was idling until you approached the car?
5      A    The headlights were on.
6      Q    Right.  I -- I understand that.  But you --
7  you didn't under -- you didn't recognize that the car
8  was idling until you approached it; right?
9      A    Yes.
10     Q    Okay.  So explain to me -- you said you
11 know -- you recognize -- you observed his vehicle, I
12 believe were your words, and what did you then do
13 after you observed his vehicle?
14     A    Well, I observed the vehicle backed into a
15 parking space along the tree line with heavy tinted
16 windows and no front plate.
17     Q    And then what did you do?
18     A    I observed that it was -- the headlights
19 were on, it was idling, and it was in proximity to the
20 playground.
21     Q    Okay.  And how far was it from the
22 playground?
23     A    Approximately 20 to 40 feet.
24     Q    Twenty to 40 feet?
25     A    Yeah.

Page 18

1      Q    So the playground was directly across
2  from --
3      A    Adjacent.
4      Q    Adjacent?
5      A    Yes.
6      Q    And, I guess, looking at this, can you help
7  me explain what does "adjacent" mean?
8      A    It would be off -- if you were sitting in
9  the vehicle while it was backed in, it would be off to
10 the right --
11     Q    Off to the --
12     A    -- slightly off to the right.
13     Q    Okay.  And it would be about 20 to 40 feet
14 to the right?
15     A    Just on the other side of the pathway.
16     Q    On the other side of the pathway.
17          And it's a jungle gym?  Is it a --
18     A    It's a mixture of things.
19     Q    It's a mixture of things.  Okay.
20          So you said that you made these
21 observations; correct?
22     A    Yes.
23     Q    You made -- you made a series of
24 observations which you've told me about.  What
25 happened after you made the observations?

Page 19

1      A    I stopped my vehicle adjacent to the
2  vehicle.
3      Q    And what do you mean by "adjacent"?
4      A    If you were sitting in the vehicle, it would
5  be slightly off to the left, in the driveway.
6      Q    Slightly off to the left?
7      A    Yes, at an angle.
8      Q    Would a person driving Mr. Watson's car be
9  able to get out of his parking spot were he to -- if
10 he were to want to?
11     A    Yes.
12     Q    Okay.  So you weren't blocking him in?
13     A    No.
14     Q    Okay.  And why did you park your car off to
15 the left of Mr. Watson's car?
16     A    Officer safety.  In case somebody engaged
17 me, I would have cover.
18     Q    Okay.  So -- so you parked your car there
19 for protection?
20     A    Yes.
21     Q    Did you intend, at this point, to conduct
22 a -- a -- to engage Mr. Watson?
23     A    I didn't know the vehicle was occupied until
24 I actually exited my vehicle and walked up on the
25 vehicle and saw somebody moving around in it.

Page 20

1      Q    Okay.  So you didn't know the vehicle was
2  occupied; is that correct?
3      A    Until I walked up on the vehicle and
4  observed somebody moving around in it.
5      Q    But you noticed that the headlights were on?
6      A    Yes.
7      Q    And I can't remember, did you notice whether
8  or not the car was idling before you got out of your
9  car?
10     A    After I got out of the -- after I got upon
11 the car because I believe I rolled my window down.
12     Q    You -- okay.  So you didn't recognize that
13 the car was occupied.  And you pulled your car up to
14 the left -- slightly off to the left.  What do you do
15 next?
16     A    I exit my vehicle --
17     Q    Okay.
18     A    -- and I attempt to get the VIN information
19 off the vehicle.
20     Q    Okay.  So would you have entered anything
21 into a computer?
22     A    At that point?
23     Q    Yes.
24     A    There was nothing to enter.
25     Q    Okay.  You did not enter anything into --

ALARIS LITIGATION SERVICES
www.alaris.us                     Phone: 1.800.280.3376                     Fax: 314.644.1334

EDDIE C. BOYD III  11/29/2018

## Page 25

1    Q    And why did you exit your vehicle?
2    A    To get the VIN.
3    Q    Okay.  And you wanted to know the VIN number
4  because you wanted -- because the vehicle didn't have
5  a license plate as you said; correct?
6    A    It did not have a front plate.
7    Q    It did not have a front plate.  Thank you.
8  And why did you want to know whether it had a -- why
9  did you want to know what -- what the license was for
10  the car?
11    A    Because the vehicle had heavily tinted
12  windows.
13    Q    And what's the significance of that?
14    A    It's vision-reducing material applied to the
15  front windshield, and it had it applied to the
16  windows, which is a violation of the state statute and
17  Ferguson ordinance.
18    Q    Okay.  And did you realize that before you
19  parked your car where you did?
20    A    Yes.
21    Q    You did.  And what was that you saw before
22  you parked your car?
23    A    A vehicle backed into a parking space along
24  the tree line with no front plate and heavily tinted
25  windows.

## Page 26

1    Q    Okay.  And I just want to be clear.  So what
2  were the -- you've mentioned so far the tinted
3  windshield and windows as the reason why you decided
4  to park your car.  Would you describe for me what the
5  significance of the other details that you've repeated
6  a couple times are?
7    MR. NORWOOD:  Objection --
8    MS. ARRINDELL:  Objection.  I believe it
9  states facts not in evidence.  I don't think he
10  testified to the windows.  He testified to the
11  windshield.
12    Q    (By Mr. Waldron) Okay.  Subject to that.
13    A    I don't -- repeat the question.
14    Q    Okay.  You repeated a couple times there's a
15  car backed in, no front license plate, headlights on.
16  Did those factors -- did -- did those things factor
17  into your decision to park your car where you did?
18    A    The vehicle backed in along the tree line,
19  with the window tint, heavily -- heavily tinted and no
20  front plate.  Those were the contributing factors.
21    Q    Okay.
22    A    Some of them, yes.
23    Q    Okay.  What -- what were other ones?
24    A    It was parked adjacent to a playground, the
25  headlights were on, the vehicle was idling.

## Page 27

1    Q    But you didn't know that yet.  You didn't
2  know that the vehicle was idling before you pulled up;
3  right?
4    A    Before --
5    MS. ARRINDELL:  I'm going to object.  Asked
6  and answered.
7    But continue.
8    A    Yeah.  Before I pulled up, no.
9    Q    (By Mr. Waldron) Okay.  So the factors that
10  you listed are that the vehicle is backed in; correct?
11    A    Yes.
12    Q    That there was no front plate; correct?
13    A    Yes.
14    Q    There were headlights -- the headlights were
15  on; correct?
16    A    Yes.
17    Q    And that there was heavily tinted windshield
18  and windows?
19    A    Yes.
20    Q    Okay.  Any other factors?
21    A    Adjacent to a playground.
22    Q    Adjacent to a playground.  And so you
23  described for me already what the significance of a
24  heavily tinted windshield and windows could be.
25    Would you describe the significance of a car

## Page 28

1  that's backed in?
2    A    A few instances, people back in when they're
3  planning on doing something illegal.  It makes it
4  easier to get away.
5    Q    Okay.  Have you -- you've seen that in your
6  experience as an officer?
7    A    Yes.
8    Q    So a car that's backed in is, to you, more
9  suspicious?
10    A    Not more suspicious.  It's more than just
11  being backed in.
12    Q    Okay.  But it's a factor.  It's more
13  suspicious than a car that's not backed in; is that
14  correct?
15    A    I wouldn't say that.  No.
16    Q    All right.  Because you listed -- I -- I
17  believe we talked about the factors of why you decided
18  to pull your car up in front of Mr. Watson's car.  And
19  one of the things you listed was that it was backed
20  in.  I'm just trying to determine whether or not the
21  fact that it was backed in contributed to why you
22  pulled up.  Did it?
23    A    That was one of the minor factors.
24    Q    Okay.  So it was a minor factor?
25    A    Yes.

7 (Pages 25 to 28)

### EDDIE C. BOYD III  11/29/2018

---

Page 33

1      MS. ARRINDELL: Excuse me.
2   A   With their headlights on?
3   Q   (By Mr. Waldron) Yes.
4   A   It could mean multiple things.
5   Q   And I'm asking you to explain what it might
6   mean.  Give me one or two.
7   A   Maybe somebody is starting the car to heat
8   it up, cool it down.
9   Q   Okay.  So that wouldn't cause any suspicion;
10  right?
11  A   Having an unattended motor vehicle running?
12  Q   If -- if the car was unattended.
13  A   I mean, it just depends because people start
14  their cars and run them for several reasons.
15  Q   Right, right, right.  Can you give me an
16  example of a time when the headlights running would
17  cause suspicion for you -- the headlights being on
18  would cause suspicion?
19  A   Suspicion?
20  Q   Yes.
21  A   I mean, it wouldn't necessarily cause
22  suspicion.  It just depends on the other circumstances
23  surrounding, you know, that individual case.
24  Q   So the headlights on their own would not
25  contribute to suspicion.  The other factors might.  Is

---

Page 34

1   that fair to say?
2      MR. NORWOOD:  Let me object to that.  I
3   think that mischaracterizes what he testified to.
4   A   Rephrase the question.
5   Q   (By Mr. Waldron) The headlights on their own
6   would not contribute -- is it fair to say that the
7   headlights on their own wouldn't contribute to any
8   suspicion, but external other factors would?
9      MR. NORWOOD:  Same objection.
10     MS. ARRINDELL:  I join in the objection.
11     MR. WALDRON:  Okay.  So just going forward
12  so that we're clear, I think one objection -- I'm okay
13  with either of you objecting.  I think -- I don't
14  think that it's necessary for us to do both just in
15  terms of fluidity.  If that's all right?
16     MR. NORWOOD:  Well, I represent the City.  I
17  don't represent Mr. Boyd.  And so I'm going to object
18  when I think it's proper on behalf of the City.  And I
19  don't control Ms. Arrindell and her client and how she
20  objects.
21     MR. WALDRON:  Okay.
22  Q   (By Mr. Waldron) So, Mr. Boyd, what I'm
23  trying to determine is this.  Are there any
24  circumstances in which your suspicion is raised when
25  you approach a car or when you see a vehicle just

---

Page 35

1   because the headlights are on?
2   A   I don't understand the question.  Could you
3   rephrase it?
4   Q   When you're patrolling, you make
5   determinations when to stop and get out and
6   investigate something.  Is that true?
7   A   I do.
8   Q   Okay.  And what I'm trying to determine is
9   would a vehicle's headlights being on, would it be a
10  factor that would cause you to stop and get out and
11  make an investigation?
12  A   Just for the headlights being on?
13  Q   Yes.
14  A   No, not necessarily.
15  Q   Okay.  And explain to me what the -- what
16  the significance was of the fact that the vehicle was
17  adjacent to the playground.
18  A   There were children playing and people in
19  the park that day.
20  Q   Okay.  And what's the -- help me understand
21  what that -- what the significance is of the fact that
22  there was a car near children or where children are
23  playing.
24  A   Well, I mean, if someone's sitting, backed
25  in, with heavy tinted windows, you would want to find

---

Page 36

1   out if they're watching the kids or, you know, if
2   there's any other criminal activity afoot besides the
3   ordinance violations.
4   Q   Okay.  And so the proximity to the
5   children -- the fact that the car was close to the
6   children was important because you were concerned for
7   the children's sake?
8   A   I didn't say that.
9   Q   Okay.  I'm just trying to understand how
10  did -- how did the kids being -- how did the presence
11  of the kids -- why was that one of the factors that
12  you've listed?
13  A   That's just something that comes up when you
14  think about a car backed into a parking space with
15  heavily tinted windows.
16  Q   And -- and what's the relationship -- you've
17  mentioned a couple times the heavily tinted windows.
18  What's the relationship between the children being
19  there and the heavily tinted windows?
20  A   Heavily tinted windows is an ordinance
21  violation.
22  Q   Okay.  And what's the connection between
23  that and -- and the children being there?
24  A   I didn't know.  I wanted to find out if
25  there was a connection there.

---

9 (Pages 33 to 36)

EDDIE C. BOYD III  11/29/2018

## Page 37

1  Q   Okay.  Okay.  So I know we've sort of been
2  slowing down, but I'm going to ask that we sort of
3  continue in the narrative.
4       I believe you've gotten out of your car, you
5  testified, and that you began to look for the vehicle
6  identification number; is that correct?
7  A   To look at it, yes.
8  Q   Okay.  And what happened next?
9  A   I saw somebody moving around in the vehicle.
10 Q   Okay.  And how did you see that?
11 A   I was like up against the window.
12 Q   You were?
13 A   No.  Well, yeah, because I was trying to get
14 the VIN.
15 Q   Okay.  So you were up against the windshield
16 or against the window?
17 A   The windshield.
18 Q   And how far away were you from the
19 windshield?
20 A   Less than a foot.
21 Q   Less than a foot.  And the windshield was
22 heavily tinted; is that right?
23 A   Yes.
24 Q   Okay.  And was the -- were any of the car
25 windows open?

## Page 38

1  A   I don't believe so.
2  Q   Do you remember?
3  A   No.  I don't recall exactly if they -- they
4  weren't open, no.
5  Q   None of the windows were open?
6  A   Not the front two.
7  Q   Were the back two?
8  A   No, I don't think so.
9  Q   Okay.  So the front two windows aren't open,
10 the back two windows aren't open?
11 A   No, I don't believe so.
12 Q   Okay.  They're all the way up?
13 A   Yes.
14 Q   Okay.  And I believe in the narrative, we're
15 at the point where you said you stuck your foot
16 about -- you stuck your head -- excuse me -- about one
17 foot away from the vehicle identification number.
18 What happened next?
19 A   I'd have to refer to my report, but I
20 believe that's when contact was made with Mr. Watson.
21 Q   Okay.  That's when contact was made.  And in
22 what way was contact made?
23 A   We began talking.
24 Q   And how did that -- how did you come to
25 recognize that Mr. Watson was there?

## Page 39

1  A   The window was lowered part of the way.
2  Q   Okay.  And did you request the window be
3  lowered or was the window just lowered?
4  A   I don't recall.
5  Q   Okay.  So you don't know whether you said,
6  "roll your window down," or whether the person in the
7  car just rolled their window down?
8  A   I don't recall.
9  Q   Okay.  And after the window was lowered, you
10 made contact with Mr. Watson, you testified.  What
11 happened?
12 A   I advised him of the violations and
13 observations.
14 Q   Okay.
15 A   And requested a driver's license and proof
16 of insurance.
17 Q   Okay.  So you advised him of violations and
18 what was the other word?
19 A   Requested driver's license and proof of
20 insurance.
21 Q   No, I apologize.  I believe you said you
22 advised him of violations and --
23 A   Observations.
24 Q   -- observations.  Okay.  So let's go into
25 that.  What did you advise him of?

## Page 40

1  A   It would have been the ordinance violations.
2  Q   Which -- so you're saying several
3  violations?
4  A   The ordinance violations.
5  Q   Okay.  So what violation -- and -- and what
6  violations did you advise him of?
7  A   The window tint and I believe no front
8  plate.
9  Q   Okay.  And do you remember what you said?
10 A   I do not.
11 Q   Okay.  But from your -- I'm trying to
12 determine here, is this what you recall or is this
13 what you recall after reviewing documents in the case
14 of preparing for this deposition?
15 A   Reviewing the documents.
16 Q   Okay.  So do you have any recollection -- if
17 I were to have asked you, for example, a month ago,
18 would you have remembered what the answer to what --
19 what your conversation was like when you approached
20 Mr. Watson?
21 A   I don't -- I don't know if I would remember
22 that a month ago.
23 Q   Okay.  So when you're testifying here,
24 you're testifying based on what you've read in your
25 report; is that correct?

10 (Pages 37 to 40)

EDDIE C. BOYD III  11/29/2018

Page 41

1      A   Yes.
2      Q   Okay.  So you advised him of the violations
3  and you don't remember what you said exactly?
4      A   No.
5      Q   But the violations that you had noted at
6  this point were tinted windows and what else?
7      A   No front plate.
8      Q   No front plate.  And what's that violation?
9      A   No front plate?
10      Q   Uh-huh.  What's that -- can you explain that
11  ordinance to me?
12      A   No front plate.
13      Q   There's an ordinance in the City called "no
14  front plate"?
15      A   One plate when two are required.
16      Q   One plate when two are required.  That's the
17  name of the city ordinance?
18      A   I'm not -- I don't recall the exact language
19  of the ordinance.
20      Q   But the gist of it is that if there's one --
21  if there's -- if two are required and somebody only
22  has one plate, then you're breaking the ordinance; is
23  that correct?
24      A   Yes.
25      Q   Okay.  And are two front plates always -- or

Page 42

1  excuse me -- are two license plates always required?
2      A   In the State of Missouri.
3      Q   Okay.  All vehicles?
4      A   For Missouri residents.
5      Q   Okay.  What about other residents?
6      A   Of Missouri?
7      Q   No.  Residents of Illinois, residents of
8  Indiana, residents of Nebraska.  Are they required to
9  have two -- two license plates?
10      A   I don't read up on Illinois, Indiana law.
11      Q   Would you be within your right -- let's say
12  I'm driving a car with Indiana license plates and I
13  don't have a front license plate and I only have a
14  back license plate, could you write me a ticket for no
15  front plate?
16      A   If I saw and observed an Indiana plate?  No,
17  I would not stop it for no front plate.
18      Q   Okay.  Would you -- could you write me a
19  ticket for no front plate?
20      A   If I saw and observed an Indiana plate, no,
21  I would not write a ticket for no front plate.
22      Q   Okay.  All right.  So you advised Mr. Watson
23  of violations, and the violations that you've told me
24  about so far was that he had a -- you observed a tint
25  violation and you observed that there was no front

Page 43

1  plate; is that correct?
2      A   Yes.
3      Q   Were there any other violations that you
4  notified him of?
5      A   I believe the seat belt violation.
6      Q   Okay.  So at this time, you would have
7  notified him of a seat belt violation?
8      A   Once he rolled down the window, yes.
9      Q   Once he rolled down the window.  Okay.  Any
10  other ordinance violations that you advised him of at
11  this point?
12      A   I would have to refer to my report.
13      Q   You'd have to refer to your report.  But
14  none that you remember?
15      MS. ARRINDELL:  Objection.  Mischaracterizes
16  testimony.
17      A   Rephrase the question.
18      Q   (By Mr. Waldron) So far you've listed tinted
19  windows, no front plate, and seat belt violations.
20  And these are all things that you listed as violations
21  that you informed Mr. Watson of when you -- when he
22  rolled his car window down; correct?
23      A   Yes, when I observed them.
24      Q   Great.  And I'm trying to find out were
25  there any other violations that you notified him of.

Page 44

1      A   If he didn't produce his license and proof
2  of insurance, those would be two additional
3  violations.
4      Q   Was that a violation that you notified him
5  of?
6      A   When I asked him for his license and proof
7  of insurance, he didn't produce it; so yes.
8      Q   Okay.  So I'm saying this initial
9  conversation.  I think that you're moving a little bit
10  farther into the conversation, but correct me if I'm
11  wrong.  At this initial point, you said the first
12  thing you do when you -- when you interacted with him,
13  the first thing you did was you advised him of
14  violations and observations.  You advised him of three
15  violations; correct?
16      A   It would have been a total of five with the
17  license and proof of insurance because I would have
18  asked for the license and proof of insurance after I
19  advised him of the violations.
20      Q   Okay.  But at the initial -- the initial
21  conversation, you hadn't got to the point where you
22  asked him for license or insurance yet; right?
23      A   After I advised him of the violations, I
24  would have asked him for his license and proof of
25  insurance.

11 (Pages 41 to 44)

EDDIE C. BOYD III  11/29/2018

## Page 45

1    Q   Okay.  Did anything happen -- what was his
2  response when you advised him of these three
3  violations?
4    A   I don't recall.
5    Q   You don't remember?
6    A   He was argumentative and combative, but I
7  don't recall what he was saying.
8    Q   Describe for me, what is "argumentative" and
9  "combative"?  What does that look like?
10    A   He didn't want to cooperate.  He was loud.
11    Q   So his voice was raised?
12    A   Yes.
13    Q   Okay.  What do you mean by "combative"?
14    A   Would not do any of the commands that I gave
15  him as far as --
16    Q   Okay.  So at -- at this point, so far my
17  understanding is that you've only advised him of
18  violations; right?  So you haven't told him to do
19  anything yet, at the point we're just at the initial
20  conversation.  Do you understand where I am -- where
21  we are?
22    A   Yeah.  When I do the initial, I advise of
23  the observations or the violations and I ask for
24  license and proof of insurance.
25    Q   Okay.  Right.  And so when you advised him

## Page 46

1  of the violations, was he combative?
2    A   He was argumentative.
3    Q   He was argumentative.  And what did he
4  argue?
5    A   I believe he said, "I didn't do anything."
6    Q   He said, "I didn't do anything"?  Did he say
7  anything else?
8    A   I don't recall at this time.
9    Q   Nothing else that you remember.  Is that
10  fair to say?
11    A   At this time.
12    Q   At this time.  And -- and -- and we're at
13  the early stage of the conversation; right?  You also
14  said you observed -- you advised him of observations
15  that you had made.  So you said you advised him of
16  violations and observations.  So the violations we got
17  to, we listed three of them.
18        What were the observations that you advised
19  him of?
20    A   Well, that he was backed into a parking
21  space, probably, with his headlights on, the engine
22  idling, heavy tinted windows.
23    Q   So you told him all of those things?
24    A   I don't recall, but those would have been
25  the observations that I advised him of.

## Page 47

1    Q   Okay.  And you -- you would -- would you
2  have explained what that -- what the significance was?
3  For example, I didn't understand some of those.  Did
4  you explain why that was relevant?
5    A   I don't recall.
6    Q   Okay.  So you advised him of violations and
7  observations.  And then you said that he said, "I
8  didn't do anything"; correct?
9    A   Yes.
10    Q   Okay.  What happened next?
11    A   I'm pretty sure when he didn't have the
12  license and proof of insurance --
13    Q   So we haven't got to that yet.  Was -- was
14  there a step -- so what I understand is that you
15  advised him of some violations.  He says, "I didn't do
16  anything."  At what point did you ask for his
17  identification?  Before he said "I didn't do anything"
18  or after?
19    A   You inserted the I don't -- he didn't do
20  anything in between the license.  I walked up --
21    Q   I -- I apologize.  I'm just trying to get
22  the sequence right.
23    A   Yeah.  Yeah.  I believe you created your own
24  sequence.  Because I walked up to the vehicle, was
25  trying to get the VIN, he lowered the window.  And

## Page 48

1  then at that point, I advised him of the violations
2  and observations and then asked for his license and
3  proof of insurance.
4    Q   Okay.  Thank you.  So I --
5    A   I don't know where it -- when he said, "I
6  didn't do anything."  It was either talking over me or
7  after I asked him for that.  But that's -- that's when
8  it came out.  I don't recall exactly at what point he
9  said, "I didn't do anything," but it was during the
10  initial confrontation.
11    Q   So the "I didn't do anything" was either as
12  you asked for his identification and for his insurance
13  or it was after?
14    A   It was at some point during the first part
15  of the contact.
16    Q   Okay.  And why did you ask for
17  identification and for insurance?
18    A   For the ordinance violation for the window
19  tint.
20    Q   Okay.  And why insurance?
21    A   Because you're supposed to maintain
22  insurance on vehicles in the State of Missouri.
23    Q   I understand that, but you said that you
24  asked for his ID and his insurance for the ordinance
25  violation.  So how does the insurance relate to the

12 (Pages 45 to 48)

EDDIE C. BOYD III  11/29/2018

## Page 53

1  What happened next?
2     A   After?
3     Q   After he said that he didn't have his
4  license and insurance on him.
5     A   I don't recall.  I'd have to refer to the
6  report.
7     Q   Okay.  And you said somewhere along here,
8  you also noticed a seat belt violation; right?
9     A   Yes.
10    Q   And describe for me, what is that violation?
11    A   He didn't have his seat belt applied while
12  he was operating the vehicle.
13    Q   Okay.  And how were you able to determine
14  that?
15    A   When he lowered the window.
16    Q   When he lowered the window.  You were able
17  to see into his car and see that his seat belt was not
18  on?
19    A   Yes.
20    Q   Okay.  What time of day was this?
21    A   2000 hours.  So about 8:00 o'clock.
22    Q   8:00 o'clock.  And it was August?
23    A   Yes.
24    Q   Was it bright out?
25    A   I don't recall.

## Page 54

1     Q   Okay.  Kids were playing, though; right?
2     A   I believe so, yes.
3     Q   I mean, you testified that children were
4  playing on the -- on the jungle gym; right?
5     A   There were people in the park -- throughout
6  the park, yes.
7     Q   People were in the park.  Were there kids on
8  the playground?
9     A   I believe so.
10    Q   I -- I think you testified that that was the
11  case; right?  Do you remember there being children on
12  the playground?
13    A   I believe so.  Yes, there were kids.
14    Q   So you do remember that?
15    A   I believe so, yes.
16    Q   Okay.  So you said that after you asked
17  Mr. Watson for his identification, for his insurance,
18  he said that he didn't have his license on him, you
19  said -- and then he didn't have his insurance
20  available, you don't recall what happened next.
21  What's the next thing that you do recall?
22    A   Calling for an assist unit.
23    Q   Okay.  Can you approximate how many minutes
24  into the interaction was that?
25    A   I don't recall.

## Page 55

1     Q   Would you give me -- would you be able to
2  give me an approximation?  Was it one minute?  Was it
3  25 minutes?
4        MR. NORWOOD:  Objection.  Calls for
5  speculation.
6     A   I don't recall.
7     Q   (By Mr. Waldron)  You have no memory?
8     A   Yes, I do have a memory.
9     Q   Okay.  So do you have -- you have no way of
10  approximating, though, how many minutes it was into
11  the interaction that you called for an assist?
12       MS. ARRINDELL:  Objection.  Calls for
13  speculation and asked and answered.
14    A   I don't recall.
15    Q   (By Mr. Waldron)  Okay.  And do you remember
16  why you called for an assist?
17    A   He was argumentative and combative.
18    Q   And the argumentative, you testified that
19  his voice was loud; is that correct?
20    A   Was not following commands.
21    Q   Okay.  And so we haven't got to the commands
22  yet.  We'll come back to that.  You said he was
23  combative.  What was he doing that was combative?
24    A   Not cooperating.  Resisting.  I believe I
25  asked him to step out of the vehicle before the assist

## Page 56

1  arrived and I was trying to place him under arrest and
2  he refused.
3     Q   You said he was resisting?
4     A   Yes.  After I asked him -- advised him he
5  was under arrest, to step out of the vehicle.
6     Q   So before you called for assist, you
7  notified him that he was under arrest?
8     A   Yes.
9     Q   Okay.  And -- and why was he under arrest?
10    A   He didn't have his license, his insurance.
11  At that time, I believe I had went to the vehicle and
12  found out the name he gave was not a good name.  It
13  was the wrong name.
14    Q   Okay.  So -- and all of this that you're
15  talking about right now, this is all before you called
16  for assist?
17    A   Yes.
18    Q   Okay.  So I want to get into the stuff
19  before the assist then.  Okay?  So what do you
20  remember about before you called for an assist that we
21  haven't talked about?
22    A   As far as what?
23    Q   Well, you just mentioned a few things.  I
24  think you mentioned that you ran his name or something
25  along those lines.  Can you refresh -- tell me what

14 (Pages 53 to 56)

EDDIE C. BOYD III  11/29/2018

## Page 57

1  you remember from that.
2      A    That the name he gave didn't come back to
3  anything.  It did -- nothing popped up.  There was no
4  record of that person.
5      Q    Okay.  And so at what point did you ask him
6  for his name?
7      A    When he didn't have his license.
8      Q    Okay.  So -- okay.  So this is helpful.  He
9  didn't have his license.  He didn't have his
10  identification.  At some point in there, you asked him
11  for his name; is that correct?
12      A    His pedigree information.
13      Q    His pedigree information.  Would that have
14  been the way you phrased the question?
15      A    To him?
16      Q    Yes.
17      A    No.
18      Q    No.  How would you have phrased the
19  question?
20      A    "I need your name."
21      Q    "I need your name."  Okay.  Would you have
22  asked him for -- did you ask him for anything else?
23      A    Yes.
24      Q    What else?
25      A    I don't recall.

## Page 58

1      Q    How do you know that you asked him for
2  something else?
3      A    I wouldn't have stopped at the name, I don't
4  believe.
5      Q    Okay.  What else would you have asked?
6      A    Anything to identify him; so . . .
7      Q    Anything in particular?
8      A    Date of birth.
9      Q    Okay.
10      A    Height, weight, address.
11      Q    Do you remember whether you asked him any of
12  these things?
13      A    I do not recall.  I would have to refer to
14  my report.
15      Q    Okay.  Did you ask him for his social
16  security number?
17      A    At that point?  No, I don't believe so.
18      Q    You've said that the date of birth, the
19  height and the weight, you said that those are things
20  you would have asked.  Generally, in situations like
21  this, would the social security number be something
22  that you would have asked about?
23      A    Driver's license and social security will
24  come if I can't obtain who they are through the
25  initial search.

## Page 59

1      Q    Driver's license would -- so driver's
2  license would come --
3      A    Driver's license number.
4      Q    Driver's license number.  Thank you.  So you
5  wouldn't ask for social security number until -- until
6  after you can't find the person; is that right?
7      A    Depends on the situation.  Each thing is
8  done on an individual basis.
9      Q    Okay.  But, in general, is that fair to say?
10      A    Each situation is based off the individual
11  situation.
12      Q    So you may have asked him for the social
13  security number.  You don't remember since each time
14  is different.  Is that fair to say?
15          MS. ARRINDELL:  Objection.  Mischaracterizes
16  his testimony.
17      A    Can you rephrase the question?
18      Q    (By Mr. Waldron) Yeah.  I'm just trying
19  to -- you said you -- you said you don't remember what
20  exactly you asked him.  You said that each situation
21  is different.  So it's possible that you asked him for
22  his social security number early on?
23      A    Early on?
24      Q    Yeah.
25      A    I don't recall.

## Page 60

1      Q    Okay.  But is it possible?
2          MS. ARRINDELL:  Objection.  Calls for
3  speculation.
4          MR. NORWOOD:  And let me object as vague in
5  terms of "early on."
6      Q    (By Mr. Waldron) Go ahead.
7      A    Can you rephrase the question?
8      Q    Is it possible that you asked Mr. Watson for
9  his social security number during your stop?
10      A    During the course of the stop?
11      Q    Yes.
12      A    That is possible.
13      Q    Okay.  And let's go to -- you asked him for
14  a name.  You asked him to give a name, you said.  What
15  name did he give?
16      A    He gave Fred Watson.
17      Q    He gave Fred Watson.  And that was in
18  response to your question, "I need your name"; is that
19  correct?
20      A    His pedigree information, yes.
21      Q    No, I -- I'm just asking what question you
22  asked.  I believe you testified that you said "I need
23  your name"; is that correct?
24      A    Yes.
25      Q    Okay.  So he said "Fred Watson."  What

15 (Pages 57 to 60)

EDDIE C. BOYD III  11/29/2018

Page 61

1    happened after that?
2        A   I collected the information that he gave me
3    and processed it.
4        Q   When you say "collected," would you have
5    written it down?
6        A   Yes.
7        Q   In what?
8        A   Paper.
9        Q   Okay.  What kind of paper?
10       A   Paper.
11       Q   I mean -- I mean, for example, I've got --
12   I've got a legal pad here; right?  They also have, you
13   know, those sort of detective spiral pads that are
14   smaller.  What -- what were you writing on at this
15   time?
16       A   A piece of paper.
17       Q   Just a piece of paper?
18       A   Yes.
19       Q   Okay.  Was it common in your practice to
20   have paper that -- that you used?
21       A   Yeah, we wrote on paper -- we write on paper
22   all the time.
23       Q   Okay.  Is it a certain type of paper?
24       A   Yes.  Notebook paper.
25       Q   Notebook paper.  Would it have been a part

Page 62

1    of a notebook or a piece of paper independently?
2        A   It was in a notebook.
3        Q   Okay.  So you had a -- you had a notebook
4    and -- and that's where you wrote the name that
5    Mr. Watson gave you; is that correct?
6        A   Yes.
7        Q   Okay.  Do you keep those notebooks?
8        A   No.
9        Q   What do you generally do with them once
10   you're finished?
11       A   I lose track of them.
12       Q   You lose track of them.  Okay.  Is the --
13   the keeping -- is the practice of keeping the
14   notebook, is that a -- is that a policy or is that
15   just something that you do within the Ferguson Police
16   Department?
17       MS. ARRINDELL:  Objection.  Mischaracterizes
18   the witness' testimony.
19       A   Yeah, I can't tell you what they tell you to
20   do on notebooks.  I haven't seen a policy on that one.
21       Q   (By Mr. Waldron) Yeah.  So you haven't seen
22   a policy.  So it's just something that you do
23   independently as an officer.  Is that fair to say?
24       MS. ARRINDELL:  Objection.  Mischaracterizes
25   the witness' testimony.

Page 63

1        A   You have to rephrase the question.
2        Q   (By Mr. Waldron) Okay.  This -- the practice
3    of using a notebook is not something that's a Ferguson
4    policy; correct?
5        A   A practice.  Are you -- you have --
6        Q   Carrying -- carrying a notebook and -- like
7    you did on that day.  It's not a Ferguson policy;
8    right?
9        A   To have a notebook?
10       Q   To carry a notebook when you're carrying out
11   your duties.
12       A   You need a notebook when you're carrying out
13   your duties.
14       Q   Okay.  So most -- do most Ferguson officers
15   do that?
16       A   I can't attest to what most officers do.
17       Q   Well, you've been an officer there for eight
18   years; right?
19       A   Yes.
20       Q   You've interacted with probably dozens of
21   officers; right?
22       A   Yes.
23       Q   Are you able to tell me, based on the
24   interactions with double -- dozens of officers,
25   whether or not -- do half of them carry a notebook?

Page 64

1        MR. NORWOOD:  Objection.  Asked and
2    answered.  Calls for speculation.
3        A   I can't tell you.  I can't tell you what
4    other officers do.
5        Q   (By Mr. Waldron) You don't know?
6        A   I cannot tell you what other officers do.
7        Q   And why can't you tell me what other
8    officers do?  You don't know or you're unable to tell
9    me?
10       A   Because you'd have to ask the other officers
11   what they do.
12       Q   You've never observed something like that?
13       A   I don't recall observing officers doing
14   anything in particular as far as a notebook.
15       Q   Okay.  So you write Mr. Watson's name down
16   in your notebook.  And what happens after that?
17       MR. NORWOOD:  Let me object.
18   Mischaracterizes his testimony.
19       Q   (By Mr. Waldron) You write -- is it fair to
20   say you wrote "Fred Watson" in your notebook?
21       A   On a sheet of paper.
22       Q   On the sheet of paper that was in your
23   notebook.  Okay.  You wrote down "Fred Watson" on a
24   sheet of paper; correct?
25       A   Some paper, yes.

16 (Pages 61 to 64)

EDDIE C. BOYD III  11/29/2018

Page 65

1      Q   Some paper.  What happens then?
2      A   Processed the information and found out that
3   it was not matching anything in the system.
4      Q   Okay.  And when you say, "processed the
5   information," what does that mean?
6      A   Ran it through the REJIS system.
7      Q   Okay.  And how would you have accessed the
8   REJIS system?
9      A   In the computer in the car or over the radio
10  through dispatch.
11     Q   Okay.  So in the computer -- and do you
12  remember in the case of Mr. Watson whether you did it
13  over radio dispatch or through the -- through the car
14  computer?
15     A   I don't recall --
16     Q   Okay.
17     A   -- at this time.
18     Q   At this time.  And what did you determine
19  once you ran it through the REJIS system?
20         MR. NORWOOD:  Objection.  Asked and
21  answered.
22     A   That Mr. Watson was not giving correct
23  information to who he actually was.
24     Q   (By Mr. Waldron) What happened next?
25     A   I'd have to refer to my report.

Page 66

1      Q   You don't remember?
2      A   I'd have to refer to my report.
3      Q   To the best of your memory, what happened
4   next?
5      A   I believe I approached Mr. Watson again.
6      Q   Okay.  And what happened?  You approached
7   him again after you determined through the REJIS
8   system that the name didn't show up.  And what
9   happened?
10     A   Ultimately, Mr. Watson was arrested after
11  the assist unit arrived.
12     Q   Did anything happen between when you
13  approached him again and when the assist unit arrived?
14     A   I'd have to refer to my report.
15     Q   Nothing that you remember?
16     A   I'd have to refer to my report.
17     Q   I'm just -- I'm just -- I understand that --
18  I'm just trying to determine that there's nothing that
19  you can recall.  Is that fair to say?
20         MS. ARRINDELL:  Objection.  Asked and
21  answered.
22         MR. WALDRON:  Respectfully, Geri Lynn, I --
23  I -- I'm just trying to -- if the answer is, no, he
24  doesn't remember, that's a perfectly acceptable
25  answer.  But "I'd have to refer to my report" doesn't

Page 67

1   answer my question, yes or no, either way.
2          MS. ARRINDELL:  Does "I don't recall" answer
3   the question sufficiently?
4          MR. WALDRON:  Absolutely.
5          MS. ARRINDELL:  Okay.  He's answered that
6   repeatedly.
7      Q   (By Mr. Waldron) Okay.  So you don't recall
8   anything between after you approached Mr. Watson,
9   after the REJIS search, and when the help comes, the
10  assist comes?
11     A   I'd have to refer to my report.  I don't
12  recall at this moment.
13     Q   Okay.  What's the next thing that you
14  remember?
15     A   Ultimately, Mr. Watson was arrested after my
16  assist unit arrived.
17     Q   And tell me about what you remember from
18  that.
19     A   Mr. Watson was arrested after the arrival of
20  my assist unit.
21     Q   How did that look?
22     A   He was placed in handcuffs.
23     Q   Who was in your assist unit?
24     A   I'd have to refer to my report.
25     Q   Nobody that you can recall today as you sit

Page 68

1   here?
2      A   I'd have to refer to my report.
3      Q   So you can't recall.  Is that fair to say?
4      A   I can't recall right now.  I'd have to refer
5   to my report.
6      Q   Okay.  So Mr. Watson was placed into
7   handcuffs.  Did you handcuff him?
8      A   I don't recall.  I'd have to refer to my
9   report.
10     Q   I don't recall.  Okay.  What was he placed
11  under arrest for?
12     A   It would have been for the vision-reducing
13  material and other non-traffic and traffic violations.
14     Q   What were they?
15     A   I'd have to refer to my report.  I don't
16  recall.
17     Q   Did you say "non-traffic and traffic-related
18  violations"?
19     A   Yes.
20     Q   Okay.  And -- and I believe at one point you
21  said that you recall ordering Mr. Watson to get out of
22  his vehicle.  Do you recall that?
23     A   Yes.
24     Q   Okay.  And do you recall whether that was
25  before or after you requested assist?

17 (Pages 65 to 68)

EDDIE C. BOYD III  11/29/2018

## Page 69

1    A   That was before I requested an assist unit.
2    Q   That was before you requested assist.  Okay.
3  And what did you say?
4    A   I don't recall exactly what I said.
5    Q   But you recall asking him to get out of his
6  vehicle?
7    A   He was under arrest and exit the vehicle.
8    Q   Okay.  And you advise -- did you advise
9  him -- did you tell him -- so did you tell him to get
10  out of his vehicle or did you tell him, "You're under
11  arrest.  Get out of your vehicle"?
12    A   It would have been, "You're under arrest.
13  Exit the vehicle."
14    Q   Did you tell him why he was under arrest?
15    A   It would have been for the violations.
16    Q   And what were the violations that you
17  observed at that time?
18    A   Window -- vision-reducing material and the
19  other violations listed in the report.
20    Q   The only one that you can recall at this
21  time was the tinted windows and windshield?
22    A   Seat belt.
23    Q   So -- so he was under arrest for --
24    A   No operator's license in possession, I
25  believe.  Proof -- financial responsibility, no

## Page 70

1  insurance.
2    Q   Okay.  So he was -- and -- and you recall
3  that this is why he was under arrest; because his
4  windows were tinted -- and I know you just said a
5  couple.  Would you -- would you tell me?  I was
6  writing.  I apologize.  His windows were tinted and
7  what else?
8    A   Financial responsibility, which is no proof
9  of insurance.
10    Q   Okay.
11    A   Seat belt.  And no public operator's license
12  in possession.  And then a few other charges listed in
13  the report.
14    Q   Okay.  And all of those were the reason why
15  you arrested him -- all the reasons in your report are
16  the reasons why you arrest -- arrested him before you
17  called your assist.  Is that fair to say?
18    A   That I placed him under arrest?
19    Q   Yes.
20    A   I'm not following the question.
21    Q   So you charged Mr. Watson in total that day
22  with nine charges; correct?
23    A   If that's what the report says, yes.
24    Q   Okay.  I -- I -- I'll represent to you that
25  that's what -- that's what happened.

## Page 71

1    Q   How many of those charges was he under
2  arrest for before you called your assist?
3    A   It would have been all of them.
4    Q   All of them?
5    A   Yes.
6    Q   All nine of them?
7    A   Yes.
8    Q   Okay.  Including failure to comply or
9  failure to obey?
10    A   Yes.
11    Q   He was under arrest for that?
12    A   If it was listed in the report, yes.
13    Q   And what had he done at that point?
14    A   He failed to comply with the order to exit
15  the vehicle when he was placed under arrest.
16    Q   Okay.  Anything else that he had failed to
17  comply with at that point?
18    A   I'd have to refer to my report -- my report.
19    Q   Nothing that you remember?
20    A   I'd have to refer to my report.  I don't
21  recall right now.
22    Q   Okay.  How about a false declaration?  Was
23  he under arrest at that point for a false declaration?
24    A   Before the assist unit arrived?
25    Q   Yes.

## Page 72

1    A   If it's listed in the report.
2    Q   Well, I'm asking to the best of your memory.
3    A   All charges listed in the report, he was
4  under arrest before the assist unit arrived.
5    Q   Okay.  But independent of the report, to
6  your memory, do you recall if he was arrested for
7  that?
8    A   All charges listed in the report, he would
9  have been under arrest for prior to the assist
10  arriving.
11    Q   I'm trying to get a sense of what you
12  remember now.  And if you don't recall, that's
13  perfectly okay.  But when you are only referring to
14  your report, it makes it difficult for me to know
15  whether you recall it at this time.  Do you understand
16  what I'm saying?
17    A   Oh, yes.  I thought that was rhetorical.  Go
18  ahead.
19    Q   No, no, no.  I -- I just -- I just want us
20  to sort of understand each other.  So false
21  declaration, do you recall, as you sit here, whether
22  or not he was under arrest for it when you told him to
23  get out of his car?
24    A   All charges listed in the report, he was
25  placed -- he was under arrest for prior to the assist

18 (Pages 69 to 72)

EDDIE C. BOYD III  11/29/2018

## Page 93

1    Q   Or after he was booked.
2    A   So after the vehicle was towed and after he
3  was booked?
4    Q   Anything after his vehicle was towed.
5    A   So you want me to answer if I remember
6  anything after he was booked or after the vehicle was
7  towed?
8    Q   After the vehicle was towed.
9    A   Okay.  So don't answer the other question
10  about after he was booked?
11    Q   Well --
12    MS. ARRINDELL:  Anything that you recall
13  from either of those two instances that where he's --
14  what he's trying to ascertain.  I don't know that --
15    A   I don't understand the question.
16    Q   (By Mr. Waldron) You testified that you
17  recall his vehicle being towed; correct?
18    A   The vehicle was towed, yes.
19    Q   And you testified that you recall that that
20  happened; correct?
21    A   Testified that the vehicle was towed?
22    Q   No, I'm asking if you testified that you
23  recall it, that you remember it happening.
24    A   I testified that the vehicle was towed.
25    Q   Right.  What else do you remember from that

## Page 94

1  night?
2    A   That he was booked.
3    Q   Okay.  And what do you remember about that?
4    A   That he was processed in the Ferguson jail.
5    Q   Okay.  And -- and describe for me what --
6  what about that do you remember?  Do you remember
7  driving Mr. Watson there?
8    A   I'd have to refer to my report.  I don't
9  recall.
10    Q   Do you recall seeing Mr. Watson in the jail?
11    A   I'd have to refer to my report.  I don't
12  recall.
13    Q   Do you recall having any conversations with
14  Mr. Watson either in your vehicle or in another
15  Ferguson police vehicle?
16    A   I'd have to refer to my report.  I don't
17  recall.
18    Q   Okay.  Do you recall any other interaction
19  with Mr. Watson after he was arrested?
20    A   What timeframe are you talking about?
21    Q   Anything after he was arrested on
22  August 1st.  Any interaction between you and him, do
23  you recall it?
24    A   Interaction.  You mean just me seeing him?
25  Him seeing me?  You talking about a conversation?

## Page 95

1    Q   Thank you.  A conversation.
2    A   No, I don't recall.
3    Q   Okay.  Mr. Boyd, do you recall pulling a gun
4  out on Mr. Watson?
5    A   No.
6    Q   Okay.  Is it something you would remember?
7    A   Yes.
8    Q   Yes.  Okay.  So -- okay.  How many times did
9  you ask Mr. Watson to get out of the car?
10    A   I'd have to refer to my report.  I don't
11  recall.
12    Q   Okay.  Do you recall Mr. Watson at all using
13  a telephone?
14    A   I'd have to refer to my report.  I don't
15  recall.
16    Q   Okay.  Did Mr. Watson ever ask for your
17  name?
18    A   I'd have to refer to my report.  I don't
19  recall.
20    Q   Okay.  Did you ever look at the back of
21  Mr. Watson's car to see if -- if he had any license
22  plates in the back?
23    A   During the course of the time that I was in
24  Mr. Watson's presence?  When are you referring to?
25    Q   At any point on August 1st.

## Page 96

1    A   I do not recall.  I would have to refer to
2  my report.
3    Q   So you don't recall looking to see whether
4  he had a license plate in the back?
5    A   I do not recall.  I'd have to refer to my
6  report.
7    Q   Okay.  Do you recall ever asking Mr. Watson
8  to take the keys out of his car?
9    A   I don't recall.  I'd have to refer to my
10  report.
11    Q   If you would point a gun at somebody, would
12  that be something that you would have to report within
13  the -- as a policy of the Ferguson Police Department?
14    MS. ARRINDELL:  Objection.  What timeframe
15  are we talking?
16    MR. WALDRON:  In general.
17    MS. ARRINDELL:  Objection.  Overbroad.
18    A   Yeah.  I wouldn't just point guns at people.
19    Q   (By Mr. Waldron) I'm sorry?
20    A   I wouldn't just point guns at people.
21    Q   No, I understand that.  What I'm saying is
22  that -- I'm asking you if -- if a -- an officer
23  of the Ferguson Police Department points a gun at
24  somebody, is there any procedure that would take place
25  that the officer would have to tell a supervisor or

24 (Pages 93 to 96)

EDDIE C. BOYD III  11/29/2018

## Page 109

1   A   It doesn't have a DSN number.
2   Q   Okay.
3   A   Or a call sign.
4   Q   And what's the following entry?
5   A   After "Notes added.  Notes added.  Field 5"?
6   Q   Yes.
7   A   At 20:18, 16 seconds?
8   Q   Yes.
9   A   "Frank 34 486.  Arrived.  Arrived on scene."
10  Q   And what do you understand that to mean?
11  A   Frank 34, arrived.
12  Q   Okay.  And do you know who 486 is?
13  A   I don't recall off the top of my head.
14  Q   Do you know who 296 is?
15  A   I don't recall off the top of my head.
16  Q   Do you agree that this makes it appear as
17  though by 20:18:16, three officers are on the scene?
18  A   I'm not understanding the question.
19  Q   We've seen 590 arrived on scene; right?
20  A   Yes.
21  Q   We've seen 296 arrived on scene?
22  A   Yes.
23  Q   And we see 486 arrived on scene?
24  A   Yes.
25  Q   Do you agree that that indicates that as of

## Page 110

1   20:18, there were three different officers on the
2   scene?
3   A   Yes, it does show that three officers
4   arrived.
5   Q   Okay.  And what's the next line say?
6   A   I lost track.  Which one we on?
7   Q   We're at 20:24:47.
8   Q   Okay.  Do you want me to read that?
9   Q   Yes, please.
10  A   Okay.  "Notes added.  Notes added.  1051
11  responding."
12  Q   And what does "1051 responding" mean?
13  A   Tow truck.
14  Q   Tow truck.  Tow truck is 1051?
15  A   10 Codes, yes.
16  Q   I'm sorry.  I didn't hear what you said.
17  A   10 Codes, yes.
18  Q   10 Codes?
19  A   Uh-huh.
20  Q   What does "10 Codes" mean?
21  A   Law enforcement codes?
22  Q   Yeah.  What does that mean?
23  A   Law enforcement codes?
24  Q   Uh-huh.
25  A   10 Codes.

## Page 111

1   Q   What does that -- I don't understand what
2   "10 Codes" means.
3   A   Law enforcement codes.
4   Q   So 10 Codes are law enforcement codes?
5   A   Yes.
6   Q   And 1050 -- does 1051 indicate tow trucks?
7   A   Yes.
8   Q   Okay.  And what does the next line say?
9   A   At 20:25:07?
10  Q   Yes.
11  A   "Notes added.  Notes added.  Down the main
12  path to the rear parking lot."
13  Q   Do you know who would've added those notes?
14  A   No.
15  Q   Okay.  And what's the next line?
16  A   At 20:25:11?
17  Q   Yes.
18  A   ASGN, space, CN, number sign, Complaint
19  Number 12-14370 assigned.
20  Q   How does somebody initiate -- how does an
21  officer initiate a complaint?
22  A   I don't understand the question.
23  Q   In the process of policing, if you decide
24  that you're going to file a complaint on somebody you
25  would initiate a complaint; correct?

## Page 112

1   A   Complaint?
2   Q   Yeah, a complaint.  That's the word that's
3   used here.  Do you use that word in policing?
4   A   That's a complaint number.
5   Q   Complaint number.  Right.  So the complaint
6   number refers to a complaint; is that correct?
7   A   It refers -- it's assigned for an incident.
8   Q   Okay.  It's assigned for an incident.  So
9   this complaint number 12-14370, that represents an
10  incident.  Am I using the term correctly?
11  A   It's assigned to an incident.
12  Q   Okay.  And who would open up that incident?
13  A   Assuming if it's for -- I -- I can't access
14  it, the dispatchers would be the ones to assign a
15  complaint on this.
16  Q   Okay.  All right.  I think we might be done
17  with this for right now.
18          (Exhibit 3, REJIS Printout, was marked
19          for identification.)
20  Q   (By Mr. Waldron) I'm next going to hand you
21  Plaintiff's Exhibit 3.  And I'm going to ask you to
22  skip the first two pages that are FERG-WAT 267 and
23  268, and I'm going to ask you to move to FERG-WAT 279.
24  Do you see that page in the lower right-hand corner?
25  A   Yes.

28 (Pages 109 to 112)

EDDIE C. BOYD III  11/29/2018

## Page 117

1   my -- your vehicle license.
2       **Q   Okay.  What about my VIN number?**
3       A   If you gave me your VIN number?
4       **Q   Yes.**
5       A   If it's registered?
6       **Q   Yes.**
7       A   Yes, if it's in Missouri.
8       **Q   Okay.  Only if it's in Missouri?**
9       A   I believe they have other ways to find
10  out-of-state stuff, but I'm not familiar with those.
11      **Q   Okay.  Having looked at the top of this**
12  **document, does this look like a search that you would**
13  **have -- that you ran?  Does this refresh your memory**
14  **at all about running a search on Mr. Watson?**
15      A   No.
16      **Q   Okay.  Can we go -- you see halfway through**
17  **the page where there's a line break, we're about a**
18  **third of the way through the page, there's a --**
19  **there's a black line?  I'm asking -- I'm going to ask**
20  **you now about everything underneath.**
21          **Do you see where it says "Start of DOR**
22  **response"?**
23      A   Yes.
24      **Q   What is -- what does that mean?**
25      A   Start of DOR response.

## Page 118

1       **Q   What's a DOR response?**
2       A   Department of Revenue.
3       **Q   Yeah.  What's a DOR response?**
4       A   A Department of Revenue response.
5       **Q   Yes.**
6       A   That's what it is.
7       **Q   Explain to me what is a Department of**
8   **Revenue response.**
9       A   It's a Department of Revenue response.
10      **Q   It's -- there's -- there's -- and in the --**
11  **have you seen such responses before?**
12      A   Department of Revenue responses?
13      **Q   Yes.**
14      A   Yes.
15      **Q   Yes.  So I'm asking you to explain to me**
16  **what is a Department of Revenue response.**
17      A   It is a Department of Revenue response.
18      **Q   And can you explain it any further to me,**
19  **what such a response is?  How somebody -- what**
20  **information you learn from the Department of Revenue**
21  **response?**
22      A   What information am I entering?
23      **Q   Well, what -- first, let's say, what**
24  **information in a Department of Revenue response are**
25  **you -- do you have access to?**

## Page 119

1       A   Department of Revenue information.
2       **Q   Okay.  Such as what?**
3       A   Department of Revenue information.
4       **Q   What are types of Department of Revenue**
5   **information?**
6       A   Driver's licenses, vehicle information, boat
7   registration.
8       **Q   Anything else?**
9       A   It's plenty of other things.
10      **Q   What else?**
11      A   I don't know.
12      **Q   So you said "driver's license."  And that --**
13  **would that be driver's license plates?  Would that be**
14  **driver's -- driver's license numbers like on my ID or**
15  **my license plates of my car?**
16      A   Vehicle plates, driver's license numbers.
17      **Q   Okay.  And let's move about halfway down.**
18  **You see underneath -- you see surrounded by stars, it**
19  **says, "This record restricted under the Federal**
20  **Driver's Privacy Protection Act"?  Do you see that?**
21      A   Yes.
22      **Q   And what's the license that's given**
23  **underneath that?**
24      A   The license?
25      **Q   Yes.**

## Page 120

1       A   G208010016.
2       **Q   And what's the name?**
3       A   The name is Watson, space, Freddie, space,
4   D.
5       **Q   And what date was this response run?**
6       A   It looks like 8/1.
7       **Q   And what time was it run?**
8       A   They got 21:05 and 9:04.
9       **Q   So that's within an hour or two of when you**
10  **encountered Mr. Watson; is that correct?**
11      A   I believe so.  I believe I encountered him
12  at 20:17.
13      **Q   Okay.  And what's the resident address?**
14      A   Resident address is 115 Monteith, St. Louis,
15  Missouri, 63137.
16      **Q   And what's the current address?**
17      A   PO Box 2003, Fairview Heights, Illinois,
18  62208.
19      **Q   As we've gone over the details of this, have**
20  **any -- have any of the details come back to you about**
21  **seeing this document before?**
22      A   No.
23      **Q   Okay.  And what is the status of the**
24  **Missouri license?**
25      A   "Status:  MO, valid, expired."

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

EDDIE C. BOYD III  11/29/2018

Page 121

1        Q    What do you understand that to mean?
2        A    The license is expired.
3        Q    Okay.  And is that somebody's license plates
4    or their driver's license?
5        A    This is a driver's license inquiry.
6        Q    Driver's license.  If I had an Illinois
7    driver's license, would it show up on here?
8        A    On this response?
9        Q    Yes.
10       A    For the Department of Revenue?
11       Q    Yes.
12       A    This is Missouri.
13       Q    So if I had an Illinois license -- driver's
14   license, would it show up on here?
15       A    Not in Missouri's Department of Revenue
16   system.
17       Q    Okay.  I'm going to ask you to turn to the
18   next page, please.  What is this -- this next entry
19   says, "Start of REJIS hot file response."  What's a
20   REJIS hot file?
21       A    You'd have to ask REJIS.
22       Q    Do you know what it is?
23       A    I don't know what the "hot file" stands for,
24   no.
25       Q    Do you know what it searches?

Page 122

1        A    Sure.  A lot of things.
2        Q    What?
3        A    I don't know, but I'm sure a lot of things.
4        Q    Oh.  But you don't know what it searches?
5        A    That -- I don't know of everything exactly
6    right now, no.
7        Q    When you run somebody's name in REJIS, or
8    when you want to find out about a person, is there --
9    are there different types of searches that you can
10   run?
11       A    In REJIS?
12       Q    Yes.
13       A    I don't recall.  We haven't had REJIS in a
14   while.
15       Q    So you don't remember whether there are
16   different types?
17       A    Yes.
18       Q    Okay.  The next -- after the line, the next
19   one seems to say, "Start of MULES hot file response."
20   Do you see where I am?
21       A    Yes.
22       Q    Do you know what MULES hot file response is?
23       A    MULES hot file response?
24       Q    Yes.
25       A    MULES.  Not MULES hot file response.

Page 123

1        Q    What's MULES?
2        A    That's a Missouri Uniform Law Enforcement
3    sharing system.
4        Q    And what information is stored in MULES?
5        A    Missouri Uniform Law Enforcement stuff.  I
6    don't know.
7        Q    What sort of stuff is that?
8        A    Missouri law enforcement stuff.
9        Q    And do you know any -- anything that's
10   stored in there?
11       A    There's a multitude of things.  I don't
12   recall offhand what it is.
13       Q    You don't know anything?
14       A    There are a multitude of things stored in
15   there.  I don't recall right now what they are.
16       Q    Okay.  Can we go halfway down after the
17   solid black line?  Do you see where it says, "Start of
18   Nlets vehicle registration"?
19       A    Yes.
20       Q    What is the Nlets vehicle registration?
21       A    Nlets vehicle registration?
22       Q    Yes.  What is that?  If you know.
23       A    Nlets vehicle registration.
24       Q    And what is Nlets vehicle registration?
25       A    Nlets vehicle registration.

Page 124

1        Q    Have you ever had any -- what information
2    can you get from Nlets vehicle registration?
3        A    Right here it's showing stuff from
4    Mr. Watson's vehicle.
5        Q    And what information do you see?
6        MS. ARRINDELL:  Can we maybe spell Nlets?
7        MR. WALDRON:  Yeah.  So Nlets is N-l-e-t-s.
8    Thank you.
9        Q    (By Mr. Waldron) So what information do you
10   see here?
11       A    Let's see.  RR.FLO37065 Victor --
12       Q    And what does that mean?
13       A    That's Florida, I guess.
14       Q    Florida what?
15       A    I don't know.
16       MS. ARRINDELL:  One second.  You got to --
17   you got to move your hand.
18       THE WITNESS:  Oh, I'm sorry.
19       MS. ARRINDELL:  She's having a hard time
20   hearing you and she's got to lean forward.
21       THE WITNESS:  Ah, okay.  Okay.
22       A    What is Florida?
23       Q    (By Mr. Waldron) No.
24       Q    Okay.
25       Q    What is FL037065V?

31 (Pages 121 to 124)

EDDIE C. BOYD III  11/29/2018

## Page 125

1    A   I don't know.
2        Q   Okay.  And what's the date on this search?
3        A   19- -- I don't know if that's the date, but
4    there's a date and time listed.  I don't know if it's
5    in reference to the search.
6        Q   And what's the -- what's the date and time
7    listed?
8        A   Date and time listed is 19:46, 8/1/2012.
9        Q   Okay.
10       A   34118.
11       Q   Do you know what "34118" means?
12       A   I do not.
13       Q   Then the next line says "22869."  Do you
14   know what that means?
15       A   I do not.
16       Q   Would you tell me what the next thing is
17   that you can understand on this.
18       A   Looks like a plate and a VIN, vehicle
19   description.
20       Q   And where do you see that?
21       A   Under DHSMV record.
22       Q   And what's the plate?
23       A   958 Mary Robert John.
24       Q   And then that series of numbers followed by
25   Buick, is that -- is that the vehicle?

## Page 126

1    A   Followed by Buick?
2        Q   Or B-u-i-c.
3        A   You -- I'm confused.  What's the question?
4        Q   Is that -- do you understand that to be the
5    vehicle?
6        A   After Buick?
7        Q   Well, the -- the vehicle that's being
8    searched here.
9        A   When did we start searching vehicles?
10       Q   Well, it appears as though this is
11   responsive -- this shows the license plate; correct?
12       A   There's a license plate, I believe, yes.
13       Q   Okay.  And it also says -- do you see on the
14   right, it says "Color:  Black"?
15       A   On the second line below there, yes, there
16   is a -- "Color:  Black," yes.
17       Q   Do you see the letters above B-u-i-c?
18       A   Yes.
19       Q   Does that refer -- does that seem to you to
20   refer to a car, having used this program before?
21       A   Yes.  This is describing information from a
22   vehicle.
23       Q   And what information can you discern from
24   this?
25       A   That it has VIN number of 1G4GE5EDXB4279655

## Page 127

1    and the abbreviation for Buick, Boston, Union, Ida,
2    Charles.  And it says 4 -- "4D," which I'm assuming is
3    four-door.
4        Q   And what else -- what other information can
5    you determine?
6        A   The color was black, abbreviated "B-l-k."
7        Q   Who's the driver?  Or who's -- who's the car
8    registered to, I should say?
9        A   It doesn't say who it's registered to, but
10   there is a name listed with it.
11       Q   Do you understand -- how that might be
12   connected?
13       A   Because it's on the same sheet.
14       Q   And do you know what that name would
15   represent?
16       A   More than likely, the person who owns it or
17   bought it or registered it.
18       Q   Okay.  And do you know when the plate is
19   registered until?
20       A   I don't see it off the top.
21       Q   Okay.  And let's look -- if I can ask you to
22   turn the page, Mr. Boyd.  Let's just look at the next
23   page.  Do you see where it says "Insurance
24   Information"?
25       A   Yes.

## Page 128

1        Q   And the insurance appears to be Government
2    Employee Insurance Company; is that correct?
3        A   The insurer and then it has Government
4    Employee INS. CO., yes.
5        Q   And there's a policy number 4038680916; is
6    that correct?
7        A   4038680916 next to policy number, yes.
8        Q   Great.  All right.  That's all I have for
9    that one.
10       MR. WALDRON:  Can we take a quick break?  I
11   don't think I'll be more than about five minutes.
12       MS. ARRINDELL:  Sure.  Go ahead.
13       MR. WALDRON:  Thanks.
14       (Whereupon, a brief break was taken.)
15       MR. WALDRON:  We're back on the record.
16       Q   (By Mr. Waldron) Officer Boyd, I'm going to
17   pass to you what's being marked as Exhibit 4.
18       (Exhibit 4, Uniform Citations, were
19       marked for identification.)
20       MS. ARRINDELL:  Thank you.
21       Q   (By Mr. Waldron) Do you recognize -- I'm --
22   I'm just going to ask you right now to look at the
23   first page that's labeled "WATSON_0001."  Do you see
24   where I am?
25       A   Yes.

32 (Pages 125 to 128)

EDDIE C. BOYD III  11/29/2018

Page 129

1    Q   Okay.  Do you recognize this document?
2    A   They look like copies.
3    Q   They look like what?
4    A   Copies.
5    Q   Copies.  Copies of what?
6    A   Uniform citations.
7    Q   And is this a -- is this the sort of
8  citation that you would write at the City of Ferguson?
9    A   For violations, traffic?
10   Q   Yes.  For traffic violations?
11   A   Yes.
12   Q   And was it -- is the yellow the only paper
13 or are there -- was it in duplicate or triplicate?
14   A   There are four --
15   Q   There are four?
16   A   -- copies.
17   Q   And what are the four colors?
18   A   Two are white, one is yellow, one is red.
19   Q   And does the yellow go to the violator as it
20 says at the bottom?
21   A   I believe the yellow is the violator's copy.
22   Q   Okay.  And in the sequence of writing the
23 tickets, they're stacked on top of each other.  Which
24 one is your pen actually hitting?
25   A   The white's.

Page 130

1    Q   The white is on top?
2    A   Yeah.  The white's on top.
3    Q   Okay.  What is this ticket for?
4    A   You would like to know the charge listed on
5  the ticket?
6    Q   Yes.
7    A   No operator's license in possession.
8    Q   And is that your signature at the bottom?
9    A   Yes.
10   Q   And what ordinance is violated here?
11   A   No operator's license in possession.
12   Q   Do you see two lines underneath that, it
13 says, "In violation of," and it's blank, but there's a
14 check through ordinance.  Do you see where I am?
15   A   Yes.
16   Q   Is it correct to say you did not write an
17 ordinance in there?
18   A   I don't recall.
19   Q   Just from looking at it, does it appear as
20 though you wrote an ordinance in there?
21   A   I don't recall.
22   Q   Do you see where the driver's license number
23 is identified on this document?
24   A   Yes.
25   Q   Where'd you get that information, do you

Page 131

1  know?
2    A   Probably the computer.
3    Q   The computer.  Which computer program would
4  have given that to you?
5    A   I don't recall, but we were using REJIS.
6    Q   Okay.  Were there any other programs that
7  you used at this time?
8    A   No.  I don't recall any.
9    Q   And do you know what the ordinance number it
10 is that was violated here?
11   A   Not off the top of my head.
12   Q   What sort of -- when you got to the City of
13 Ferguson, what sort of training did you receive on the
14 city ordinances?
15   A   I don't recall.
16   Q   Do you recall having any training?
17   A   Yes.
18   Q   And what -- what do you recall?
19   A   That I had training.
20   Q   And what do you recall about that training?
21   A   It was nine weeks -- nine to 12 weeks.
22   Q   And was it -- in the process of that
23 training, did you learn about the specific ordinances
24 of the City?
25   A   Specific ordinances?

Page 132

1    Q   Yes.
2    A   I don't recall.
3    Q   Do you recall learning about any ordinances
4  in the nine-to-12-week training?
5    A   I don't recall the ordinances I learned.
6    Q   Can you explain to me why you had probable
7  cause to write this ticket?
8        MR. NORWOOD:  Let me object.  Calls for a
9  legal conclusion.
10       Subject to that.
11   Q   (By Mr. Waldron) Go ahead.
12   A   I'm sorry.  Why did I have probable cause to
13 write the ticket?
14   Q   Yes.
15   A   I don't understand the question.
16   Q   So you wrote this ticket; correct?
17   A   Yes.
18   Q   And you wrote this ticket because you
19 believed a violation had taken place; correct?
20   A   Yes.
21   Q   Do you recall what gave you cause to believe
22 that a violation had taken place?
23   A   Which violation?
24   Q   This violation.
25       MS. ARRINDELL:  That one.

33 (Pages 129 to 132)

## EDDIE C. BOYD III  11/29/2018

| Page 161 | Page 163 |
|---|---|

**Page 161**

1  stop?
2      A   Are you still operating the vehicle?
3      Q   Well, I'm ask -- the car's still running,
4  yes.
5      Q   So you're still operating the vehicle?
6      Q   That's correct.
7      A   Then you're in violation.
8      Q   Okay.  Let's look at the next page that's
9  labeled "Watson 0007."
10          And what's this citation for?  And at the
11  top, it's 787147.
12      A   787147 says "Failure to register."  And then
13  there's something, I can't quite see it, "Out-of-state
14  motor vehicle, within 30 days," looks like.  I don't
15  know what that is.  I couldn't even make it out.
16      Q   Could it -- could it be of -- could it be of
17  residence?
18      A   Yeah.  Yeah, it could be that.
19      Q   Could you explain, besides the title of the
20  ordinance, what does this ordinance mean?
21      A   I'm sorry?
22      Q   Besides the title of the ordinance -- the
23  ordinance that you read to me, when are times that you
24  would enforce this ordinance?
25      A   Somebody fails to register their vehicle

**Page 163**

1      Q   Yes.  Okay.  And where does that 30-day
2  number come from?
3      A   At the time they established residency in
4  Missouri?
5      Q   Yeah.  Where -- is that in the ordinance?
6      A   I'd have to refer to the ordinance.  I don't
7  recall right now.
8      Q   If it wouldn't be in the ordinance, then
9  where would it be?
10      A   I'm assuming it would be in the ordinance.
11  So I don't know.
12      Q   Okay.  And why did you have probable cause
13  to write this ticket?
14      A   Because he failed to register his vehicle in
15  the State of Missouri -- or with the State of Missouri
16  within 30 days of residence.
17      Q   So that means you believe that Mr. Watson
18  had been a residence of Missouri -- a resident of
19  Missouri for 30 days or more; is that correct?
20      A   Yes.
21      Q   And why did you believe that?
22      A   He had an expired license, and there was
23  nothing else to show that he was not a resident of
24  Missouri.
25      Q   What about any searches that you ran?

| Page 162 | Page 164 |
|---|---|

**Page 162**

1  after -- after -- within 30 days of their -- of
2  residence.
3      Q   And they have to -- do they have to live in
4  the State of Missouri?
5      A   You have to be a resident, yes.
6      Q   So you have to be a resident of Missouri in
7  order to --
8      A   You don't have to.  I mean, I -- who would
9  register their vehicle if they weren't a resident?
10      Q   I'm saying if I'm -- what if I'm passing
11  through Missouri, am I in violation of this?
12      A   When you're a resident?
13      Q   No.
14      A   How long are you passing through?
15      Q   I'm -- I'm driving -- literally driving
16  through.
17      A   So you are asking me if you have to register
18  your vehicle to drive it into Missouri?
19      Q   I don't.  I don't; right?  I mean, we agree,
20  I wouldn't have to do that; right?
21      A   I don't understand that question.
22      Q   Is it fair to say that only people who can
23  get this citation are people who have lived in
24  Missouri for more than 30 days?
25      A   Yes.

**Page 164**

1      A   I'm confused.  Searches?
2      Q   Did you run any searches that show he might
3  be a resident of a different state?
4      A   I don't believe -- I don't know how we would
5  run a search on a different state to see where he
6  lived that's --
7      Q   How about his drive -- his driver's
8  license -- or, I'm sorry -- his license plate?  What
9  was his -- what state was his license plate from?
10      A   I believe what you showed me was Florida.
11      Q   Okay.  So yet, despite that, you still
12  believed that he was a Missouri resident?
13      A   Yes.
14      Q   Okay.  And the next and last page is 0008,
15  and that's ticket number 787148.  Mr. Boyd, what is --
16  what is this ticket for?
17      A   787148 shows no vehicle inspection.
18      Q   And when -- when are you authorized to write
19  a citation like that?
20      A   When you don't have a vehicle inspection.
21      Q   Every car that doesn't have a vehicle
22  inspection is in violation?
23      A   If they're Missouri residents.
24      Q   Okay.  So you -- so for this ordinance, you
25  have to be a Missouri resident?

41 (Pages 161 to 164)

EDDIE C. BOYD III  11/29/2018

Page 169

1      Q    Have you received any training since you've
2  been at the City of Ferguson?
3      A   I don't recall.
4      Q    Okay.  So if you have, you don't remember
5  what -- you don't remember -- you don't remember
6  receiving that training?
7      A   I received continuing education training,
8  but I don't know all of the topics for all of them.
9      Q    Based on your training, when's a person
10  allowed to -- when's an officer allowed to search a
11  person's vehicle?
12      MS. ARRINDELL:  Objection.  Calls for a
13  legal conclusion.
14          You can answer to the extent you know the
15  answer.
16      A   Incident to arrest, consent, probable cause.
17      Q    (By Mr. Waldron) Any others?
18      A   None that I can think of now.
19      Q    Okay.  And what does the search incident to
20  arrest look like?
21      A   Somebody's arrested.  You search the
22  vehicle.
23      Q    And what are you searching for in that
24  instance?
25      A   Illegal items.  If you're doing an inventory

Page 170

1  search of a vehicle for a tow, you document those.
2      Q    So an incident to arrest -- am I right to
3  understand that every time you arrest a person in a
4  car, you can search their car?
5      A   It's an inventory search if you're towing
6  it.
7      Q    Okay.  How about for the search incident for
8  arrest?  What if you're not towing it?
9      A   You don't have to search it every time.
10      Q    Can you?  Are you permitted to search it
11  every time?
12      A   If you think it needs to be searched.
13      Q    And how do you determine whether it needs to
14  be searched?
15      A   It depends on the circumstances you're
16  arresting the person for.
17      Q    And what -- what are those circumstances --
18  so when -- help me understand when you could search a
19  car and when you could not search a car based on
20  search incident to arrest.
21      MS. ARRINDELL:  Objection to the extent it
22  calls for speculation.  Calls for a hypothetical.
23      A   Search incident to arrest, you can search a
24  car.  There's no can and can't.  If you lock them up,
25  they're in the vehicle, you can search it.

Page 171

1      Q    (By Mr. Waldron) So if you arrest somebody
2  and they're in a vehicle, you can search their car?
3      A   If they're in it.
4      Q    If they're in it.  Okay.  And are you
5  allowed to search whatever you want within their car,
6  if you arrest the person?
7      A   If it's open.
8      Q    If it's open?
9      A   Meaning, if they have access to it.
10      Q    If they have access.  Okay.  If they lock
11  the car, are you allowed to unlock it?
12      A   If they lock it, am I allowed to -- are they
13  in the car?
14      Q    They're in your cruiser and they've locked
15  their car.
16      A   How would they lock their car?
17      Q    Maybe when they're getting arrested.
18      A   I don't understand that question.
19      Q    Okay.  How about a consent search, how does
20  that look?
21      A   You want me to answer -- you want me to
22  answer how does a consent search look?
23      Q    Yeah.  Would you describe for me what a
24  consent search is?
25      A   A consent search?

Page 172

1      Q    Yes.
2      A   That's how it looks like, somebody giving
3  consent to search their car.
4      Q    Okay.  So -- so you ask permission and a
5  person searches the car?
6      A   If someone gives consent to search their
7  car, then you can search their car.
8      Q    And are there circumstances when you, as an
9  officer, ask for permission to search a car?
10      A   Those circumstances may arise.
11      Q    What are those circumstances?
12      A   I don't know.  That's too broad of a
13  question to answer.
14      Q    Can you name some circumstance -- one
15  circumstance that could arise?
16      A   I can't think of any right now.
17      Q    So you can't think of any circumstances in
18  which you'd ask somebody to search their car?
19      A   Not off the top of my head right now.
20      Q    Okay.  How about probable cause?  Under what
21  circumstances are you allowed to search a car for
22  probable cause?
23      MR. NORWOOD:  Objection.  Calls for a legal
24  conclusion and speculation.
25      A   I'd have -- you need to be more specific.

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

EDDIE C. BOYD III  11/29/2018

Page 173

1    Q    (By Mr. Waldron) So you -- you listed the
2  several different instances in which somebody could
3  search a car.
4        You said "search incident to arrest."  You
5  said "a consent search."  You said "probable cause."
6        Would you describe for me when are you
7  allowed to search a car related to this probable
8  cause?
9        MR. NORWOOD:  Same objection.
10    A    I can't think of any clear circumstances off
11  the top of my head.  I mean, there's several, though.
12    Q    (By Mr. Waldron) What would one be?
13    A    There's several.  I just can't think of any
14  right now.
15    Q    And what's an inventory search?
16    A    An inventory.
17    Q    No, I'm asking what -- what is an inventory
18  search?
19    A    It's an inventory.
20    Q    It's an inventory of what?
21    A    What are -- what are we searching?
22    Q    Under what conditions would you conduct an
23  inventory search?
24    A    When I'm taking inventory of something.
25    Q    And when would you take inventory of

Page 174

1  something?
2    A    It depends on what the situation is.
3    Q    Can you describe for me an inventory search
4  that you've conducted?
5    A    I can't think of one off the top of my head.
6    Q    Have you ever conducted one?
7    A    Yes.
8    Q    And what did that look like?
9    A    An inventory search.
10    Q    Do all cars get an inventory search or only
11  certain cars?
12    A    So are we talking about cars now?
13    Q    Yeah.  So I was referring to an inventory
14  search that I think that you had listed.  The kind
15  that you had designated as one of the types of
16  searches that you conduct of a car.
17    A    So you're being specific.  We're talking
18  about an inventory search of a vehicle now?
19    Q    Yes, sir.
20    A    If you are locked up and your vehicle's
21  being towed, there's an inventory search of your
22  vehicle.
23    Q    And is that search different from any of the
24  other searches of vehicles that we've talked about?
25    A    I'm confused about that question.

Page 175

1    Q    Is -- is the search that you conduct of an
2  inventory search of a vehicle, is that different in
3  any way than a probable cause search or a consent
4  search?  Are the procedures different or what you
5  would search for different?
6    A    Are we talking about a vehicle?
7    Q    We're talking about these searches of a
8  vehicle, yes.
9    A    I mean, a search is a search.  It just
10  depends on why you're searching it.
11    Q    Okay.  So it would -- it would all be the
12  same?
13        MR. NORWOOD:  Object.  It mischaracterizes
14  what he just said.
15    A    I mean, it depends on what kind of search it
16  is.  I mean, it's inventory, probable cause, incident
17  to arrest.
18    Q    (By Mr. Waldron) Right.  So what I'm --
19    A    Fear of a weapon.
20        (Reporter clarification.)
21    Q    (By Mr. Waldron) And what I'm trying to get
22  to is an inventory search.  Is there anything that
23  distinguishes an inventory search from an incident to
24  arrest search?
25    A    An inventory search is of an item incident

Page 176

1  to arrest.
2    Q    Okay.  Are you -- have you been given
3  instructions from the City of Ferguson about how to
4  carry out an inventory search?
5    A    No.  I think we learned that in the academy
6  searches.
7    Q    Okay.  And describe for me how do you
8  conduct an inventory search of a car.
9    A    Search it.
10    Q    And do you collect anything or do you just
11  look through it?  Is there anything that you would
12  ever confiscate or gather?
13    A    If there are personal items that can go with
14  the property of the subject arrested, then it's
15  gathered and put with the property.
16    Q    And it -- so it's just personal items that
17  are gathered?
18    A    Not personal, no, not all of it -- I'm
19  sorry.  Let me rephrase.  Can I strike that?  No, I
20  don't get to strike?  Damn.
21        Items of value, okay, that can be placed in
22  a subject's property.  And if they can't be placed in
23  a subject's property, then they are listed on the tow
24  sheet if they're of value.
25    Q    Okay.  And when would they not be able to be

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDDIE C. BOYD III  11/29/2018

| Page 177 | Page 179 |
|---|---|

Page 177

1   placed in the -- in the person -- an arrestee's
2   property?
3       A   It's too big.
4       Q   Okay.  So it's too big.  That makes sense.
5       And who do you give the -- the items of
6   value that you find, what happens to it?  Does it go
7   along with the -- the person who's being arrested?
8   Who -- who is in control of it?
9       A   At what point?
10      Q   When it's -- when it's first found.
11      First found when?
12      Q   When it's first found in the vehicle.
13      A   So items of value that I find in a vehicle
14  if they are too big, they stay with the vehicle.
15      Q   Got it.
16      A   If they are manageable, they go with the
17  suspect.
18      Q   They go with the suspect.  And they would
19  be -- they're provided to property -- to -- to the
20  property department, is that right, of the jail?
21      A   The jail doesn't have a property department.
22      Q   Okay.  So what happens to those -- to those
23  items?
24      A   They would be with the subject's property
25  bag.

Page 178

1       Q   And who would record that?
2       A   Record it where?
3       Q   Who would take note of, you know, one iPhone
4   was found in the back of a car that's -- that's a
5   personal item, it's an item of value, how would they
6   know that when a person's arrested, it goes with this
7   person?
8       A   The CO would have made an inventory of the
9   bag.  Corrections officer.
10      Q   The corrections officer.  Thank you.  And so
11  it's up to the individual officers to determine
12  whether or not something's an item of value?
13      A   I mean, money, jewelry, phones in operating
14  condition, et cetera, et cetera.
15      Q   Going back to the other searches that aren't
16  inventory searches, but we're still talking about
17  vehicles here.  Are you allowed to search a vehicle
18  for a traffic violation after arresting that person if
19  you're not going to tow the vehicle?
20      MR. NORWOOD:  Let me object.  Improper
21  hypothetical.  It calls for speculation.
22      A   So I'm not towing the car?
23      Q   (By Mr. Waldron) You're not towing the car.
24  Within -- have you been trained -- within your
25  training, are you allowed to search the car if it's a

Page 179

1   traffic matter?
2       A   Are they under arrest?
3       Q   Yes.
4       A   Were they in the vehicle when I placed them
5   under arrest?
6       Q   Yes.
7       A   Then I would search the car.
8       Q   Okay.  And for what -- which of the reasons
9   that you stated?
10      A   Search incident to arrest.
11      Q   And do you know what the purpose of the
12  search incident to arrest is?
13      A   Locate weapons, drugs, illegal items.
14      Q   Even if it's just a traffic violation?
15      A   I mean, the traffic violation was why I
16  locked them up.  Also to make sure nothing of value is
17  left inside the vehicle when it's parked.
18      Q   And that would be -- that would be an
19  inventory search; right?
20      A   I mean, you can cross the two if you like.
21      (Reporter clarification.)
22      Q   (By Mr. Waldron) Are you allowed to go up to
23  a person on the street and ask them to identify
24  themselves?
25      MS. ARRINDELL:  Objection.  Relevance.

Page 180

1       A   You want to know if I can walk up to
2   somebody and ask their name?
3       Q   (By Mr. Waldron) As an officer.
4       A   Why wouldn't I be?
5       Q   Okay.  Are you allowed to -- what happens if
6   they -- if they don't give their name?
7       MR. NORWOOD:  Objection.  Improper
8   hypothetical.  Speculation.
9       MS. ARRINDELL:  Join in that objection.
10      Q   (By Mr. Waldron) Are you familiar with the
11  term a "detention," when you detain someone?
12      A   Yes.
13      Q   To talk with them; right?
14      A   Well, I don't have to detain somebody to
15  talk to them.
16      Q   Okay.  But let's -- let's -- for the
17  purposes of right now, let's just talk about detaining
18  someone; right?  Do you understand?
19      A   (Witness nods.)
20      Q   Okay.  So for the purposes of detaining a
21  person, can you detain anyone?
22      A   What are they detained for?
23      Q   I'm asking you, are you allowed to detain
24  any person or do you need something special in order
25  to detain a person?

45 (Pages 177 to 180)

EDDIE C. BOYD III  11/29/2018

## Page 185

1    Overbroad.  Calls for speculation.  Witness has asked
2    for clarification.
3         MR. NORWOOD:  And I'd object, too, as it
4    calls for a legal conclusion with respect to what's
5    allowable, and also it's an improper hypothetical.
6         And I join in Geri Lynn's objection also.
7    A    Repeat the question again.
8    Q    (By Mr. Waldron) If you detain a person --
9    A    Uh-huh.
10   Q    -- are you allowed to ask for their
11   identification?
12   A    What am I detaining them for?
13   Q    No matter what you detain them for.
14        MR. NORWOOD:  Well, let me object then.
15   That -- that -- that's an improper hypothetical.  It's
16   overbroad and it's --
17        MR. WALDRON:  You can have a running
18   objection to this just so that we don't get --
19        MR. NORWOOD:  I'm going to make my objection
20   the way I want to make my objection.  You can run with
21   whatever you want to run with.
22        On this particular question, it's an
23   improper hypothetical, it's overbroad, and it calls
24   for a legal conclusion.
25   A    Can you rephrase the question?

## Page 186

1    Q    (By Mr. Waldron) You've detained a person.
2    Are you allowed to ask for their identification?
3    A    That's the same question.
4    Q    And I haven't got an answer yet.  I'm just
5    trying to get one.
6    A    I don't understand it.  Can you rephrase it?
7    Q    Would it be helpful if I gave a
8    hypothetical?
9    A    No, but you can try.
10   Q    All right.  Let's move on.  Are we on
11   Exhibit 5?  Is that correct?
12   A    Yes, 5.
13        (Exhibit 5, Police Report, was marked
14        for identification.)
15        MR. WALDRON:  This is Plaintiff's Exhibit 5.
16   And this is one version of the police report.  It's
17   designated WATSON_0041, 42, 43, 44, and 45.
18   Q    (By Mr. Waldron) Officer Boyd, do you
19   recognize this document?
20   A    Yes, it looks familiar.
21   Q    And what is it?
22   A    It is a Ferguson Police Department Offense
23   Incident Report.
24   Q    And is it the arrest report for Mr. Watson?
25   A    It appears to be.

## Page 187

1    Q    Do you see a time listed about a third of
2    the way down the page for "Received Date"?
3    A    Yes.
4    Q    What time is indicated by that?
5    A    2017.
6    Q    Did you fill this form out?
7    A    This report?
8    Q    Yes.
9    A    No.  I don't enter these into the -- we
10   didn't enter these into the computer at the time.
11   Q    Who did?
12   A    Records.
13   Q    Who worked in records?
14   A    I don't recall.
15   Q    So there was a records department?
16   A    Still is.
17   Q    And is it within the police department or
18   just within the larger City of Ferguson?
19   A    It's for the police department.
20   Q    So you wouldn't have filled this out?
21   A    I wouldn't have entered the information, no.
22   Q    Where would the information on this have
23   come from?
24   A    To enter?
25   Q    Yes, to enter.

## Page 188

1    A    They would have gotten the information to
2    enter from me.
3    Q    Okay.  How would you have provided it to
4    them?
5    A    Incident sheets and the supplement narrative
6    sheet.
7    Q    So you did not enter this into the
8    computer -- into a computer or anything else?
9    A    No.
10   Q    How -- you said there's an incident sheet?
11   A    Incident sheets.
12   Q    And where did you fill out an incident
13   sheet?
14   A    We have copies -- we had copies of them.
15   Q    Would you -- could I ask you to turn to the
16   last page.
17   A    Yes.
18   Q    Just so that we can all sort of figure this
19   out as soon as possible, is this an incident sheet?
20   A    This is part of the report that I prepared,
21   yes.
22   Q    Okay.  So this is part of the report that
23   you prepared.  And would you have typed this page?
24   A    Oh, yes, I would have typed this.
25   Q    And on what program would you have typed it?

47 (Pages 185 to 188)

EDDIE C. BOYD III  11/29/2018

## Page 189

1    A   Word.  I --
2        Q   Okay.  Do you remember that exactly or
3    you're just --
4        A   No, I don't remember.  I don't recall what
5    program.
6        Q   And if I understand it correctly, you would
7    type this sheet called an "Incident Sheet," and
8    somebody in records would then convert it to this
9    document on the front page that's page 41, which is
10   called the "Incident Report"; is that correct?
11       A   That is how the process should work.
12       Q   That is how the process -- and is it -- is
13   it how the process did work generally?
14       A   Generally.
15       Q   Okay.  Good.  All right.  So if there's
16   information on this first page that is not on page 45,
17   do you know where it came from?
18       A   No.
19       Q   Okay.  Under the name of the officers, it
20   says your name in the middle of the page, and then it
21   says "PO/K-9 Gregory Casem and PO Todd Mink."  Does
22   that refresh your memory about who was at the scene?
23       A   Yes, it says that they were there.
24       Q   Does that -- does reading that bring
25   anything back about their presence at the scene?

## Page 190

1        A   Not at this time.
2        Q   How about -- does the K-9 next to "K-9
3    Gregory Casem" mean he had a dog with him?
4        A   It means he's a K-9 officer.
5        Q   So it doesn't necessarily mean he had a dog?
6        A   Sometimes they don't have their dogs.
7        Q   Okay.  And what was the departed date --
8    right above your name, it says the "Departed Date"?
9        A   8/1 of '12.
10       Q   Yep.  And what's the -- what's the time?
11       A   2210.
12       Q   And that would be 10:10 p.m.; correct?
13       A   Yes.
14       Q   Do you know where that time would have come
15   from?
16       A   No, I do not.
17       Q   And what are the charges here?
18       A   Listed on the incident page?
19       Q   Yes.
20       A   Failure to obey, obstructing, resisting,
21   et cetera, city official.
22       Q   And any others?
23       A   Oh, it skips two lines and it says "Making
24   false declaration."
25       Q   Is it correct to say that an incident report

## Page 191

1    is only filled out for certain types of violations and
2    not for others?
3        A   No.
4        Q   So for all citations, all traffic stops,
5    there's an incident report filled out?
6        A   Well, the ticket is the report for traffic
7    violations.
8        Q   All right.  So would you help me to
9    understand the difference between traffic violations
10   and other violations?
11       A   There's traffic and non-traffic.
12       Q   And traffic is what?  Everything relating to
13   a car?
14       A   Related to traffic.
15       Q   Relating to traffic.  And help me to clarify
16   there.  You sort of corrected me.  What is the
17   difference -- traffic -- between traffic and cars?
18       A   I don't understand the question.
19       Q   Well, I -- I just felt like you corrected
20   and that there was something diff -- distinct about
21   what a traffic offense is.
22       A   Traffic.
23       Q   Okay.  Is manner of walking a traffic
24   violation?
25       A   That is non-traffic.

## Page 192

1        Q   Non-traffic.  So that would be an incident
2    report?
3        A   That would be an ANF, depending on what you
4    did.
5        Q   And what -- what -- did you say ANF?
6        A   Arrest Notification Form.
7        Q   A-N-F.  And do you see at the bottom of this
8    document, on the left-hand side, it says "Reporting
9    Officer, 590, Eddie Boyd, III."  Do you see that?
10       A   Yes.
11       Q   And it says "Approving Officer."  Is there
12   an approving officer?
13       A   On this document you provided?
14       Q   Yes.
15       A   No.
16       Q   How did the approval process work?
17       A   I do not know.  I sent it up for approval
18   and from there it's the next level.
19       Q   And who did you send it to?
20       A   My sergeant or lieutenant at the time.
21       Q   Who would your sergeant or lieutenant have
22   been at the time?
23       A   I don't recall.
24       Q   And when you said "sent it up," what does
25   that mean?

48 (Pages 189 to 192)

EDDIE C. BOYD III  11/29/2018

| Page 193 |
| --- |

1     A   Turned in my prepared report and they viewed
2  it.  And if there are any corrections that need to be
3  made and you corrected it, or they sent it back to
4  have the corrections made and -- no corrections needed
5  to be made then it was forwarded.
6     Q   It was forwarded to who?
7     A   I do not know the process from when I turned
8  it in to my supervisor.
9     Q   Okay.
10     A   But ultimately it ends up with records.
11     Q   Okay.  So records doesn't write it until
12  it's been approved?
13     A   I'm not sure how that works with them.
14     Q   Okay.  And you said sometimes it gets sent
15  back for corrections, reports get sent back for
16  corrections?
17     A   They can send them back with corrections.
18     Q   And do you know what those would be?  Like
19  can you give me an example of what a correction would
20  look like?
21     A   Misspelled word.
22     Q   Okay.  Anything besides spelling or grammar?
23     A   There could be a few things, but I can't
24  think of anything else off the top of my head.
25     Q   Okay.  Because, generally, the supervisors

| Page 194 |
| --- |

1  wouldn't have been there; right?
2     A   Been where?
3     Q   At -- at the incident that you're writing
4  about or that an officer's writing about.
5     A   It depends.
6     Q   It depends.  Okay.  Let's look at the next
7  page.  Actually, I apologize.  I'm going to read
8  starting at the -- the bottom of page 41, the first
9  page.
10        It says, "On 8/1/12 at 2017 hours while
11  patrolling Forestwood Park located at 825 Forestwood,
12  I observed a black 2011 Buick 4-door sedan.  Vine" --
13  and then it's got a long set of -- "1G4GE5EDXBF279655.
14  Idling with the headlights on, no front plate, heavy
15  tinted windows and windshield, backed into a parking
16  space along the tree line."  Did I read that
17  correctly?
18     A   It says "Vine" but, yeah.
19     Q   It says "The vehicle was facing the obstacle
20  course where several small children were playing,
21  unsupervised."  Did I read that correctly?
22     A   Oh.  Yes, yes, yes.
23     Q   And as far as you know, is that -- is that
24  true so far, in your report?
25     A   Was what true?  The -- the spelling --

| Page 195 |
| --- |

1     Q   That that -- that that happened.
2     A   Oh, this is the incident?
3     Q   Yes.
4     A   Yes.
5     Q   And you're looking on the back page, I
6  noticed.  Is that because that's the page that you
7  actually wrote?
8     A   Yes.
9     Q   Okay.  Understood.
10        And it says "As I approached the vehicle's
11  location, I could make out a subject moving around
12  inside."  Does that reflect what you remember?
13     A   Yes.
14     Q   And the next sentence says, it should be
15  noted we have several car break-ins in the
16  above-mentioned location with the black tint -- with a
17  black tinted windows.
18        MS. ARRINDELL:  Objection.  Misstates what
19  is typed.
20        MR. WALDRON:  I'm more than happy for you to
21  correct me if I -- if I missed something, Geri Lynn.
22  I'm not sure.
23        MS. ARRINDELL:  The word "vehicle," it was
24  just skipped.
25        MR. WALDRON:  Oh, thank you.

| Page 196 |
| --- |

1        MS. ARRINDELL:  No problem.
2        MR. WALDRON:  In that last sentence?
3        MS. ARRINDELL:  You said "Black tinted
4  windows" instead of "Black vehicle tinted windows."
5        MR. WALDRON:  Oh.  Thank you.  "Black
6  vehicle tinted windows."  Thank you.
7        MS. ARRINDELL:  No problem.
8     Q   (By Mr. Waldron) Do you recall that there
9  had been break-ins -- several car break-ins with black
10  vehicles with tinted windows?
11     A   We had a report of a black vehicle with
12  tinted windows that was breaking into vehicles.  Yeah,
13  I recall that.
14     Q   And where do you recall that report
15  happening?
16     A   They said it was up at the park.
17     Q   And how did you hear about that report?
18     A   I do not recall.
19     Q   Would there be a record of a report like
20  that?
21     A   There may be.
22     Q   Okay.  The next sentence says, "I exited my
23  marked patrol vehicle and approached the driver's side
24  door where I made contact with the driver, who
25  identified himself as Fred Watson, 6'0" tall,

49 (Pages 193 to 196)

EDDIE C. BOYD III  11/29/2018

## Page 197

1  197 pounds," 109 -- "1924 West Laura, Pensacola,
2  Florida."
3       Did anything else, to your memory, happen
4  before you approached the car?  In -- in the sequence
5  that we're going in here?
6       A   Well, there was a mistake that I made in the
7  report.  It should have been "who later identified
8  himself."  But that was my bad.
9       Q   So that should say "who later identified
10 himself"?
11      A   Yes.
12      Q   So your report says that he identified
13 himself; right?
14      A   Yes.
15      Q   And later he identified himself as that?
16      A   After I asked for his license, proof of
17 insurance, he didn't have it.  And then I requested
18 his pedigree information, and that's who he identified
19 himself as.
20      Q   Okay.  So this report is incorrect?
21      A   I left out a word.  So if the entire report
22 is incorrect for leaving out a word --
23      Q   No.  I mean, this -- that detail of this
24 report is incorrect?
25      A   I left out a word.  So if the entire report

## Page 198

1  is incorrect, then so be it.
2       Q   Okay.  And where did you get the -- the
3  information about 6'0" and -- and that other
4  information?
5       A   I would have got it from him if I'm asking
6  for his name and pedigree information.
7       Q   Was that common for you to ask for
8  somebody's height and weight?
9       A   Depends on what the situation is.
10      Q   Does it indicate to you that you asked him
11 for this information?
12      A   Yeah.  If he didn't have a license, proof of
13 insurance, then, yeah, I probably would have asked for
14 height and weight.
15      Q   And would you have asked for his address?
16      A   Yes.
17      Q   And this is the address he provided?
18      A   Had to be.  I wouldn't have pulled it from
19 anywhere else.
20      Q   Is the only place you could have got this
21 information --
22      A   From him?
23      Q   From anywhere?  From REJ -- from REJIS, from
24 anywhere else?
25      A   At the time at the side of the car, it would

## Page 199

1  have been from him.
2       Q   Okay.  So you -- could you have put this in
3  later?
4       A   Put what in later?
5       Q   This information about his height, his
6  weight, his address.
7       A   I mean, anything's possible, but this is
8  what I would use to try to verify his identity --
9       Q   And you --
10      A   -- because he didn't have his license in his
11 possession.
12      Q   You would have used his height and weight to
13 identify his identity?
14      A   It would have been part of it.
15      Q   It would have been -- and which program
16 would have -- would have helped you find his identity
17 based on his height and weight?
18      A   There would be a combination of all the
19 information to verify the information that he gave.
20 He gave his name, date of birth, height, weight, and
21 address.  That's all the stuff that would be listed on
22 an operator's license or non-driver's license.
23      Q   And if he didn't provide it to -- to you,
24 where would you find that information?
25      A   I mean, if he omitted or left out a line,

## Page 200

1  then I wouldn't be able to find it.
2       Q   No, I understand that.  Where would you be
3  able to verify that -- to find some other source
4  saying, "Yeah, this a 6' tall, 197-pound guy?"
5       A   If he told the truth --
6       Q   Yes.
7       A   -- it would be in his record.  Because it
8  would be listed on his driver's or non-driver's
9  license.
10      Q   And when you say "record," what do you mean?
11 Which -- which report?
12      A   Department of Revenue or any other place.
13      Q   Or REJIS?
14      A   REJIS is a system.  It's not the Department
15 of Revenue.  Department of Revenue sends a response to
16 REJIS.
17      Q   Okay.  So as we -- as we've read this, is
18 there anything that's -- the sequence is incorrect so
19 far?
20      A   Yes.  The sequence is incorrect so far.
21      Q   What's incorrect?
22      A   I would have asked him for his license and
23 proof of insurance before I obtained his pedigree
24 information.
25      Q   But that's not represented here in the

50 (Pages 197 to 200)

EDDIE C. BOYD III  11/29/2018

Page 201

1  report?
2      A   That I asked for his pedigree information?
3      Q   That you would have asked for his license
4  and to the point that we are -- to the point that
5  we're at.  You said you would have asked for his
6  license beforehand?
7      A   Yeah.  When I walked up, advised him of the
8  violations, I would have asked for his license and
9  proof of insurance.
10     Q   Okay.  So you -- you're just getting ahead
11 of us for a second.  But at the -- at the words
12 "Pensacola, Florida," everything up to there, the
13 sequence is okay?
14     A   Except for later.
15     Q   Except for later.  Right.
16         And it says "And advised him of the
17 violations and my observations."  What were the
18 violations?
19         MR. NORWOOD:  Let me object.  Asked and
20 answered.  We've gone over that already.
21     Q   (By Mr. Waldron) Subject to that.
22     A   Oh, you want me to repeat it?
23     Q   What were the violations that you had
24 identified at that point?
25         MR. NORWOOD:  Objection.  Asked and

Page 202

1  answered.
2          MS. ARRINDELL:  Join in that objection.
3          MR. NORWOOD:  Multiple times.
4      A   No front plate.  Heavy tinted windows.
5      Q   (By Mr. Waldron) Okay.  Next says, "I
6  requested his driver's license and proof of insurance
7  to which he advised he did not have his license on him
8  and his insurance card was somewhere in the vehicle.
9  He did not know where it was."
10         Any reason to disagree with that sentence?
11     A   No.
12     Q   Next says, "Watson became enraged as I
13 attempted to retrieve his pedigree information."
14         What pedigree information were you trying to
15 retrieve?
16     A   Name, date of birth.
17     Q   And he didn't provide it to you?
18     A   It says, "He became engaged."  It didn't say
19 he didn't give it.
20     Q   Okay.  So he did give his pedigree
21 information?
22     A   Didn't say that he didn't give it in here.
23     Q   I'm sorry?
24     A   Did not say that he didn't give it in here.
25     Q   Okay.  So your understanding, from reading

Page 203

1  this, is that he provided his pedigree information?
2      A   Yes.
3      Q   Okay.  So he's provided his pedigree
4  information.  And then next it says, "He advised he
5  was not doing anything wrong and I had no right to
6  bother him."
7          Do you recall that?
8      A   Where we at?
9      Q   We're at the paragraph that starts with the
10 word "Watson."
11     A   Oh.  Okay.
12     Q   I'll read it again.
13         "He advised he was not doing anything wrong
14 and I had no right to bother him.  He said I was
15 violating his Fifth Amendment right after I instructed
16 him not to use his cell phone when he was detained for
17 officer safety reasons."
18         Does that agree with what you recall from
19 the incident?
20     A   That's what's written.
21     Q   Do you have any recollection independent of
22 what's written?
23     A   I can't think of anything right now.
24     Q   Okay.  Is a person allowed to use their cell
25 phone at a -- at a traffic stop?

Page 204

1      A   They can.
2      Q   They can.  What about here where it says you
3  instructed him not to use his cell phone when he was
4  detained for officer safety reasons?
5      A   Then he couldn't.
6      Q   Okay.  And so in what circumstances would
7  officer's -- officer's safety dictate that it can't be
8  used?
9      A   If I felt like they were calling somebody
10 there to ambush me or to do harm to me.  Things along
11 those nature -- that nature.
12     Q   And is it fair to say that you -- that you
13 suspected that to be the case because you told him not
14 to use the cell phone?
15     A   Because he was combative and argumentative.
16     Q   So you believed that he was going to call to
17 ambush -- or to call somebody?
18     A   Yeah.  Call somebody to ambush me, attack
19 me.
20     Q   Okay.  And next it says, "Upon arrival of my
21 assists, PO Todd Mink, DSN 486, I instructed Watson to
22 exit the vehicle so I could pat him down for weapons."
23         Is that correct as you remember it?
24     A   I asked him to exit the vehicle before
25 that -- before the assist arrived and that he was

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

EDDIE C. BOYD III  11/29/2018

Page 209

1    about the Ferguson ordinances?
2        Q   Well, I was -- I was just referring to
3    policies.  But I think we can try -- I mean, I think
4    we can get to this.  I don't think this is that
5    difficult.
6        What I'm trying to understand is, as an
7    officer, do you always have the right to instruct a
8    person to get out of their vehicle if they're at a
9    traffic stop?
10       MR. NORWOOD:  Objection.  Calls for
11   speculation.  Improper hypothetical.  And a legal
12   conclusion.
13       MS. ARRINDELL:  Concur.
14       A   What am I pulling them out of the car for?
15       Q   (By Mr. Waldron) For any reason.  Are you
16   allowed to?
17       A   Why?
18       Q   Are you allowed to?
19       A   But for what?  You need to tell me why I'm
20   pulling them out of the car.
21       Q   So you need a reason to have them come out
22   of the car; is that right?
23       A   For your example, I would like one.  I don't
24   understand what you're getting at.  You're asking me
25   am I allowed to pull anybody out of a vehicle?

Page 210

1        Q   Yeah.
2        A   Why?
3        Q   So that's what I'm trying to figure out.
4    Are you allowed to?  You don't know?
5        A   I didn't say that.  I'm asking you why am I
6    pulling them out of the car?  Why am I pulling them
7    over.
8        Q   You -- let's say you feel unsafe.  Officer
9    safety.
10       MR. NORWOOD:  Well, let me object.  That's
11   vague and ambiguous as well.  We've got compound,
12   vague and ambiguous.
13       Q   (By Mr. Waldron) All right.  Let's go back
14   into this.  So the -- you mention that Officer Casem,
15   who's on the front page, is not here.  Any particular
16   reason or just a typo?
17       MS. ARRINDELL:  Objection.  It
18   mischaracterizes his testimony.
19       A   Can you repeat the question?
20       Q   (By Mr. Waldron) Is the only reason that
21   Officer Casem is not here is just because of a --
22   there's no --
23       A   I'm sorry.
24       Q   -- there's no reason behind it other than
25   you just forgot?

Page 211

1        A   I don't see where Officer Casem did anything
2    besides showed up.
3        Q   Okay.  I think the next part where it says
4    "He refused," do you see where I am, it's underneath
5    Officer Mink's name?
6        A   Yes.
7        Q   "He refused to exit the vehicle and after
8    the fifth time of instructing him to exit the vehicle,
9    he was advised he was under arrest for failure to obey
10   an officer, and that if he didn't exit the vehicle, he
11   would be tased."
12       This is the first mention I've seen of him
13   being under arrest in this report.  Do you agree?
14       A   Yes.
15       Q   But it's your testimony that you actually
16   instructed him that he was under arrest earlier in the
17   stop; is that correct?
18       A   Before the assist got there, yes.
19       Q   Before the assist.  You just didn't include
20   it until later on?  You just --
21       A   It's not in the report.
22       Q   It's not in the report; right?
23       A   Yes.
24       Q   Okay.  "He raised his windows up and moments
25   later reluctantly exited the vehicle where he was

Page 212

1    taken into custody and all resisting ceased."
2        What do you mean "all resisting ceased"?
3        A   He was not exiting the vehicle after he was
4    told he was under arrest.
5        Q   So that was resisting?
6        A   Yes.
7        Q   Okay.
8        "After placing him into handcuffs, he kicked
9    the driver's door closed in an attempt to lock it as
10   if he was trying to conceal something."
11       Why did you include that detail?
12       A   Because that's what he did.
13       Q   And so you tried to include all the details
14   that you could remember; right?
15       A   The ones that -- all the ones that I could
16   remember, yes.
17       Q   Except for the one where you told him he was
18   under arrest before the assist came; right?
19       A   I said I didn't remember it at the time of
20   the report.
21       Q   And the next sentence says, "The door did
22   not lock and a search incident to arrest revealed his
23   real name was Freddie Watson, 115 Monteith, St. Louis,
24   Missouri 63137."  And then it says, on the top of the
25   next page, "5'11", 175 pounds."

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

EDDIE C. BOYD III  11/29/2018

Page 213

1          So you searched -- this indicates that you
2    searched his vehicle, incident to his arrest?
3          A    Yes.
4          Q    And do you know what you found that provided
5    his name and address?
6          A    I don't recall exactly what it was.
7          Q    Do you know where the height came from?
8          A    The Department of Revenue response from
9    Missouri.
10         Q    So do you know -- do you know where the
11   height -- why the height would be different from the
12   height provided above?
13         A    That's what's listed on the expired license
14   and the first one is what he gave me.
15         Q    So he -- it's your testimony that he told
16   you "I am 6' tall and I'm a 197 pounds"?
17         A    That's where I would have got it from.  From
18   him.
19         Q    And that's the only place you would have got
20   it?
21         A    That's where I would have got it from.
22         Q    Okay.  Next it says, "Watson was additional
23   charged with making a 'false statement.'"
24              What's the false statement that he made?
25         A    I'd have to read the complaint for the

Page 214

1    charge.
2          Q    Okay.  You don't recall?
3          A    Not at this time.
4          Q    "It should be noted a REJIS computer search
5    of Freddy Watson" -- and that's Freddy with a Y,
6    F-r-e-d-d-y -- "revealed no record of an operator's
7    license through Florida, Illinois, or Missouri."
8              And how do you search REJIS through
9    different states?  Could you explain to me how that
10   works?
11         A    I don't recall.
12         Q    But is my -- my understanding from reading
13   this is that you can do REJIS searches through
14   different states.  Do you have to identify specific
15   states or is it just nationwide?
16         A    I don't recall.
17         Q    Okay.  Why did -- why the states Florida,
18   Illinois, or Missouri?
19         A    I mean, I don't recall why, but I'm assuming
20   it's because that's maybe what he told me, and
21   "Florida" up top.
22         Q    And you don't -- you don't remember how the
23   REJIS system worked in terms of this state -- whether
24   you'd have to search nationwide or whether you had to
25   search state by state?

Page 215

1          A    No, I don't recall at this time.
2          Q    The next sentence says, "A REJIS computer
3    search -- computer check of Freddie Watson,
4    F-r-e-d-d-i-e, revealed an expired operator's license
5    through Missouri that had not been surrendered to
6    another state."
7              How would you have got that information?
8          A    Through, I guess, the REJIS.
9          Q    So from reading this report, it appears as
10   though you searched in Florida and Illinois for
11   Freddy, with a Y?
12         A    I didn't search for Freddy with a Y.
13         Q    All right.  So I think I understand one of
14   the issues that we're having.  And that is the fact
15   that the narrative that you're looking at on 45 is
16   slightly different than the narrative we're looking at
17   on 43.  And if -- I'd call your attention to -- do you
18   see the paragraph that starts "Watson," Mr. Boyd?
19         A    Yes.
20         Q    You see how it's Freddy, F-r-e-d-d-y, on
21   page 43?
22         A    Yes.  That -- that doesn't match up what I
23   turned in.
24         Q    Right.  Okay.  And this -- so this
25   mistake -- or this difference would have been somebody

Page 216

1    in reports -- the reports office who would have
2    written Freddy with a Y?
3          A    Whoever entered it.
4          Q    It wouldn't have been you?
5          A    No, mine says "Freddie."
6          Q    Right.  And you didn't type this?
7          A    No.  I didn't enter this incident/offense
8    report into the computer.
9          Q    Understood.  So I think it might be helpful
10   for us to do -- or I'm going to switch to doing what
11   you're doing, which is looking at page 45 because
12   that's -- that's the report you wrote; right?
13         A    Yes.
14         Q    Okay.  So that report on 45, I'm at the
15   paragraph that starts "Watson".  "Watson was
16   additional charged with making a false statement.  It
17   should be noted a REJIS computer search of Fred Watson
18   revealed no record of an operator's license through
19   Florida, Illinois, or Missouri."
20              Does that reflect what you remember?
21         A    Yes.
22         Q    And it says, "A REJIS computer check of
23   Freddie Watson, revealed an expired operator's license
24   through Missouri that had not been surrendered to
25   another state."

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

EDDIE C. BOYD III  11/29/2018

| Page 217 | Page 219 |
|---|---|

**Page 217**

```
1           Does that reflect what you remember?
2      A   Yes.
3      Q   Do you know why you would have searched
4   "Fred" for Florida, Illinois, or Missouri, but not
5   "Freddie"?
6      A   Because he gave me Fred Watson initially.
7      Q   And then you went back and searched
8   "Freddie"?
9      A   Searched "Freddie" where?
10     Q   Well, it says, "A REJIS computer check of
11  Freddie Watson"?
12     A   I'm sorry.  Okay.  So you're asking me did I
13  go back and search "Freddie" in Missouri or did I
14  search him --
15     Q   Did you go -- did you ever search "Freddie"?
16     A   Yes.
17     Q   F-r-e-d-d-i-e?
18     A   Yes, yes, yes.  That's how I came up with
19  the expired operator's license in Missouri.
20     Q   And what searches did you conduct for
21  "Freddie" -- for "Freddie"?
22     A   I went through REJIS.
23     Q   Through REJIS.  And do you remember whether
24  it was Missouri specifically, or whether it was
25  specific states or whether it was nationwide?
```

**Page 219**

```
1   document is this?
2      A   This is a complaint form.
3      Q   And when would you fill out a complaint
4   form?
5      A   When there's a complaint that needs to be
6   filled out for a crime that's been committed.
7      Q   And that's a non-traffic complaint; is that
8   right?
9      A   Yes.
10     Q   Okay.  Is this a -- would this be a
11  duplicate or would there just be one copy of this?
12     A   This is just one copy you gave me.
13     Q   I mean, I -- I understand that this is
14  clearly a photocopy of one -- and a document, but when
15  you fill out these complaint forms, generally is it a
16  yellow and a white sheet, or is it just one piece of
17  paper?
18     A   No, it's a single sheet.
19     Q   A single sheet.  And where did the -- the
20  number for this is Cause Number 12-14370.  Is that the
21  number that you would have -- that would have been
22  generated from dispatch?
23     A   The complaint number?
24     Q   Yes.
25     A   Yes.
```

| Page 218 | Page 220 |
|---|---|

**Page 218**

```
1      A   I don't recall.
2      Q   Do you recall receiving any information on
3   that evening that showed that Mr. Watson lived in
4   Illinois?
5      A   I don't recall.
6      Q   Do you recall receiving any information that
7   Mr. Watson lived in Florida?
8      A   From where -- from Mr. Watson, yeah.
9      Q   From any other sources besides Mr. Watson?
10     A   I don't recall.
11     Q   Okay.  And the last sentence says, "He was
12  conveyed to the Ferguson Police Department where he
13  was booked accordingly."
14         Are we on 6?
15     A   Yes.
16         (Exhibit 6, Complaint Form, was marked
17          for identification.)
18         MR. WALDRON:  I'm going to mark this
19  Exhibit 6, and this is WATSON_46 and 47.
20         Sorry, Geri Lynn.
21     Q   (By Mr. Waldron) Mr. --
22         MR. NORWOOD:  What -- so what is the --
23  you're marking it Number 6?
24         MR. WALDRON:  This is 6.
25     Q   (By Mr. Waldron) Mr. Boyd, what sort of a
```

**Page 220**

```
1      Q   Okay.  And it's Freddie Watson, Defendant,
2   115 Monteith address.  And my apologies if I asked you
3   this.  Do you know where you got that address from?
4      A   The -- probably through REJIS, Department of
5   Revenue.
6      Q   Through REJIS.  Okay.  And it says -- in the
7   section where you write the complaint, is that your
8   handwriting?
9      A   Yes.
10     Q   It says, "Fail to obey an officer -- Watson
11  refused to provide pedigree information when asked."
12         Is that correct as you remember it?
13     A   That's what it says.
14     Q   Is that a correct -- as you remember -- do
15  you remember it?
16     A   It sounds -- that sounds right, yes.
17     Q   It sounds right.  Okay.
18         "Then refused to exit his vehicle when
19  advised he was under arrest."
20         Is that correct?
21     A   That sounds right.
22     Q   Which information -- which pedigree
23  information did Mr. Watson refuse to provide?
24     A   At what point?
25     Q   Well, at the point that you've filed this
```

EDDIE C. BOYD III  11/29/2018

Page 241

1      A   My auntie and my father.
2      Q   What's her name?
3      A   Audrey Lee.
4      Q   And where was she a police officer?
5      A   St. Louis City.
6      Q   And you said there was another person?
7      A   My father.
8      Q   And what's his name?
9      A   Eddie Boyd.
10      Q   As soon as it was coming out of my mouth, I
11   knew.  And where was he a police officer?
12      A   St. Louis City.
13      Q   Have you ever had an adult order of
14   protection filed against you?
15          MS. ARRINDELL:  Objection.  Relevance.
16      A   My ex-wife.  I believe she tried to file
17   one.
18      Q   (By Mr. Waldron) Did she file it?
19      A   She tried.
20      Q   Why do you say "tried" as opposed to she
21   actually filed it?
22      A   They didn't allow it.
23      Q   Okay.  So she -- your understanding is she
24   went to the courthouse and attempted to file it, but
25   she was not allowed to?

Page 242

1      A   It wasn't entered, as far as I know;
2   so . . .
3      Q   Okay.  Do you know what the reason for her
4   filing it was?
5      A   I do not know.
6      Q   Okay.  Where do you currently live?
7      A   St. Louis.
8      Q   What's your address?  This is under -- we're
9   under a protective order so what's said in this
10   deposition is confidential.
11      A   I don't feel comfortable giving my address.
12   I have some safety issues.  I have protesters who are
13   outside my door because I was a police officer, want
14   to attack me and, you know, do harm to me and my
15   family.  And being that we're in an adverse situation
16   right here, I don't feel comfortable giving my home
17   address.  You can have the station address.  That's
18   where I can get mail as well.
19      Q   And you said you've had protesters outside
20   of your door before?
21      A   Yes.  Sitting, watching, stalking,
22   harassing.
23      Q   When was that?
24      A   2014 to about 2015, 2016.
25      Q   Did you file a police report?

Page 243

1      A   No.  I just -- I believe I just advised my
2   supervisor.
3      Q   Who was your supervisor?
4      A   I don't recall.
5      Q   How did you advise him?
6      A   Verbally.
7      Q   You wouldn't have written it down?
8      A   I don't recall if I did or not.
9      Q   What was your first job in law enforcement?
10      A   Police officer.
11      Q   Where?
12      A   St. Louis City.
13      Q   St. Louis City.  And what year would that
14   have been?
15      A   2002.
16      Q   And what was your first role, your first
17   position at St. Louis City in 2002?
18      A   I'm not understanding the question.
19      Q   What was your title?
20      A   When I joined?
21      Q   Yes.
22      A   Police recruit in training.
23      Q   What other titles did you have?
24      A   Police recruiting in training.
25      Q   Okay.  As you advanced through the

Page 244

1   department.
2      A   Oh.  Probationary police officer.
3      Q   When did -- when did you become a
4   probationary police officer?
5      A   Upon graduating from the academy.
6      Q   Okay.  Do you know what year that was?
7      A   2003.
8      Q   Okay.  How long were you a probationary
9   police officer?
10      A   I don't recall.
11      Q   Did you have any titles before -- besides --
12   or any subsequent to being a probationary police
13   officer?
14      A   You mean after that?
15      Q   Yes.
16      A   A police officer.
17      Q   Police officer.  And any titles besides
18   police officer at SLMPD?
19      A   No.
20      Q   No?
21      A   None that I recall.
22      Q   Were you ever demoted?
23      A   Yes.
24      Q   And what were you demoted from?
25      A   Police officer.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 289

```
 1   the termination?
 2       A  I don't know.  Is it on the form somewhere?
 3       Q   Yeah.  So look toward the top.  It says,
 4   "Primary reason for termination."  It says "check one
 5   box only."
 6       A  Oh.  It says "Personal."
 7       Q   And what else?
 8       A  Where else would it be?
 9       Q   To the left.  It looks like "Other
10   employment" is checked; right?
11       A  Other -- I don't see it.  "Other
12   employment."  Yeah, it says "Other employment" and
13   "Personal."
14       Q   And you don't remember whether you actually
15   had a job lined up or you just meant "some other job."
16   Fair to say?
17       MS. ARRINDELL:  Objection.  Mischaracterizes
18   witness' testimony.
19       Q   (By Mr. Waldron) Well, did you have other
20   employment at this time?
21       MS. ARRINDELL:  Objection.  Asked and
22   answered.
23       A  I don't recall.
24       Q   (By Mr. Waldron) You don't recall.  And on
25   top, it says "Employee Under Investigation."  Then
```

Page 290

```
 1   there's "No" and a "Yes" and the "Yes" is checked, and
 2   for Internal Affairs No. 7/106.
 3       Is it a coincidence that your last day
 4   physically on job, that's 4/26/07, was the same day
 5   that you filed this police report against Christopher
 6   Dickson?
 7       A  I don't know.  I mean, would it be a
 8   coincidence?
 9       Q   I'm asking you if you remember any
10   connection between the two things.
11       A  No, I don't.
12       Q   You remember nothing about those two things?
13       A  No.
14       Q   So it's pure happenstance that on one day,
15   Christopher Dickson -- you filed these charges against
16   Christopher Dickson where, in -- in your words, or in
17   somebody's words, a hand goes and hits him in the
18   face, and on the same day, that's your last day on the
19   job?
20       A  I -- I mean, I don't know what you want me
21   to say.  But, I mean --
22       Q   If you don't remember, you don't remember.
23       A  I -- I mean, I don't recall if the
24   circumstances is a coincidence.
25       Q   And do you remember whether there was an
```

Page 291

```
 1   investigation on this, an Internal Affairs
 2   investigation?
 3       A  From your form you gave me, it says
 4   "IAD File."
 5       Q   Do you ever know what happened to it?
 6       A  No.
 7       Q   Would you be surprised if you -- to find out
 8   that an allegation that -- that you -- another
 9   allegation against you had been sustained?
10       MS. ARRINDELL:  Objection.  Calls for
11   speculation.
12       A  Is that a question?
13       Q   (By Mr. Waldron) Yeah.  Would you be --
14   would you be surprised or are you surprised to hear
15   this was -- that it was sustained?
16       A  I -- I -- I don't have an answer for that
17   because, I mean, I don't know anything about it.
18       Q   You don't know anything about it; right?
19   Okay.  Have you ever -- what is Missouri POST?
20       A  Peace officer -- or police officers
21   standardized -- or standard training.
22       Q   And what do they do?
23       A  Monitor training and police officer -- or
24   peace officers' licenses.
25       Q   And had you ever -- have you ever had your
```

Page 292

```
 1   license revoked by Missouri POST?
 2       A  No.  No.
 3       Q   Have you ever had it investigated?
 4       A  I believe there was an investigation.
 5       Q   There was an investigation.  Do you know
 6   what the result was of the investigation?
 7       A  I believe everything was dropped.
 8       Q   Everything was dropped.  Do you know why it
 9   was dropped?
10       A  I don't recall at this time.
11       Q   So you remember that it was dropped, but you
12   don't remember why it was dropped?
13       MS. ARRINDELL:  Objection to the extent it
14   calls for waiver of attorney-client privilege and
15   communication.
16       A  I don't recall.
17       Q   (By Mr. Waldron) Okay.  So what years were
18   you at St. Ann?
19       A  Approximately '07 to 2010.
20       Q   To -- I'm sorry, what year?
21       A  2010.
22       Q   2010.  Okay.  '07 to 2010 you were at
23   St. Ann.  And what was your duty or what was your --
24   your position there?
25       A  Police officer.
```

```
Requested by: #LAUCL1    ORI: MO095201J
Car ID: DESK    LTERM: BFRGADVI
Date/Time of Inquiry: 12/05/2013 11:03 AM

*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*
WANTED PERSON    -- ACTIVE    REF-NO: W08592616    MO0952800-FERGUSON PD
WATSON       FREDDIE     D          B M 034 DOB:10081979 HGT:5-11 WT:175
BUILD:___    COMP:___   HAIR:XXX   EYES:BRO   PLACE-OF-BIRTH:__   MAR-STA:_
 RESIDENCE:  PO BOX 2003                                          12/05/2013
            FAIRVIEW HTS IL 62208
MISC:FAIL TO OBEY PTA BOND 300
ADDITIONAL ID'S -----
SOC SEC NO:▊▊▊▊▊▊
OPR LIC NO:G208010016          MO 2005
CHARGES . . . . . . . . . EXT . . WAR/OCA . . . . . . DATE . CHG-CODE
   CTY WAR FAIL TO APPEAR ORDINANCE P  WAR:FGT137596      10292013 76151150
       RMK  EXT 50 MILES                OCA:13-7596
       OOC:91226990 - FAIL TO OBEY POLICE OFCR CORI:MO095201J
EXT DESC: P = PARTIAL INTRASTATE
----------
EN:12-05-2013 11:03 #LAUCL1   UP:_____ _____ _____
LC:_____ _____  CN:_____ _____ _____
4049  SUPPLEMENTAL DATA ENTERED - MULES ONLY
MULES SHP:131205-110343      NOTIFY-ORI:          -
*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*
```



PLAINTIFF'S
EXHIBIT
3

FERG-WAT 00267

Response                                                                    Page 1 of 1

```
Requested by: #LAUCL1    ORI: MO095201J
Car ID: DESK    LTERM: BFRGADVI
Date/Time of Inquiry: 12/05/2013 11:03 AM
_____           START OF DOR  RESPONSE PHOTO   _____
NAME: WATSON,FREDDIE D
OLN:  G208010016    SEX: M
PHOTO TAKEN: 10-11-2002
DOC TYPE: DRIVERS LICENSE        SEQ: 021372840002
```



```
_____           START OF DOR  RESPONSE        _____
12/05/2013 11:02              DEPARTMENT OF REVENUE       DRIVERS HISTORY
DESK G208010016                                           FULL RESPONSE


  **************************************************************************
  * THIS RECORD RESTRICTED UNDER THE FEDERAL DRIVER'S PRIVACY PROTECTION ACT *
  **************************************************************************
  LIC: G208010016
  NAME: WATSON, FREDDIE D                      SSN: ████████
  SEX: MALE     AGE: 034 DOB: 10/08/1979 HGT: 5-11  WGT: 175  EYES: BROWN
        RESIDENT ADDRESS          CURRENT ADDRESS
  115 MONTEITH                    PO BOX 2003
  ST LOUIS, MO 63137              FAIRVIEW HTS, IL 62208-0203
  PREV NAME: WATSON, FREDDIE D
  ----------------------<<<<        LICENSE        >>>>---------------------------
  STATUS MO: VALID EXPIRED
  SURRENDERED TO:
  CLASS: F-NON-COMMERCIAL                          SEQ: 021372840002
  EXP: 10/08/2005                                  L-UPD: 11/04/2002
  ----------------------<<<<        PERMIT         >>>>---------------------------
  CLASS: F-NON-COMMERCIAL                          SEQ: 962080459010
  EXP: 08/17/1996                                  L-UPD: 02/27/1996

  ----------------------<<<<        ID CARD        >>>>---------------------------
  EXP: 08/19/2001                   SEQ: 982082310248 L-UPD: 09/16/1998
  ----------------------<<<<   CONVICTION / ACTIONS   >>>>-------------------------
  05/23/2013 PTS:02 SPEEDING
                 VIOL: 04/30/2013 CONVICTED: 05/17/2013  UTT: 120522300
                 CIR CRT MUN DIV NORTHWOODS

  _____            END OF DOR RESPONSE         _____
```

https://10.96.9.217/leweb/hotfile/response_info.htm?request=20483071&amp;response=0      12/5/13

FERG-WAT 00268

Response                                                                          Page 1 of 1

```
Requested by: #HAYJM1    ORI: MO0952800
Car ID: DESK    LTERM: LFRGAAVI
Date/Time of Inquiry: 08/01/2012 21:05 PM
                          START OF DOR  RESPONSE PHOTO
NAME: WATSON,FREDDIE D
OLN:  G208010016   SEX: M
PHOTO TAKEN: 10-11-2002
DOC TYPE: DRIVERS LICENSE      SEQ: 021372840002
```



```
                          START OF DOR  RESPONSE
08/01/2012 09:04            DEPARTMENT OF REVENUE           DRIVERS HISTORY
DESK WATSON    FREDDIE    19791008M                        FULL RESPONSE


*************************************************************************
* THIS RECORD RESTRICTED UNDER THE FEDERAL DRIVER'S PRIVACY PROTECTION ACT *
*************************************************************************
LIC: G208010016
NAME: WATSON, FREDDIE D                          SSN:
SEX: MALE     AGE: 032 DOB: 10/08/1979 HGT: 5-11  WGT: 175  EYES: BROWN
   RESIDENT ADDRESS             CURRENT ADDRESS
115 MONTEITH                    PO BOX 2003
ST LOUIS, MO 63137              FAIRVIEW HTS, IL 62208-0203
PREV NAME: WATSON, FREDDIE D
----------------------<<<<      LICENSE      >>>>--------------------------
STATUS MO: VALID EXPIRED
SURRENDERED TO:
CLASS: F-NON-COMMERCIAL                              SEQ: 021372840002
EXP: 10/08/2005                                      L-UPD: 11/04/2002
----------------------<<<<      PERMIT       >>>>--------------------------
CLASS: F-NON-COMMERCIAL                              SEQ: 962080459010
EXP: 08/17/1996                                      L-UPD: 02/27/1996

----------------------<<<<      ID CARD      >>>>--------------------------
EXP: 08/19/2001                    SEQ: 982082310248 L-UPD: 09/16/1998
                          END OF DOR RESPONSE
```

**FERG-WAT 00279**

Response                                                                    Page 1 of 2

```
                        START OF REJIS HOT FILE RESPONSE

CADR*** FOR /LIC 958MRJ FL 2012 PC - NO RECORD REJIS
                        END OF REJIS HOT FILE RESPONSE
```

```
                   START OF MULES HOT FILE RESPONSE
FROM-MULES/3      DATE: 08/01/2012  TIME: 21:46:35 DEST TERM: LFRGAAVI
QW.ORI/MO0952800.LIC/958MRJ  .LIS/FL.LIY/12.LIT/PC
* NO MULES WANT OR WARRANT
* '*  INQUIRY HAS BEEN SENT TO NLETS                    * *
                        END OF MULES HOT FILE RESPONSE
```

```
                   START OF NCIC HOT FILE RESPONSE
FROM-NCIC         DATE: 08/01/2012  TIME: 21:46:35 DEST TERM: LFRGAAVI
QW.MO0952800.LIC/958MRJ.LIS/FL

M00952800

=====================================================================
NO NCIC WANT LIC/958MRJ LIS/FL
***MESSAGE KEY QW SEARCHES WANTED PERSON FILE FELONY RECORDS REGARDLESS OF
EXTRADITION AND MISDEMEANOR RECORDS INDICATING POSSIBLE INTERSTATE
EXTRADITION FROM THE INQUIRING AGENCY'S LOCATION.  ALL OTHER NCIC PERSONS
FILES ARE SEARCHED WITHOUT LIMITATIONS.
                        END OF NCIC HOT FILE RESPONSE
```

```
                   START OF NLETS VEHICLE REGIST
FROM-NLETS        DATE: 08/01/2012  TIME: 21:46:38 DEST TERM: LFRGAAVI
RQ.MO0952800.FL.*0SEIP00000.TXT LIC/958MRJ.LIY/2012.LIT/PC

RR.FL037065V
19:46 08/01/2012 34118
19:46 08/01/2012 22869 MO0952800
*7554615900
TXT
--DMVR--
DHSMV RECORD -
958MRJ      1G4GE5EDXBF279655 BUIC      4D     11 004077 ORIGINAL - NEW

                                                    COLOR: BLK
FREDDIE       DEMON        WATSON

PO BOX 2003                          CLASS: 001 GVW: 000000
FAIRVIEW HTS                IL 62208-0203   COUNTY RES: 09
DOB: 10/08/79 SEX: M DECAL/YR: 14763257/2 DECAL EXP:10/08/12 USE: PRIVATE




                   REGISTRANT(S) INFORMATION
REGISTRANT 1: FREDDIE        DEMON       WATSON
PO BOX 2003                          SEX: M  DOB: 10/08/79
```

FERG-WAT 00286

Response                                                                    Page 2 of 2

```
FAIRVIEW HTS                       IL      62208-0203    DL#1: W325244793680
REGISTRANT 2:
                                                        SEX:    DOB:   /  /
                                                        NO R2



                    INSURANCE INFORMATION
INSURER: GOVERNMENT EMPLOYEES INS. CO.          POLICY # 4038680916

5260 WESTERN AVENUE
CHEVY CHASE        MD 20815-0000

END DHSMV RESPONSE
_____       END OF NLETS VEHICLE REGIST      _____
```

FERG-WAT 00287

ORI NO. MO 0952800
**CITY OF FERGUSON**
UNIFORM CITATION

Proof of financial
responsibility ☐YES ☐NO

111  787144

| STATE OF MISSOURI | | DIVISION |
| IN THE CIRCUIT COURT OF  **ST. LOUIS** | COUNTY | **MUNICIPAL** |

COURT ADDRESS (STREET, CITY, ZIP)
110 CHURCH ST.     FERGUSON, MO 63135   14370

| COURT DATE - COURT TIME   9/25/12 | 10:00 ☒ AM  6:00 ☐ PM | COURT PHONE NO  (314) 524-5264 |

**I, KNOWING THAT FALSE STATEMENTS ON THIS FORM ARE PUNISHABLE BY LAW, STATE THAT I HAVE PROBABLE CAUSE TO BELIEVE THAT:**

| ON ABOUT (DATE)  8/1/12 | AT TIME  2017 HRS | HWY CLASS | UPON AT OR NEAR (LOCATION)  JS Ferguson |

WITHIN CITY/COUNTY AND STATE AFORESAID.

NAME (LAST, FIRST, MIDDLE)
Watson, Freddie D

STREET ADDRESS
115 Fourteenth

| CITY  Louis | STATE  MO | ZIP CODE  6337 |

| DATE OF BIRTH  10/1/79 | AGE  32 | RACE  B | SEX  M | HEIGHT  511 | WEIGHT  175 |

| DRIVER'S LIC NO.  G208010016 | CDL  ☐ YES  ☐ NO | STATE  MO |

**LEAVE THIS LINE BLANK**

EMPLOYER

ADDRESS (STREET, CITY, STATE, ZIP)

DID UNLAWFULLY  ☒ OPERATE/DRIVE  ☐ PARK  ☐ C.M.V.  ☐ WITH HAZ MAT

| V E H I C L E | YEAR  2011 | MAKE  Buick | MODEL | STYLE | COLOR  Blk |
| | REGISTERED WEIGHT | | LIC NUMBER  958MRT | STATE  FL | YEAR  2012 |

**DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE. THE FACTS SUPPORTING THIS BELIEF ARE AS FOLLOWS:**

No Operators license in possession

☐ Subject taken into custody. (Complete "For Issuance of a Warrant" section on reverse side.)

| DRIVING  ___ MPH | POSTED SPEED LIMIT  ___ MPH | DETECTION METHOD  ☐ STATIONARY RADAR  ☐ WATCH (AIR)  ☐ PACE  ☐ MOVING RADAR  ☐ WATCH (GROUND)  ☐ OTHER |

| IN VIOLATION OF | ☐ RSMo  ☒ ORD | CHARGE CODE | ☐ IN FATAL ACCIDENT |
| SEAT BELT VIOLATION  ☐ ORD  ☐ RSMo | | CHARGE CODE | ☐ IN ACCIDENT  ☐ DWI/BAC |

| OFFICER | BADGE | TRP/ZONE | DATE  8/1/12 |

ON INFORMATION, UNDERSIGNED PROSECUTOR CHARGES THE DEFENDANT AND INFORMS THE COURT THAT ABOVE FACTS ARE TRUE AND PUNISHABLE BY
☐ RSMo  ☐ ORD

| PROSECUTOR'S SIGNATURE | DATE |

I PROMISE TO DISPOSE OF THE CHARGES OF WHICH I AM ACCUSED THROUGH COURT APPEARANCE OR PREPAYMENT OF FINE AND COURT COSTS

| SIGNATURE X  Booked | DR LIC POSTED  ☐ YES  ☐ NO |

MO 100-0051 (10-02)

WATSON_00001

**VIOLATOR'S COPY**

PLAINTIFF'S EXHIBIT
4
tabbies

**ORI NO. MO 0952800**

**CITY OF FERGUSON**
(W)

**UNIFORM CITATION**

Proof of financial responsibility ☐YES ☐NO

111  787145

| STATE OF MISSOURI | | DIVISION |
|---|---|---|
| IN THE CIRCUIT COURT OF | **ST. LOUIS** COUNTY | **MUNICIPAL** |

COURT ADDRESS (STREET, CITY, ZIP)
**110 CHURCH ST.    FERGUSON, MO 63135**    14370

COURT DATE - COURT TIME  9/25/12
10:00 ☑ AM
6:00 ☐ PM

COURT PHONE NO
**(314) 524-5264**

I, KNOWING THAT FALSE STATEMENTS ON THIS FORM ARE PUNISHABLE BY LAW, STATE THAT I HAVE PROBABLE CAUSE TO BELIEVE THAT:

ON/ABOUT (DATE)  4/1/12   AT TIME  207 HRS   HWY CLASS   UPON/AT OR NEAR (LOCATION)  825 Ferguson

WITHIN CITY/COUNTY AND STATE AFORESAID,

NAME (LAST, FIRST, MIDDLE)
Watson, Freddie  D

STREET ADDRESS
115 Meredith

CITY  St. Louis    STATE  MO   ZIP CODE  63137

| DATE OF BIRTH | AGE | RACE | SEX | HEIGHT | WEIGHT |
|---|---|---|---|---|---|
| 10/2/79 | 32 | B | M | 511 | 175 |

DRIVERS LIC. NO  G208010016    CDL ☐ YES ☑ NO    STATE  MO

**LEAVE THIS LINE BLANK**

EMPLOYER

ADDRESS (STREET, CITY, STATE, ZIP)

DID UNLAWFULLY  ☑ OPERATE/DRIVE  ☐ PARK    ☐ C.M.V.  ☐ WITH HAZ MAT

VEHICLE:
| YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|
| 2011 | Buick | | 4 dr | Blk |

REGISTERED WEIGHT   LIC NUMBER  958 MRT   STATE  MO   YEAR  2013

DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE. THE FACTS SUPPORTING THIS BELIEF ARE AS FOLLOWS:

No proof of insurance

☑ Subject taken into custody. (Complete "For Issuance of a Warrant" section on reverse side.)

| DRIVING ___ MPH | POSTED SPEED LIMIT ___ MPH | DETECTION METHOD ☐ STATIONARY RADAR ☐ WATCH (AIR) ☐ PACE ☐ MOVING RADAR ☐ WATCH (GROUND) ☐ OTHER |
|---|---|---|

IN VIOLATION OF  ☐ RSMo  ☐ ORD    CHARGE CODE    ☐ IN FATAL ACCIDENT
☐ IN ACCIDENT

SEAT BELT VIOLATION  ☐ ORD  ☐ RSMo    CHARGE CODE    ☐ DWI/BAC

OFFICER  A.N.    BADGE    TRP/ZONE    DATE  X 4/1/12

ON INFORMATION UNDERSIGNED PROSECUTOR CHARGES THE DEFENDANT AND INFORMS THE COURT THAT ABOVE FACTS ARE TRUE AND PUNISHABLE BY    ☐ RSMo  ☐ ORD

PROSECUTOR'S SIGNATURE    DATE

I PROMISE TO DISPOSE OF THE CHARGES OF WHICH I AM ACCUSED THROUGH COURT APPEARANCE OR PREPAYMENT OF FINE AND COURT COSTS

SIGNATURE X) Booked

DR LIC POSTED ☐ YES ☑ NO

MO 100-0051 (10-02)

**WATSON_00003**

VIOLATOR'S COPY

ORI NO. MO 0952800
**CITY OF FERGUSON**
UNIFORM CITATION

Proof of financial
responsibility ☐YES ☑NO

**111 787146**

| STATE OF MISSOURI | | | DIVISION |
| IN THE CIRCUIT COURT OF   **ST. LOUIS** | | COUNTY | **MUNICIPAL** |

COURT ADDRESS (STREET, CITY, ZIP)
**110 CHURCH ST.      FERGUSON, MO 63135**   14370

| COURT DATE - COURT TIME | 10:00 ☑AM | COURT PHONE NO |
| 9/25/12 | 6:00 ☐PM | **(314) 524-5264** |

I, KNOWING THAT FALSE STATEMENTS ON THIS FORM ARE PUNISHABLE BY LAW, STATE
THAT I HAVE PROBABLE CAUSE TO BELIEVE THAT:

| ON/ABOUT (DATE) | AT TIME | HWY CLASS | UPON AT OR NEAR (LOCATION) |
| 8/1/12 | 2:07 HRS | | 325 Ferguson |

WITHIN CITY/COUNTY AND STATE AFORESAID.

NAME (LAST, FIRST, MIDDLE)
Watson, Freddie D

STREET ADDRESS
115 Monteith

| CITY | STATE | ZIP CODE |
| St. Louis | MO | 63127 |

| DATE OF BIRTH | AGE | RACE | SEX | HEIGHT | WEIGHT |
| 10/8/79 | 32 | B | M | 5'11 | 175 |

| DRIVER'S LIC. NO | | CDL | STATE |
| G202010-18 | | ☐YES ☐NO | MO |

**LEAVE THIS LINE BLANK**

EMPLOYER

ADDRESS (STREET, CITY, STATE, ZIP)

| DID UNLAWFULLY | ☑OPERATE/DRIVE | ☐PARK | ☐C.M.V. | ☐WITH HAZ MAT |

| V E H I C L E | YEAR 2011 | MAKE Buick | MODEL Sedan | STYLE 4dr | COLOR BLK |
| | REGISTERED WEIGHT | | LIC NUMBER 758 MRT | STATE FL | YEAR 2012 |

DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE. THE FACTS SUPPORTING THIS
BELIEF ARE AS FOLLOWS:

Vision reducing material applied
to windshield

☐ Subject taken into custody. (Complete "For Issuance of a Warrant" section on reverse side.)

| DRIVING | POSTED SPEED LIMIT | DETECTION METHOD |
| | | ☐STATIONARY RADAR ☐WATCH (AIR) ☐PACE |
| MPH | MPH | ☐MOVING RADAR ☐WATCH (GROUND) ☐OTHER |

| IN VIOLATION OF | ☐RSMo | CHARGE CODE | ☐IN FATAL ACCIDENT |
| | ☐ORD | | ☐IN ACCIDENT |
| SEAT BELT ☐ORD | | CHARGE CODE | ☐DWI/BAC |
| VIOLATION ☐ | RSMo | | |

| OFFICER | BADGE | TRP/ZONE | DATE |
| | | | 8/1/12 |

ON INFORMATION, UNDERSIGNED PROSECUTOR CHARGES THE DEFENDANT AND
INFORMS THE COURT THAT ABOVE FACTS ARE TRUE AND PUNISHABLE BY      ☐RSMo  ☐ORD

| PROSECUTOR'S SIGNATURE | DATE |

I PROMISE TO DISPOSE OF THE CHARGES OF WHICH I AM ACCUSED THROUGH COURT
APPEARANCE OR PREPAYMENT OF FINE AND COURT COSTS

| SIGNATURE X   Looked | DR LIC POSTED ☐YES ☐NO |

MO 100-0051 (10-02)

**WATSON_00004**

VIOLATOR'S COPY

VIOLATOR'S COPY

MO 100-0051 (10-02)

| | |
|---|---|
| I PROMISE TO DISPOSE OF THE CHARGES OF WHICH I AM ACCUSED THROUGH COURT APPEARANCE OR PREPAYMENT OF FINE AND COURT COSTS<br>SIGNATURE X [illegible] | DR LIC POSTED ☐ YES ☐ NO |
| PROSECUTOR'S SIGNATURE | DATE |
| ON INFORMATION, UNDERSIGNED PROSECUTOR CHARGES THE DEFENDANT AND INFORMS THE COURT THAT ABOVE FACTS ARE TRUE AND PUNISHABLE BY | ☐ RSMo ☐ ORD |
| OFFICER [illegible] BADGE TRIP/ZONE | DATE 8/1/18 |
| SEAT BELT VIOLATION ☐ ORD ☐ RSMo CHARGE CODE | ☐ IN ACCIDENT ☐ DWI/BAC |
| IN VIOLATION OF ☐ RSMo ☒ ORD CHARGE CODE | ☐ IN FATAL ACCIDENT |
| DRIVING MPH POSTED SPEED LIMIT MPH | DETECTION METHOD ☐ MOVING RADAR ☐ STATIONARY RADAR ☐ WATCH (GROUND) ☐ WATCH (AIR) ☐ OTHER ☐ PACE |

☐ Subject taken into custody. (Complete "For Issuance of a Warrant" section on reverse side.)

DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE. THE FACTS SUPPORTING THIS BELIEF ARE AS FOLLOWS:

Expired State Operators License

VEHICLE: REGISTERED WEIGHT | C.D.L. | NUMBER [illegible] | STATE | YEAR

YEAR | MAKE Buick | MODEL | STYLE | COLOR Blk

DID UNLAWFULLY ☒ OPERATE/DRIVE ☐ PARK ☐ C.M.V. ☐ WITH HAZ MAT

ADDRESS (STREET CITY STATE ZIP)

EMPLOYER

**LEAVE THIS LINE BLANK**

DRIVER'S LIC NO. [illegible] | CDL ☐ YES ☐ NO | STATE MO

DATE OF BIRTH | AGE | RACE | SEX M | HEIGHT | WEIGHT

STREET ADDRESS [illegible]

CITY St. [illegible] | STATE MO | ZIP CODE [illegible]

NAME (LAST FIRST MIDDLE) Watson Fredrick D

WITHIN CITY/COUNTY AND STATE AFORESAID,

ON/ABOUT (DATE) [illegible] AT TIME [illegible] HRS | HWY CLASS | UPON/AT OR NEAR (LOCATION) [illegible]

THAT I HAVE PROBABLE CAUSE TO BELIEVE THAT:

I, KNOWING THAT FALSE STATEMENTS ON THIS FORM ARE PUNISHABLE BY LAW, STATE

COURT DATE - COURT TIME [illegible] | 10:00 ☐ AM 6:00 ☐ PM | COURT PHONE NO (314) 524-5264

COURT ADDRESS (STREET, CITY, ZIP) 110 CHURCH ST. FERGUSON, MO 63135 [illegible]

STATE OF MISSOURI IN THE CIRCUIT COURT OF ST. LOUIS COUNTY DIVISION MUNICIPAL

CITY OF FERGUSON
ORI NO. MO 0952800
UNIFORM CITATION

111 787150

Proof of financial responsibility ☐YES ☐NO

Proof of financial
responsibility ☐YES ☐NO

**ORI NO. MO 0952800**
**CITY OF FERGUSON**
**UNIFORM CITATION**

111   787149

| STATE OF MISSOURI | | DIVISION |
| IN THE CIRCUIT COURT OF | **ST. LOUIS** · COUNTY | **MUNICIPAL** |

COURT ADDRESS (STREET, CITY, ZIP)
**110 CHURCH ST.     FERGUSON, MO 63135**     14370

| COURT DATE - COURT TIME | 10:00 ☐ AM | COURT PHONE NO |
| 9/25/12 | 6:00 ☐ PM | **(314) 524-5264** |

I, KNOWING THAT FALSE STATEMENTS ON THIS FORM ARE PUNISHABLE BY LAW, STATE
THAT I HAVE PROBABLE CAUSE TO BELIEVE THAT:

| ON/ABOUT (DATE) | AT TIME | HWY CLASS | UPON AT OR NEAR (LOCATION) |
| 7/11/12 | 7 HRS | | 825 Ferguson |

WITHIN CITY/COUNTY AND STATE AFORESAID,

NAME (LAST, FIRST, MIDDLE)
Watson, Freddie D

STREET ADDRESS
115 Libert 4th

| CITY | | STATE | ZIP CODE |
| St Louis | | MO | 63137 |

| DATE OF BIRTH | AGE | RACE | SEX | HEIGHT | WEIGHT |
| 10/21/79 | 32 | B | M | 5'11 | 175 |

| DRIVER'S LIC. NO. | | CDL | STATE |
| G308010016 | | ☐ YES ☐ NO | MO |

**LEAVE THIS LINE BLANK**

EMPLOYER

ADDRESS (STREET, CITY, STATE, ZIP)

| DID UNLAWFULLY | ☑ OPERATE/DRIVE | ☐ PARK | ☐ C.M.V. | ☐ WITH HAZ MAT |

| V E H I C L E | YEAR | MAKE | MODEL | STYLE | COLOR |
| | 2011 | Buick | Sedan | 4dr | Blk |
| | REGISTERED WEIGHT | | NUMBER | STATE | YEAR |
| | | | 958MRT | FL | 2012 |

DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE. THE FACTS SUPPORTING THIS
BELIEF ARE AS FOLLOWS:

No Seat belt

☐ Subject taken into custody. (Complete "For Issuance of a Warrant" section on reverse side.)

| DRIVING | POSTED SPEED LIMIT | DETECTION METHOD |
| MPH | MPH | ☐ STATIONARY RADAR  ☐ WATCH (AIR)  ☐ PACE |
| | | ☐ MOVING RADAR  ☐ WATCH (GROUND) ☐ OTHER |

| IN VIOLATION OF | ☐ RSMo | CHARGE CODE | ☐ IN FATAL ACCIDENT |
| | ☑ ORD | | ☐ IN ACCIDENT |
| SEAT BELT | ☐ ORD | CHARGE CODE | ☐ DWI/BAC |
| VIOLATION ☐ | RSMo | | |

| OFFICER | BADGE | T.R.P./ZONE | DATE |
| AH | | | 8/11/12 |

ON INFORMATION, UNDERSIGNED PROSECUTOR CHARGES THE DEFENDANT AND
INFORMS THE COURT THAT ABOVE FACTS ARE TRUE AND PUNISHABLE BY          ☐ RSMo
                                                                        ☐ ORD

| PROSECUTOR'S SIGNATURE | | DATE |

I PROMISE TO DISPOSE OF THE CHARGES OF WHICH I AM ACCUSED THROUGH COURT
APPEARANCE OR PREPAYMENT OF FINE AND COURT COSTS

| SIGNATURE X) _____ | DR LIC POSTED ☐ YES ☐ NO |

MO 100-0051 (10-02)

WATSON_00006

VIOLATOR'S COPY

Proof of financial
responsibility ☐YES  ☐NO

**ORI NO. MO 0952800**
**CITY OF FERGUSON**
**UNIFORM CITATION**

111   787147

| STATE OF MISSOURI | | | DIVISION |
|---|---|---|---|
| IN THE CIRCUIT COURT OF | **ST. LOUIS** | COUNTY | **MUNICIPAL** |

COURT ADDRESS (STREET, CITY, ZIP)
**110 CHURCH ST.     FERGUSON, MO 63135**   14 376

| COURT DATE - COURT TIME | 10:00 ☐ AM | COURT PHONE NO |
|---|---|---|
| 9/25/17 | 6:00 ☐ PM | (314) 524-5264 |

I, KNOWING THAT FALSE STATEMENTS ON THIS FORM ARE PUNISHABLE BY LAW, STATE
THAT I HAVE PROBABLE CAUSE TO BELIEVE THAT:

| ON/ABOUT (DATE) | AT TIME | HWY CLASS | UPON AT OR NEAR (LOCATION) |
|---|---|---|---|
| 8/1/17 | 207 HRS | | XXS Ferguson |

WITHIN CITY/COUNTY AND STATE AFORESAID.

NAME (LAST, FIRST, MIDDLE)
Watson, Tyedric D

STREET ADDRESS
11 S Monteith

| CITY | | STATE | ZIP CODE |
|---|---|---|---|
| St Louis | | MO | 63137 |

| DATE OF BIRTH | AGE | RACE | SEX | HEIGHT | WEIGHT |
|---|---|---|---|---|---|
| 10/1/79 | 32 | B | M | 5'11 | 175 |

| DRIVER'S LIC. NO. | | CDL | STATE |
|---|---|---|---|
| G 208010016 | | ☐ YES  ☐ NO | MO |

**LEAVE THIS LINE BLANK**

EMPLOYER

ADDRESS (STREET, CITY, STATE, ZIP)

| DID UNLAWFULLY | ☑ OPERATE/DRIVE | ☐ PARK | ☐ C.M.V. | ☐ WITH HAZ MAT |
|---|---|---|---|---|

| V E H I C L E | YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|---|
| | JC11 | truck | Nissan | 4dr | Blk |
| | REGISTERED WEIGHT | L I C | NUMBER | STATE | YEAR |
| | | | 9581NRT | FL | 202 |

DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE. THE FACTS SUPPORTING THIS
BELIEF ARE AS FOLLOWS:

Failure to register an out
of state motor veh within 30 day
RSMo

☐ Subject taken into custody. (Complete "For Issuance of a Warrant" section on reverse side.)

| DRIVING | POSTED SPEED LIMIT | DETECTION METHOD |
|---|---|---|
| MPH | MPH | ☐ STATIONARY RADAR  ☐ WATCH (AIR)  ☐ PACE  ☐ MOVING RADAR  ☐ WATCH (GROUND)  ☐ OTHER |

| IN VIOLATION OF | CHARGE CODE | |
|---|---|---|
| ☐ RSMo  ☑ ORD | | ☐ IN FATAL ACCIDENT  ☐ IN ACCIDENT |
| SEAT BELT ☐ ORD  VIOLATION ☐ | CHARGE CODE  RSMo | ☐ DWI/BAC |

| OFFICER | BADGE | TRP/ZONE | DATE |
|---|---|---|---|
| | | | 8/1/17 |

ON INFORMATION, UNDERSIGNED PROSECUTOR CHARGES THE DEFENDANT AND
INFORMS THE COURT THAT ABOVE FACTS ARE TRUE AND PUNISHABLE BY     ☐ RSMo  ☐ ORD

| PROSECUTOR'S SIGNATURE | | DATE |
|---|---|---|

| I PROMISE TO DISPOSE OF THE CHARGES OF WHICH I AM ACCUSED THROUGH COURT APPEARANCE OR PREPAYMENT OF FINE AND COURT COSTS | DR. LIC POSTED |
|---|---|
| SIGNATURE/X   Booked | ☐ YES  ☐ NO |

MO 100-0051 (10-02)

**WATSON_00007**

**VIOLATOR'S COPY**

WATSON_00008

**ORI NO. MO 0952800**
**CITY OF FERGUSON**
**UNIFORM CITATION**

Proof of financial responsibility ☐YES ☐NO

111 787148

STATE OF MISSOURI
IN THE CIRCUIT COURT OF **ST. LOUIS** COUNTY — DIVISION **MUNICIPAL**

COURT ADDRESS (STREET, CITY, ZIP): **110 CHURCH ST. FERGUSON, MO 63135** 14370

COURT DATE - COURT TIME: 9/25/12 — **10:00** ☒ AM / **6:00** ☐ PM — COURT PHONE NO: **(314) 524-5264**

**I, KNOWING THAT FALSE STATEMENTS ON THIS FORM ARE PUNISHABLE BY LAW, STATE THAT I HAVE PROBABLE CAUSE TO BELIEVE THAT:**

| ON/ABOUT (DATE) | AT TIME | HWY CLASS | UPON/AT OR NEAR (LOCATION) |
|---|---|---|---|
| 8/1/12 | 2017 HRS | | 825 Ferguson |

**WITHIN CITY/COUNTY AND STATE AFORESAID,**

NAME (LAST FIRST MIDDLE): Watson, Fredric D

STREET ADDRESS: 115 Monteith

| CITY | STATE | ZIP CODE |
|---|---|---|
| St Louis | Mo | 63137 |

| DATE OF BIRTH | AGE | RACE | SEX | HEIGHT | WEIGHT |
|---|---|---|---|---|---|
| 10/31/79 | 32 | B | M | 5'11 | 175 |

DRIVER'S LIC NO: G202010016 — CDL ☐ YES ☒ NO — STATE: MO

**LEAVE THIS LINE BLANK**

EMPLOYER

ADDRESS (STREET CITY STATE ZIP)

**DID UNLAWFULLY** ☒ OPERATE/DRIVE ☐ PARK ☐ C M V. ☐ WITH HAZ MAT

| VEHICLE | YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|---|
| | 2011 | Buick | Sedan | 4dr | Blk |

| REGISTERED WEIGHT | LIC NUMBER | STATE | YEAR |
|---|---|---|---|
| | 458 MRT | FL | 2012 |

**DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE. THE FACTS SUPPORTING THIS BELIEF ARE AS FOLLOWS:**

No vehicle inspection

☐ **Subject taken into custody.** (Complete "For Issuance of a Warrant" section on reverse side.)

| DRIVING | POSTED SPEED LIMIT | DETECTION METHOD |
|---|---|---|
| MPH | MPH | ☐ STATIONARY RADAR ☐ WATCH (AIR) ☐ PACE ☐ MOVING RADAR ☐ WATCH (GROUND) ☐ OTHER |

IN VIOLATION OF ☐ RSMo ☒ ORD — CHARGE CODE — CHARGE CODE — ☐ IN FATAL ACCIDENT ☐ IN ACCIDENT ☐ DWI/BAC

SEAT BELT VIOLATION ☐ ORD ☐ RSMo

| OFFICER | BADGE | TRP/ZONE | DATE |
|---|---|---|---|
| | | | 8/1/12 |

ON INFORMATION UNDERSIGNED PROSECUTOR CHARGES THE DEFENDANT AND INFORMS THE COURT THAT ABOVE FACTS ARE TRUE AND PUNISHABLE BY ☐ RSMo ☐ ORD

PROSECUTOR'S SIGNATURE — DATE

I PROMISE TO DISPOSE OF THE CHARGES OF WHICH I AM ACCUSED THROUGH COURT APPEARANCE OR PREPAYMENT OF FINE AND COURT COSTS

SIGNATURE X Booked — DR LIC POSTED ☐ YES ☒ NO

MO 100-0051 (10-02)

VIOLATOR'S COPY

# Ferguson Police Department

222 S Florissant Road, Ferguson, MO 63135

11/20/

## Offense / Incident Report

| Report Date 08/01/2012 2017 | Type of Incident **FAILURE TO OBEY, OBSTRUCTING, RESISTING, ETC. CITY OFFICIAL** | Complaint No. 12-14370 | Case Status CLEARED BY ARREST |
|---|---|---|---|

08/01/2012 2020

| Street Address 825 FERGUSON AVE | | City FERGUSON | State | Zip Code |
|---|---|---|---|---|
| Sector 4 | Precinct 1 | Geo 134.0 | Ward | Latitude | Primary Location |
| Neighborhood | | Jurisdiction | | Longitude | Secondary Location |

| Received Date / Time 08/01/2012 2017 | Call Received Via | Dispatched Date / Time 08/01/2012 2017 | Call Dispatched As 6100 TRAF VIOL | |
|---|---|---|---|---|
| Arrived Date / Time 08/01/2012 2017 | Departed Date / Time 08/01/2012 2210 | Offense Category | TTY Ref.# | TeleType Operator |

| ID | Name | Role | Primary | Arrived Scene | Departed Scene |
|---|---|---|---|---|---|
| 590 | PO Eddie Boyd III 590 | REPORTING | ☑ | | |
| 296 | PO/K9 Gregory Casem 296 | | ☐ | | |
| 486 | PO Todd Mink 486 | | ☐ | | |

| Charge Cause Number | Local Code | Jurisdiction | State Statute Type/Class | State Charge Code | Category |
|---|---|---|---|---|---|
| FAILURE TO OBEY, OBSTRUCTING, RESISTING, ETC. CITY OFFICIAL | | | | | |
| | 29.16 | FERGUSON PD | | | |

| | | | | |
|---|---|---|---|---|
| MAKING FALSE DECLARATION (M) | | | 575.06 | 2910099 |
| | | | M B | |

On 8-1-12 at 2017 hours while patrolling Forest wood Park, located at 825 forest wood, I observed a:

Black 2011 Buick 4door sedan

| Reporting Officer | 590 | PO Eddie Boyd III 590 | Approving Officer ( I ) ( Cover Pages Only ) |
|---|---|---|---|
| Approving Officer ( II ) ( Cover Pages Only ) | | | |

PLAINTIFF'S EXHIBIT
5

| Page 1 of 4 | Printed 10/30/2012 1110 |
|---|---|

© 1994 - 2012, Information Technologies, Inc. http://www.kiusa.com

WATSON_00041

# Ferguson Police Department

222 S Florissant Road, Ferguson, MO 63135

## Offense / Incident Report

| Report Date | Type of Incident | Complaint No. | Case Status |
|---|---|---|---|
| 08/01/2012 2017 | FAILURE TO OBEY, OBSTRUCTING, RESISTING, ETC. CITY OFFICIAL | 12-14370 | CLEARED BY ARREST |

Vine: 1G4GE5EDXBF279655

idling with the headlights on, no front plate, heavy tinted windows and windshield, backed into a parking space along the tree line. The vehicle was facing the obstacle course where several small children were playing unsupervised. As I approached the vehicles location I could make out a subject moving around inside. It should be noted we have had several car break-ins in the above mentioned location with a black vehicle tinted windows.

I exited my marked patrol vehicle and approached the driver's side door where I made contact with the driver, who identified himself as:

Fred Watson
6' 0", 197 lbs
1924 W. Laura
Pensacola, FL.

And advised him of the violations and my observations. I requested his driver's license and proof of insurance to which he advised he did not have his license on him and his insurance card was somewhere in the vehicle he did not know where it was.

Watson became enraged as I attempted to retrieve his pedigree information. He advised he was not doing anything wrong and I had no right to bother him. He said I was violating his 5th Amendment right after I instructed him not to use his cell phone while he was detained for officer safety reasons.

Upon arrival of my assists, PO Todd Mink, DSN 486, I instructed Watson to exit the vehicle so I could pat him down for weapons. He refused to exit the vehicle and after the 5th time of instructing him to exit the vehicle he was advised he was under arrest for "Fail to Obey an Officer" and that if he didn't exit the vehicle he would be tased. He raised his window up and moments later reluctantly exited the vehicle where he was taken into custody and all resisting ceased. After placing him into handcuffs he kicked his driver's door closed in an attempt to lock it as if he were trying to conceal something. The door did not lock and a search incident to arrest revealed his real name was:

Freddie Watson
115 Monteith
St. Louis, MO 63137

| Reporting Officer | 590 | PO Eddie Boyd III 590 | Approving Officer ( I ) (Cover Pages Only) |
|---|---|---|---|
| Approving Officer ( II ) (Cover Pages Only) | | | |

Page  2  of  4          Printed  10/30/2012 1110

© 1994 - 2012. Information Technologies, Inc. http://www.bluas.com

# Ferguson Police Department

222 S Florissant Road, Ferguson, MO 63135

## Offense / Incident Report

| Report Date | Type of Incident | Complaint No. | Case Status |
|---|---|---|---|
| 08/01/2012 2017 | FAILURE TO OBEY,OBSTRUCTING, RESISTING, ETC. CITY OFFICIAL | 12-14370 | CLEARED BY ARREST |

5'11, 175 lbs

Watson was additional charged with making a 'False Statement'. It should be noted a REJIS computer check of Freddy Watson revealed no record of an operator's license through Florida, Illinois, or Missouri.

A REJIS computer check of Freddie Watson revealed an 'Expired Operators License' through Missouri that had not been surrendered to another state.

He was conveyed to the Ferguson P.D. where he was booked accordingly.

| Name (Last, First Middle Suffix) OFFICER BOYD, | Race | Sex F | DOB | Age | Juvenile | SSN | Moniker |
|---|---|---|---|---|---|---|---|

| Type | Street Address | City FERGUSON | State MO | Zip Code 63135 | Country USA |
|---|---|---|---|---|---|

| Type | Phone | Ext/PIN | Type | Email Address |
|---|---|---|---|---|
| BUSSINESS | | 5590 | | |

| Name CITY OF FERGUSON | Type GOV'T | ☑ Willing to Prosecute | Rel. to Sus.  UNKNOWN |
|---|---|---|---|

| Type | Street 110 CHURCH ST | City FERGUSON | State MO | Zip Code 63135 | Country |
|---|---|---|---|---|---|

| Type | Phone | Ext/PIN | Type | Email Address |
|---|---|---|---|---|
| BUSINESS | (314) 524-5173 | | | |

| Name (Last, First Middle Suffix) WATSON, FREDDIE | Race B | Sex M | DOB | Age 32 | Juvenile | SSN | Moniker |
|---|---|---|---|---|---|---|---|

| Reporting Officer    590    PO Eddie Boyd III 590 | Approving Officer ( I ) ( Cover Pages Only ) |
|---|---|
| Approving Officer ( II ) ( Cover Pages Only ) | |
| Page   3   of   4 | Printed  10/30/2012 1110 |

© 1994 - 2012. Information Technologies, Inc. http://www.ifiaxa.com

WATSON_00043

# Ferguson Police Department

222 S Florissant Road, Ferguson, MO 63135

## Offense / Incident Report

| Report Date | Type of Incident | Complaint No. | Case Status |
|---|---|---|---|
| 08/01/2012 2017 | FAILURE TO OBEY,OBSTRUCTING, RESISTING, ETC. CITY OFFICIAL | 12-14370 | CLEARED BY ARREST |

| Type | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| | | ST. LOUIS | ND | | |

| Height | Weight | Build | Skin Color | Complexion | Eyes | Type of Eyewear | City | State |
|---|---|---|---|---|---|---|---|---|
| 511 | 175 | | | | BROWN | | | |

| Hair | Hair Length | Hair Style | Beard | Mustache | Side Burns | Mannerisms | Country |
|---|---|---|---|---|---|---|---|
| BLACK | | | | | | | |

| Voice | Teeth | Deformities |
|---|---|---|
| | | |

☐ Drugs  ☐ Alcohol  ☐ Suspect Identified  ☐ Suspect Located  ☐ Suspect Near Scene  ☐ Serious Repeat Offender

| Veh. Year | Make | Model | Veh. Desc. | Veh Style | VIN |
|---|---|---|---|---|---|
| 2011 | BUIC | SADAN | | | 1G4GE5EDX6F279655 |

| Tag | Tag Year | Tag Month | Veh Color-Top | Veh Color-Bottom | Veh Type | Veh Value | Veh Status |
|---|---|---|---|---|---|---|---|
| | | | | | | 50.00 | |

| Name | Phone | Ext. | EMail |
|---|---|---|---|
| | | | |

| Street No. | Dir | Street/Rt | Apt/Suite | City | St. | Zip |
|---|---|---|---|---|---|---|
| | | | | | | |

☐ Stolen  ☐ Impounded  ☑ Towed  ☐ Recovered  ☐ Recovered Non-Locally

| Tow Company | Tow Phone | Tow Phone Ext. | Tow Tag | Tow Fee |
|---|---|---|---|---|
| FERGUSON SUPER | (314) 869-0050 | | | 50.00 |

| Reporting Officer | 590 | PO Eddie Boyd III 590 | Approving Officer ( I ) |
|---|---|---|---|
| | | | ( Cover Pages Only ) |

| Approving Officer ( II ) | |
|---|---|
| ( Cover Pages Only ) | |

| Page   4   of   4 | Printed   10/30/2012 1110 |
|---|---|

© 1994 - 2012. Information Technologies. Inc. http://www.itiuss.com

WATSON_00044

| | | |
|---|---|---|
| IF ADDITIONAL SPACE IS NEEDED USE ANOTHER CONTINUATION FORM   CC | | |
| 1. DEPARTMENT REPORTING **Ferguson Police Department** | **CONTINUATION** | 2. DEPARTMENT FILE NO. 12-14370 |
| 3. DATE OF THIS REPORT 08-01-12 | DETAILS STOLEN PROPERTY PERSONS WANTED – ARRESTED – VICTIM – WITNESS | 4. Page   1   Of   1    Pages |
| 5. VICTIM OR COMPLAINANT City of Ferguson | 6. PLACE OF OCCURRENCE 825 Ferguson (Forestwood Park) | |

On 08/01/12 at 2017hrs while patrolling Forestwood Park, located at 825 Forestwood, I observed a:

Black 2011 Buick 4dr sedan
1g4ge5edxbf279655

idling with the headlights on, no front plate, heavy tinted windows and windshield, backed into a parking space along the tree line. The vehicle was facing the obstacle course where several small children were playing unsupervised. As I approached the vehicles location I could make out a subject moving around inside. It should be noted we have had several car break-ins in the above mentioned location with a black vehicle tinted windows.

I exited my marked patrol vehicle and approached the driver's side door where I made contact with the driver, who identified himself as:

Fred Watson
6'00" 197
1924 W Laura
Pensacola, FL

and advised him of the violations and my observations. I requested his driver's license and proof of insurance to which he advised he did not have his license on him and his insurance card was somewhere in the vehicle he did not know where it was.

Watson became enraged as I attempted to retrieve his pedigree information. He advised he was not doing anything wrong and I had no right to bother him. He said I was violating his 5th Amendment right after I instructed him not to use his cell phone while he was detained for officer safety reasons.

Upon arrival of my assists, PO Todd Mink, DSN486, I instructed Watson to exit the vehicle so I could pat him down for weapons. He refused to exit the vehicle and after the 5th time of instructing him to exit the vehicle he was advised he was under arrest for 'Fail to Obey an Officer' and that if he didn't exit the vehicle he would be tased. He raised his window up and moments later reluctantly exited the vehicle where he was taken into custody and all resisting ceased. After placing him into handcuffs he kicked his driver's door closed in an attempt to lock it as if he were trying to conceal something. The door did not lock and a search incident to arrest revealed his real name was:

Freddie Watson
115 Monteith
St. Louis, MO 63137
5'11" 175lbs

Watson was additional charged with making a 'False Statement'. It should be noted a Rejis computer check of Fred Watson revealed no record of an operator's license through Florida, Illinois, or Missouri.

A REJIS computer check of Freddie Watson revealed an 'Expired Operators License' through Missouri that had not been surrendered to another state.

He was conveyed to the Ferguson PD where he was booked accordingly.

WATSON_00045

Ferguson, Mo. 8 - 1 12
Date

STATE OF MISSOURI )
City of Ferguson )

IN THE MUNICIPAL COURT OF FERGUSON, MISSOURI  CAUSE NO. 12-14370

THE CITY OF FERGUSON, PLANTIFF          DOCKET NO. _____

vs

Freddie Watson          DEFENDANT

115 montieth          ADDRESS

NOW COMES City of Ferguson

(ADDRESS) 110 Church

And being duly sworn, on oath, and under penalties of perjury complains that on and or about
the 1 day of 8 20 12 at or near 825 Ferguson

within the corporate limits of Ferguson, Missouri, the above named
defendant did then and there unlawfully: Fail to obey an officer — Watson
refused to provide pedigree information when asked.
Then refused to exit his vehicle when advised he
was under arrest.

_____

_____

In violation of Section _____ of the revised Code of the City of Ferguson, 1998.
The undersigned complainant states the facts herein are true and acknowledges that he/she has
been notified any false statements made herein are punishable by law.

PO Will B/L 590
Complainant

Subscribed and sworn to before me this_____day of _____ 20___

                                    Municipal Judge or Clerk

The undersigned Prosecutor informs the court on information and belief that the above offense
herein charged was committed and the facts that form this belief are contained in the above
statement of facts concerning this matter.

                                    _____
                                    Prosecuting Attorney
Subscribed and sworn to before me this ____ day of ____ 20___

                                    _____
                                    Municipal Clerk



PLAINTIFF'S
EXHIBIT
6
tabbies

⑧

WATSON_00046

Ferguson, Mo. 8/1/12
Date

STATE OF MISSOURI                )
City of Ferguson                     )

IN THE MUNICIPAL COURT OF FERGUSON, MISSOURI  CAUSE NO. 12-4370

THE CITY OF FERGUSON, PLAINTIFF            DOCKET NO. _____

vs

Freddie Watson _____ DEFENDANT

115 Montieth _____ ADDRESS

NOW COMES City of Ferguson _____

(ADDRESS) 110 Church _____

And being duly sworn, on oath, and under penalties of perjury complains that on and or about
the 1 day of 8 2012 at or near: 805 Ferguson _____

within the corporate limits of Ferguson, Missouri, the above named
defendant did then and there unlawfully: False statement - Watson
gave a false name after advising he did not have
his identification on him. He later said his
military ID was in the vehicle he tried to
secure before being taken into custody.

In violation of Section _____ of the revised Code of the City of Ferguson, 1998.
The undersigned complainant states the facts herein are true and acknowledges that he/she has
been notified any false statements made herein are punishable by law.

_____ 590
Complainant

Subscribed and sworn to before me this ____ day of _____ 20 ___

_____
Municipal Judge or Clerk

The undersigned Prosecutor informs the court on information and belief that the above offense
herein charged was committed and the facts that form this belief are contained in the above
statement of facts concerning this matter.

_____
Prosecuting Attorney
Subscribed and sworn to before me this ____ day of _____ 20 ___

_____
Municipal Clerk



WATSON_00047