# Exhibit 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF MISSOURI

3                  EASTERN DIVISION

4

5

6

7        FRED WATSON,

8             Plaintiff,

9

10            vs.           Case No.  4:17-CV-2187

11

12       CITY OF FERGUSON,

13       MISSOURI, et al.,

14            Defendants.

15

16

17

18            DEPOSITION OF FRED WATSON

19         Taken on behalf of the Defendants

20              August 16, 2018

21

22

23

24

25

Page 6

1    Q.    And how long have you resided at 56
2 Rugby Drive?
3    A.    Two and a half years.
4    Q.    And prior to living at 56 Rugby Drive
5 where did you reside?
6    A.    There was a gap where I was homeless
7 from about February to August or September.
8    Q.    February of what year?
9    A.    '15.
10    Q.    Okay.  February of '15 until when?
11    A.    Excuse me.  February of '15 until
12 about August, September of '15.
13    Q.    And you say you were homeless meaning
14 where were you living at the time?
15    A.    In my car, storage, staying nights at
16 friends, relatives.
17    Q.    Okay.  And when you were homeless did
18 you have your children with you as well?
19    A.    I did have my children with me.
20    Q.    Okay.  So the children lived with you
21 in your car and in storage and those various places
22 that you talked about?
23    A.    Yes, that's correct.
24    Q.    All right.  Before we dive in let me
25 provide I guess what we refer to as some ground

Page 7

1 rules on our deposition.  We're here of course in
2 the case of what is denominated as Fred Watson
3 versus the City of Ferguson, et al., Case No.
4 4:17-CV-2187 and in conjunction with a lawsuit that
5 you have initiated.
6         Do you understand that?
7    A.    I do.
8    Q.    Okay.  And you just took an oath to
9 tell the truth and you understand the fact that
10 that means you're sworn to tell the truth in this
11 matter, is that correct?
12    A.    I do.
13    Q.    We're in a nice and formal conference
14 room, it's a little bit more informal but that said
15 of course you need to treat this as if we're in a
16 court of law.
17         Do you understand that?
18    A.    I do.
19    Q.    All right.  If I ask a question you
20 don't understand, I have a tendency to ramble
21 sometimes, I don't know if you'll have problems
22 hearing my voice, sometimes I get pretty loud, but
23 if for any reason you don't understand the
24 questions please point it out and I'll try to
25 rephrase the question so that you understand it,

Page 8

1 because we're here to get the facts, the truth, so
2 if there's any mis, confusion about my question or
3 anything I say feel free to check me on it and then
4 we'll make sure we get a question that you
5 understand so that you can properly answer.
6         If you need to take a break at any
7 time we're fairly flexible in that regard, the only
8 caveat is if we're in the middle of a question we
9 like the question to be finished up with before we
10 take a recess.  Our plan today is to take a lunch
11 recess, we've ordered lunch for everyone, I believe
12 we're going to have a pretty full day, so just be
13 prepared for that.
14         Now, when you introduced yourself to
15 me you identified, introduced yourself as Fred, is
16 that right?
17    A.    Yes.
18    Q.    Do you recall that?  And the lawsuit
19 is brought under the name of Fred Watson, is that
20 correct?
21    A.    (Indicating).
22    Q.    You understand that?
23    A.    Okay.  Yes.
24    Q.    You understand that?
25    A.    Yes.

Page 9

1    Q.    And I guess what I'm trying to figure
2 out is why did you initiate your lawsuit under the
3 name of Fred Watson as opposed to your legal name
4 Freddie Demon Watson?
5    A.    I go by Fred.
6    Q.    I understand that you go by Fred but
7 is there any particular reason why you chose to
8 bring this lawsuit in the name of Fred as opposed
9 to your legal name Freddie?
10    A.    Maybe you can ask my lawyers.
11    Q.    So as you sit here today whatever
12 reasons your lawyers may have you have no reason as
13 to why you personally filed this lawsuit in the
14 name of Fred as opposed to Freddie?
15    A.    No.
16    Q.    Okay.  Fair enough.
17         Now, do you also go by the name, your
18 middle name, Demon?
19    A.    Yes.
20    Q.    Under what circumstances do you go by
21 your name Demon?
22    A.    I don't understand the question.
23    Q.    Well, you filed your lawsuit in the
24 name of Fred, right?  Right?  That is yes or no
25 question, right?

3 (Pages 6 - 9)

Page 10

1    A.    Yes.
2    Q.    Okay.  And your legal name is
3  Freddie, right?
4    A.    Yes.
5    Q.    All right.  And my question is are
6  there circumstances where you go by a name other
7  than Freddie or Fred and use the name Demon?
8    A.    Not that I recall.
9    Q.    All right.  What name is on your
10  birth certificate?
11    A.    Freddie Demon Watson.
12    Q.    All right.  And your driver's
13  license?
14    A.    Freddie Demon Watson.
15    Q.    All right.  And when you file your
16  Social Security, or your federal tax returns what
17  name do you put on your federal tax forms?
18    A.    Freddie Demon Watson.
19    Q.    All right.  And why when you file a
20  tax return do you use the name Freddie Demon Watson
21  as opposed to Fred Watson?
22    A.    There's no reason.  That's my name.
23    Q.    That's your legal name.
24    A.    And that's a legal federal document,
25  yes.

Page 11

1    Q.    All right.  So for legal federal
2  documents you feel the need then to use your legal
3  name, is that correct?
4    A.    At times.  Sometimes I use Fred
5  Watson.
6    Q.    For legal documents?
7    A.    Yes.
8    Q.    What kinds of legal documents do you
9  use the name Fred Watson?
10    A.    For my ID at times for contracts.
11    Q.    Give me an example of that.  What IDs
12  have you used the name Fred Watson?
13    A.    Some documents for NGA, National
14  Geospacial Intelligence Agency is the reference
15  that I can recall.
16    Q.    All right.  And why in that context
17  did you use the name Fred as opposed to your legal
18  name Freddie?
19    A.    Just sometimes I use Fred.
20    Q.    I'm just trying to get a sense as to
21  what times do you decide to use one name as opposed
22  to another name.
23    A.    There is no time, there is no
24  distinguishing factors that I will use one versus
25  the other.  It's my name.

Page 12

1    Q.    All right.  Your name meaning Fred
2  and Freddie, you consider both of those your names.
3    A.    Correct.
4    Q.    All right.  And Demon you said you
5  don't recall using that name as opposed to using
6  Fred or Freddie, is that correct?
7    A.    That's correct.
8    Q.    On your e-mail address what name do
9  you use there?
10    A.    Watson FD.
11    Q.    Okay.  And when you have e-mails do
12  you, have you gone by the name Demon on your e-mail
13  transmissions?
14    A.    I can't recall.
15    Q.    Okay.  And we've got some documents
16  that may shed some light on it.
17    A.    Okay.
18    Q.    Prior, we're talking about your
19  residences and you were saying you were homeless
20  from February of '15 until about August or
21  September of '15, is that right?
22    A.    Correct.
23    Q.    All right.  Prior to that where did
24  you reside?
25    A.    In Belleville.

Page 13

1    Q.    Where in Belleville?
2    A.    I believe the address is 124 West
3  Haven Meadows Drive.
4    Q.    Okay.  Let me go back to your address
5  at 56 Rugby Drive.  Do you own or lease that place?
6    A.    Own.
7    Q.    All right.  How long have you owned
8  the residence at 56 Rugby Drive?
9    A.    Since about September of 2015.
10    Q.    September of 2015.  Okay.  So after
11  you were homeless you then proceeded to purchase a
12  residence at 56 Rugby Drive, is that correct?
13    A.    That's correct.
14    Q.    All right.  And what funds did you
15  use to purchase that residence if I might ask?
16    A.    Used some of the funds that I -- what
17  was the question, what are you asking?
18    Q.    What money did you use to purchase
19  that residence at the time you purchased it in
20  September of '15?
21    A.    The purchase didn't require me to put
22  down any funds if that's the question.
23    Q.    That is the question.  So it was a no
24  money down purchase?
25    A.    That's correct.

4 (Pages 10 - 13)

Page 22

1    Q.    And that was because of this training
2 you were undergoing?
3    A.    Yes.
4    Q.    And what time frame where we having
5 training?
6    A.    Again, that would be the end of 2007,
7 early 2008 until I went overseas.
8    Q.    Prior to 2007 were you in any type of
9 training arrangement?
10    A.    I was in school.
11    Q.    Okay.
12    A.    I was taking classes.
13    Q.    Okay.  So end of 2007, 2008 you were
14 in transit in training, where were you training?
15    A.    Various government sites, military
16 sites.
17    Q.    What type of training?
18    A.    IT training.
19    Q.    And so give us some of the locations.
20    A.    I don't think I could provide those
21 locations.
22    Q.    You're saying because of some
23 confidential arrangement you had with the
24 government you can't disclose what cities you would
25 have been employed in?

Page 23

1    A.    That's not what the question you
2 asked me I don't think.
3    Q.    I'm trying to figure out what
4 locations these various government trainings took
5 place, what states were you in?
6    A.    I don't think due to the
7 confidentiality, due to the sensitivity of the
8 locations I can provide you with that information.
9    Q.    I'm not asking for an address or a
10 city, I'm just trying to geographically, can we do
11 region?  What region were you in?
12    A.    I don't think I can provide you with
13 that information.
14    Q.    Well, I'm going to object.
15        MR. NORWOOD:  I mean I don't think he
16 has any basis for that.  We have his resume that he
17 provided to his employer which identified certain
18 locations which I can pull out and go into it that
19 way.  I don't think he has the grounds to withhold
20 where he was physically during any particular
21 timeframe on any grounds and therefore I'm going to
22 suggest that you confer with your client so that we
23 can get the information that we're seeking.
24        MR. STRODE:  Can you ask him to
25 confirm things on the resume?

Page 24

1        MR. NORWOOD:  Well, I don't want to,
2 I mean I have a certain order that I'm going to use
3 so I think we're at a point now where Mr. Watson
4 needs to understand that he can't unilaterally
5 decide what questions he's going to answer and not
6 answer so I think we need to understand those
7 ground rules so that we can proceed smoothly.  I'm
8 not obligated to pull out a resume -- let me finish
9 explaining.
10        He's obligated to answer my
11 questions, I'm not obligated to explain.  So could
12 you take a moment to talk to your client, because I
13 think we're entitled to the information?
14        MR. STRODE:  Sure.  First, to be
15 clear on what I was saying, I thought you were
16 suggesting that as a way to proceed.  I'm not
17 trying to run your depo.  I understand the ground
18 rules for the deposition here, we're happy to
19 confer with him for a moment, I think he's just
20 trying to make sure he doesn't run afoul of any of
21 his obligations.
22        MR. NORWOOD:  Sure.
23 (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD)
24    Q.    (BY MR. NORWOOD)  Just a point of
25 clarification, one member of our team has observed

Page 25

1 someone on your side of the table recording this
2 session and I just want to get on the record
3 whether or not that's accurate so we can move on.
4 Is anybody recording this session?
5        MR. WALDRON:  No.
6        MR. NORWOOD:  Just checking.
7    Q.    (BY MR. NORWOOD)  Back to my question
8 then Mr. Watson.  During this time frame, 2007 to
9 2008 when you were in transit working for various
10 government entities in an IT capacity, what states
11 were you in during that timeframe?
12    A.    Arizona.
13    Q.    All right.  This all happened in
14 Arizona, is that right?
15    A.    To my understanding, yes.
16    Q.    Okay.
17    A.    As I remember, yes.
18    Q.    And you would have been living in
19 hotels during that timeframe, is that correct?
20    A.    That's correct.
21    Q.    And did you maintain a residence
22 during that timeframe anywhere?
23    A.    No.
24    Q.    All right.  You had alluded to a
25 residence in Florida.  Where was that residence?

7 (Pages 22 - 25)

Page 26

1      A.    Pensacola.
2      Q.    All right.  And was that in -- well,
3   was that an apartment -- strike that.
4           Was that an apartment or a home that
5   you owned?
6      A.    Neither.
7      Q.    All right.  What was it?
8      A.    It was a house that I lived with my
9   friend.
10     Q.    What's the name of your friend?
11     A.    Neil.
12     Q.    All right.  What's his last name?
13     A.    Evans.
14     Q.    Neil Evans.  Okay.  When did you
15  reside with Mr. Neil Evans in Pensacola, Florida?
16     A.    Between 2002, approximately 2002 to
17  about 2005.
18     Q.    Okay.  And you were, where were you
19  employed between 2002 and 2005?
20     A.    United States Government.
21     Q.    Which particular branch of the United
22  States Government?
23     A.    United States Navy.
24     Q.    Okay.
25     A.    I was a Merchant Marine from '03 to

Page 27

1   '05.
2      Q.    And what is a Merchant Marine?
3      A.    I was doing IT work for the
4   government, I believe they're Department of the
5   Navy as well.
6      Q.    And so you were employed by the U.S
7   Navy during that timeframe, 2002 to 2005?
8      A.    So there's a break, from 1998 to
9   2002, or excuse me, yeah.  1998 to 2o02 is my Navy
10  time, my active duty Navy time.  From about 2002 to
11  2005 is the Merchant Marine which is federal
12  employment.
13     Q.    Okay.
14     A.    Federal government.
15     Q.    All right.  So you were an active
16  duty with the Navy from 1998 to 2002?
17     A.    Yes.
18     Q.    All right.  And when you were on
19  active duty with the Navy where did you reside?
20     A.    On the ship and some apartments
21  throughout Virginia.
22     Q.    Okay.  And then you took this job
23  after you were discharged from the Navy in 2002 you
24  took a federal government job, is that correct?
25     A.    That's correct.

Page 28

1      Q.    Doing IT related work?
2      A.    That's correct.
3      Q.    All right.  And during that period of
4   time, 2002 to 2005, you were then living with your
5   friend in Pensacola, Florida, is that right?
6      A.    Yes.  During that time I served on
7   the ships so there's no, there wasn't always a
8   physical address or a rental property or a house in
9   my name.
10     Q.    Okay.  So you considered this
11  residence of your friend your residence?
12     A.    Yes.
13     Q.    And you considered that your
14  residence from 2002 to 2005, is that right?
15     A.    That's correct.
16     Q.    Okay.  After 2005 -- well, strike
17  that.
18           When you were working with the
19  federal government from 2002 to 2005 where were you
20  assigned geographically?
21     A.    Virginia.
22     Q.    Okay.  So you were assigned to
23  Virginia during that three year timeframe, is that
24  right?
25     A.    That's correct.

Page 29

1      Q.    All right.  When did you then live in
2   Pensacola, Florida during that timeframe?
3      A.    What's the question?
4      Q.    I believe you indicated that you had
5   a residence that you established in Pensacola,
6   Florida by way of living with this friend of yours,
7   right?
8      A.    Yes.
9      Q.    All right.  And what I'm trying to
10  figure out is how many months of the year, 2002,
11  2003, 2004, 2005, did you actually live there with
12  your friend?
13     A.    I don't recall the exact number of
14  months because I was in and out to sea throughout
15  that period so I may be on the ship for one month,
16  I may be on the ship for six months, I may be on
17  the ship for three months.
18     Q.    Okay.  But when you weren't out at
19  sea and you were working in Virginia, when were you
20  living in Pensacola?  That's all I'm trying to
21  figure out.
22     A.    So that kind of depended on the
23  orders, how long I had off.
24     Q.    Okay.
25     A.    When was my next deployment.

8 (Pages 26 - 29)

1 investigators.  They go and do their checks, they
2 check whatever it is that they check.  I have
3 tickets in 2012 that I can not got resolved.
4 During this investigation they asked me about the
5 tickets.  I assured them that the tickets would be
6 cleared up on the first court date, because of the
7 tickets I received I had all those documents,
8 license, insurance, registration, all of those
9 things, so I didn't think it was a big issue.  In
10 this investigation told me fine, we'll keep moving,
11 bring this information back to us.  Through that
12 process I was unable to close those tickets or get
13 a disposition as the government asked for of the
14 tickets.  I wasn't able to provide them anything.
15 That lingered on for two years.
16     Q.    Okay.
17     A.    To my understanding you cannot have
18 these investigations opened that long.  Obviously
19 it was something that I could not get resolved
20 which hindered the process for them clearing me for
21 classified work to do my normal duties.  In that
22 process there was a conditional clearance set
23 saying that to my understanding they eventually
24 reached out and was not, was also not provided any
25 information on the tickets.  Being that in the,

1 again this is my understanding, were minor tickets
2 they sent me to have a conditional clearance which
3 allowed me to continue doing the government's work
4 with hopefully having some resolution down the
5 line.
6     Q.    Okay.
7     A.    The resolution did not happen and
8 they had to close the file.  Closing the file to in
9 my sense that you cannot get these resolved and you
10 said you have those documents that say due to this
11 issue on August 2012 there's, one of the tickets
12 that is considered criminal so we can't, we're not
13 going to give you this clearance in good faith and
14 you have an open criminal ticket.
15     Q.    Okay.  And so your testimony is that
16 you understand that in 2014 you lost your security
17 clearance because of the fact that the tickets that
18 were outstanding were unresolved.
19     A.    That is my understanding.
20     Q.    Okay.  The conditional security
21 clearance that you obtained, that would have been a
22 six month conditional security clearance, correct?
23     A.    -ish.  I'm not exactly sure of the
24 exact timeframe.
25     Q.    Okay.  And we have documents so we'll

1 get more into that so let me move, kind of move
2 forward.
3           I understood that if you had resolved
4 those traffic tickets that you would have then
5 obtained your security clearance without any
6 conditions, is that your understanding?
7     A.    My understanding is had I had a
8 solution or had those ticket resolved we would not
9 be having this conversation today.  Well, I'm not
10 going to say we wouldn't be having this
11 conversation, I'm going to say we wouldn't be
12 talking about the clearance portion of this
13 conversation.
14     Q.    Okay.
15     A.    My clearance would have been renewed,
16 I would have still been working, there would have
17 been no issues on that front.
18     Q.    Okay.  What was your understanding as
19 to what type of resolution of the outstanding
20 traffic tickets were necessary in order to move
21 forward to obtain full unconditional security
22 clearance?
23     A.    My understanding was they wanted
24 something, they wanted a disposition whether they
25 were cleared, paid, I wasn't able to provide them

1 anything because I wasn't able to acquire anything
2 from the city of Ferguson.
3     Q.    Okay.  So then it was your
4 understanding that if the tickets were resolved and
5 paid and you were able to provide documentation of
6 them being resolved and paid that that would have
7 removed any impediment to your security clearance,
8 is that right.
9     A.    Let's be clear.  It's not my
10 understanding that the tickets would be paid that
11 would have resolved the issue, because the tickets,
12 I didn't do anything wrong to have those tickets.
13 I was not going to pay those tickets for charges
14 that I did not commit.  That alone still would have
15 hindered my security clearance.
16     Q.    Okay.
17     A.    If, not if, I did not plead guilty to
18 any of the charges, the reason shy I asked to go to
19 trial, I asked to go talk to the judge and see
20 somebody, anybody, about the tickets.  Ferguson
21 wouldn't give me anything to provide to the
22 government stating any conditions of the charges.
23 So with not being able to state any conditions of
24 the charges the government says that we can no
25 longer go forward, we've already did, in good

Page 54

1 faith, give you, as you say a six month, given me a
2 conditional access allowing me to partially do my
3 work because I still was not able to do the work
4 that I was doing at that capacity.  That capacity
5 that I operated in had been reduced due to signing
6 the conditional clearance, giving me a little more
7 time to get something from Ferguson, a status from
8 Ferguson of these tickets.
9     Q.    Okay.
10    A.    Had I got a status, not paid, because
11 I didn't do, I had a drivers license, I had
12 insurance, I have my registration, legally I have
13 my driver's license and I have all those things
14 that the tickets said I did not have.  And I wasn't
15 driving so the seatbelt, there's not registering or
16 having a suspended license, all of those were
17 frivolous charges so I would not pay a fine to say
18 I don't have a driver's license when I clearly have
19 a driver's license.  I would not pay a fine just to
20 make it go away to say I do not have proper
21 registration or insurance because I indeed have all
22 of those things, in the car.
23    Q.    And I understand all that.  My
24 question to you is this:  Did you have an
25 understanding that had you paid those fines,

Page 55

1 whether or not your security clearance would be
2 going forward?  I'm not saying that you should
3 have --
4    A.    I do not --
5    Q.    Let me finish, please.
6          I'm not saying that you should have,
7 I'm just trying to understand what you understood
8 what understood with respect to what the
9 expectations of the government were, was, with
10 respect to your security clearance and that's the
11 only thing I'm trying to find out, this is all
12 hypothetical, right?  Let's deal with hypotheticals
13 how.  Hypothetically if you had decided to pay
14 those tickets at some reduced littering type of
15 violation, if you would have decided to do that,
16 I'm not saying you would have and I understand why
17 you wouldn't, but had you decided to do that and
18 paid those tickets and provided proof of that
19 payment to the government do you have any sense as
20 to how that would have affected your security
21 clearance?
22    A.    I am a federal employee, or excuse
23 me, I'm a federal contractor, breaking the law in
24 any sense would hinder me from having my clearance
25 removed.  There is no way that I am going to plead

Page 56

1 guilty of breaking the law for one when I did not
2 break the law, there's no way I'm going to plead
3 guilty or pay tickets wither they're reduced or
4 not, because that's saying that I am guilty and I
5 am not guilty of these charges.  I can not take
6 these charges back my superior and say hey, I pled
7 guilty to something I didn't do to make it go away.
8 I would lose my security clearance that day.
9     Q.    Okay.  And understand that.  Just so
10 the record's clear, your understanding if you had
11 had these tickets reduced to littering and paid a
12 fine that nonetheless you would have lost your
13 security clearance, is that your understanding?
14    A.    My understanding is had those tickets
15 not been resolved throughout I would have lost my,
16 if they were not threw out, if they were not
17 resolved I would have lost my clearance.
18    Q.    I understand resolved and let's make
19 sure we get our nomenclature right, because
20 resolution could be a bunch of different things.
21          Your understanding, and I'm trying to
22 get it clear on the record, is that in order to
23 maintain your security clearance you had to have
24 favorable resolutions of all of those matters
25 meaning that you had to be found not good for them.

Page 57

1 Is that your understanding?
2     Q.    My understanding is that not only did
3 it need to be favorable, I needed had a letter
4 saying these were not laws that I broke and that I
5 was not found guilty of breaking, or paying, they
6 had to, I don't know The legal term, but they had
7 to have been threw out, judgment in my favor, not
8 reduced to a fine because it wouldn't matter, to my
9 understanding it doesn't matter what the reduction
10 is, that's a guilty plea.
11    Q.    Okay.
12    A.    If you're guilty of this I could lose
13 my clearance.
14    Q.    So just so we understand.  If you
15 were guilty of littering and you have to pay a fine
16 for that that's enough to cost you your security
17 clearance.
18    A.    That's enough to affect my clearance.
19    Q.    Okay.  Fair enough.
20          Do you have an understanding as to
21 why you were terminated from NJVC?
22    A.    My understanding is I couldn't get
23 the tickets resolved which led to me reporting to
24 my superiors twice a month via e-mail, phone calls,
25 appointments and being asked on a daily basis

15 (Pages 54 - 57)

Page 58

1 what's the status. Every day I went to work what's
2 the status of the tickets, what's the status of the
3 tickets. I've begged and pleaded with supervisors,
4 the government, please call Ferguson, please ask
5 them. You as the government, as the federal
6 government should be able to get something whereas
7 I can not. This is where the condition comes in
8 at. We wasn't able to get anything, to my
9 understanding. We'll give you a little more time
10 being that you have other court dates coming up.
11    Q.    Okay. Do you know if your lawyers
12 understood that if you had pled guilty to littering
13 and paid a fine that that would impact your
14 security clearance?
15    A.    State the question again.
16        MR. NORWOOD: Could you read that one
17 back for us?
18    (Whereupon, the reporter read from the record)
19    A.    Yes, I explained this several,
20 several times. That the outcome of these tickets
21 if they are not threw out, if they are not, again,
22 I don't know the legal term, if they're not
23 overturned or, if they don't go away favorably with
24 a letter saying that I did not break the law or
25 these, I indeed had all the documents that the

Page 59

1 tickets referenced then that would cause me issues
2 with my security clearance.
3    Q.    Okay.
4    A.    I explained that in great detail on
5 several occasions. I've showed my ID, my
6 government ID to my lawyers, I've allowed my lawyer
7 to speak to the government themselves. So they
8 were very aware that I am not bleeding guilty,
9 definitely I wanted to go to trial, I wanted to
10 talk to the judge because this would have given me
11 some documentation to provide to the government.
12 I've asked to go to trial more times than I can
13 count.
14    Q.    When you say your lawyers that
15 included Mr. Bosley, is that correct?
16    A.    That's correct.
17    Q.    And Mr. Shock, is that right?
18    A.    That's correct.
19    Q.    So just so we are all clear. If you
20 had tinted windows that were in violation of the
21 law and you received a ticket for that and you
22 ultimately paid that ticket you believe that that
23 would have impacted your security clearance,
24 correct?
25    A.    Okay. The question one more time.

Page 60

1        MR. NORWOOD: Can we read that one
2 back?
3    (Whereupon, the reporter read from the record)
4    A.    Are you asking me if I had illegally
5 tinted windows?
6    Q.    (BY MR. NORWOOD) No, no. Let's
7 assume you did, for purposes of my question. If
8 you had illegally tinted windows and you received a
9 ticket for that and you paid that ticket you
10 understand that that would have jeopardized your
11 security clearance, is that correct?
12    A.    I don't want to assume that I had
13 illegal tint on my car, because I did not have
14 illegal tint on my car -- let me answer your
15 question.
16        I don't want to assume and I don't
17 want to have a hypothetical question asked of me to
18 say if I did do this. My windows were not
19 illegally tinted and if I had a ticket no matter
20 what the ticket is, if I get a particular for
21 jaywalking I have to report that to my job. Any
22 infraction with law enforcement I have to report no
23 matter how minor or how major that situation is.
24    Q.    I understand you have to report it to
25 your employer.

Page 61

1    A.    Yes, it would affect my clearance.
2    Q.    So that if you were found guilty of
3 having illegal tinted windows you believe that
4 would have cost you your security clearance,
5 correct?
6    A.    No. I'm saying that I have to report
7 that encounter and I operate within the law so I
8 know my tints were legal and if I get a ticket for
9 that I report that. How they work depended on the
10 severity of that charge.
11    Q.    Right.
12    A.    That's something that I can't tell
13 you that the outcome would have been.
14    Q.    All right. That's what I'm trying to
15 clarify based on your understanding. As it relates
16 to the tinted window issue, whether or not you were
17 good for it or not good for it?
18    A.    I was good for it.
19    Q.    If you were convicted of that you
20 don't know as you sit here today if in fact you
21 would have lost your clearance for that violation
22 alone. Correct?
23    A.    You're asking me if the only ticket I
24 received that day was a window tint ticket would I
25 have lost my clearance.

16 (Pages 58 - 61)

Page 74

1 Sometimes I write Fred, sometimes I write Freddie,
2 just depends on how I feel that day.
3     Q.    Depends on how you feel that day.
4     A.    I show my ID, they know who I am.  A
5 lot of times I just write Watson.
6     Q.    Okay.  Who is Jennifer Lewis?
7     A.    That was a friend at the time.
8     Q.    You say, is she no longer a friend?
9     A.    I haven't spoke to Ms. Lewis in a few
10 years.
11     Q.    Was she a girlfriend?  In your
12 definition of girlfriend.
13     A.    Yeah, I don't know what your
14 definition is.
15     Q.    I want your definition.
16     A.    I knew Ms. Lewis, she was a friend.
17     Q.    Fair enough.
18           Now, we're talking about August 1st,
19 2012 and you were hopefully as best you can recall
20 explaining to me what you did that day leading up
21 to you going to Ferguson to play basketball.
22     A.    You're asking me about waking up, I
23 mean obviously I woke up.
24     Q.    Obviously.
25     A.    I don't remember the things that

Page 75

1 transpired during that day.
2     Q.    Did you work that day?
3     A.    I don't think I worked that day.
4     Q.    All right.
5     A.    I believe I was in the park, I mean
6 it was hot as being in the desert.
7     Q.    Okay.  All right.  What time did you
8 get to the park, let's start with that?
9     A.    I don't even recall what time I got
10 to the park.
11     Q.    It was still light outside though?
12     A.    Very light outside, it was
13 exceptionally hot so it had to be anywhere from
14 like 1 to 3 p.m.
15     Q.    That you got to the park.
16     A.    Yes.
17     Q.    And you were there until what time?
18     A.    Until I was taken away in a squad car
19 about 8:30 p.m.
20     Q.    What time was it when you encountered
21 Officer Boyd?
22     A.    I don't recall the exact time.  It
23 was later in the evening though.
24     Q.    Okay.  So did you routinely go to
25 Ferguson to play basketball or was this something

Page 76

1 different?
2     A.    It's a pickup game so we occasionally
3 would, well, I would occasionally go there and play
4 ball, I'm familiar with the park.
5     Q.    Okay.
6     A.    It was a decent day outside, I wanted
7 to go play some ball and I go and play with some of
8 the guys over there.  Regular pickup game.
9     Q.    So you were there starting about 1 or
10 so, some time thereafter?
11     A.    Yes.
12     Q.    And you played pickup ball during all
13 that timeframe and then I understand from your
14 complaint at some time you sat in your car and you
15 wanted to cool off.
16     A.    Correct.
17     Q.    All right.  Before then, before you
18 went to Ferguson that afternoon do you recall as
19 you sit here today anything that you did that
20 morning?
21     A.    I do not.
22     Q.    All right.  Did you go to Navy
23 Federal Credit Union that day?
24     A.    I don't recall.  I thought I did, I
25 don't recall if I went or not.  I thought I --

Page 77

1 yeah, I don't recall.
2     Q.    Okay.  All right.  Let's kind of work
3 with that a bit.  Okay.  You don't recall if you
4 went to Navy Federal Credit Union on August the
5 1st, right, as you sit here today?
6     A.    Correct.
7     Q.    All right.  Did you go to Navy
8 Federal Credit Union on August the 2nd?
9     A.    I did, I believe so.
10     Q.    All right.
11     A.    Again, I believe that one of those
12 dates I went, yes.
13     Q.    All right.  Well, you've seen your
14 bank records, correct?
15     A.    Correct.
16     Q.    Your bank records say that at
17 9:30-ish you went to Navy Federal Credit Union and
18 withdrew $2,001, correct, or $2,100, correct?
19     A.    Correct.
20     Q.    All right.  Is there any dispute
21 about that?
22     A.    No.
23     Q.    So then in your complaint you have an
24 allegation about $2,000 being stolen out of your
25 vehicle, all right?

Page 78

1     A.    Correct.
2     Q.    And that's 2,000 separate and apart
3  from this other 2,000 you took out, is that
4  correct?
5     A.    Correct.
6     Q.    So the 2,000 you had in your vehicle
7  on the 1st, where did you get that particular
8  $2,000?
9     A.    I just had the money, I was taking
10  money out from the bank over time.  I have money at
11  home so in the situation where I need funds and I'm
12  unable to get to the bank I have money at home.
13    Q.    Okay.
14    A.    I carry, I mean I'm making a wealthy
15  sum, $100,000 plus, so I carry money on me for a
16  lot of different reasons.
17    Q.    Okay.  So you would have had 2,000 --
18  how much did you have on you that day?
19    A.    I don't know the exact amount that I
20  had that day.
21    Q.    Outside of the $2,000 did you have
22  other monies?
23    A.    In the car?
24    Q.    On your person, in the car?
25    A.    What's the question?

Page 79

1     Q.    Your allegation is that you had
2  $2,000 stolen out of your car, right?
3     A.    That's correct.
4     Q.    Where was that 2,000 at the time you
5  were approached by Officer Boyd?
6     A.    That $2,000 was in the little slide
7  console of my vehicle.
8     Q.    The center console.
9     A.    Correct.
10    Q.    All right.  Other than that $2,000
11  did you have any other monies in that console?
12    A.    Yes.
13    Q.    Okay.  How many other monies did you
14  have in that console?
15    A.    It was, I don't recall the exact
16  amount, it's 2,700, it was, I had, I had a few
17  hundreds, a lot of hundreds and a few 50s and some
18  change, some 20s and 10s.
19    Q.    So you had $2,700 total?
20    A.    I don't know the exact number.
21    Q.    Okay.  Approximately 2,700, give or
22  take 100 or two?
23    A.    Correct.
24    Q.    And how did you have that in the
25  console?  Was it wadded up --

Page 80

1     A.    Folded in half --
2     Q.    Let me finish.
3           Was it wadded up, was it in an
4  envelope, how did you have that 2,700 or so in the
5  center console?
6     A.    It was folded in half, of course all
7  the bills are facing the same way.
8     Q.    Okay.
9     A.    The large money is on the inside,
10  smaller bills on the outside.
11    Q.    So you have a wad, if I can use that
12  term.
13    A.    I don't know what a wad is, but.
14    Q.    You've heard of the term wad before,
15  wad of money, right?  You've heard that term
16  before.  Can we agree on that?
17    A.    Sure.
18    Q.    So you had a wad of money consisting
19  of hundreds and fifties and other denominations
20  totaling something in the neighborhood of $2,700
21  and it was in the center console.  Is that right?
22    A.    That's correct.
23    Q.    And it was money that you  -- well,
24  strike that.
25           Why on this particular day did you

Page 81

1  have the $2,700 in your center console?
2     A.    I don't know that there is a -- so I
3  had bills to pay, I had school supplies to grab, I
4  had school tuition to pay, it's the first of the
5  month, kids going to school here in another week
6  and I had things to do and in the process of doing
7  those things I'm going to get me a couple games of
8  basketball in.
9     Q.    All right.  And typically when you
10  pay tuition for your kids you did that in cash?
11    A.    Most of the time, yes.
12    Q.    All right.  So all of the money was
13  all together?
14    A.    That's correct.
15    Q.    In the center console?
16    A.    That's correct.
17    Q.    All right.  Then you played your
18  pickup games and you then, if I understand your
19  complaint, you went to the car to cool off.
20    A.    That's correct.
21    Q.    All right.  And when you -- what kind
22  of car were you driving?
23    A.    I was driving a Buick LaCrosse.
24    Q.    All right.  Did it have tinted glass?
25    A.    I do have tinted windows.

21 (Pages 78 - 81)

1    Q.    You do now or you did then?
2    A.    I had tinted windows then, I have
3 tinted windows now.
4    Q.    Do you have the same car you had
5 then?
6    A.    I have the same car.
7    Q.    And what make and model is that?
8    A.    It's a Buick LaCrosse.
9    Q.    What year?
10    A.    2011.
11    Q.    2011 Buick LaCrosse.  And you have
12 tinted windows?
13    A.    I have tinted windows.
14    Q.    You have front tint?
15    A.    What do you mean front tint?  On my
16 front door?
17    Q.    No.  The front windshield, is that
18 tinted?
19    A.    No.
20    Q.    What's tinted on the vehicle?
21    A.    I have the driver door, the passenger
22 door on the front, the back door, passenger and
23 driver and the rear window in the back.
24    Q.    But no tinting on the front
25 windshield.

1    A.    No tinting on the front windshield.
2    Q.    All right.  And you then finish your
3 pickup game, went to your car, did you start up
4 your vehicle?
5    A.    Not at that time.  I'm back and
6 forth, I'm drinking water, I'm talking.  I was
7 trying to cool off.
8    Q.    I'm talking about when you were
9 sitting in your vehicle when Officer Boyd pulled
10 up.
11    A.    I was parked, yes.  The vehicle was
12 running, AC was blowing, yes.
13    Q.    So the vehicle was running, the AC
14 was blowing.
15    A.    Yes.
16    Q.    And what happened next?
17    A.    Well, I had my window down at least
18 halfway anyway at that point.
19    Q.    So you had your AC on but your window
20 was down?
21    A.    Correct.
22    Q.    All right.  And what happened next?
23    A.    Officer Boyd -- well, I didn't know
24 who he was at that time but a police officer drove
25 into the park and parked his car directly in front

1 of mine blocking me into the parking spot.
2    Q.    Okay.  And what happened next?
3    A.    He gets out of his car, he comes
4 around to my window, I see him with his hand on his
5 hip, I seen him unsnapping his weapon and he asked
6 me do you know why I pulled you over, do you know
7 why I stopped you.
8    Q.    Okay.  What was your response tp
9 that?
10    A.    Sir, you didn't pull me over, you
11 didn't stop me, I've been sitting here 10, 15
12 minutes in the park.
13    Q.    Did you roll down the window to talk
14 to him?
15    A.    I rolled down the window actually a
16 little more and the way my car is, again, it's a
17 small car so it sit low to the ground.
18    Q.    Okay.
19    A.    So I did lower the window more as he
20 approached the car so we can have an exchange, he
21 can talk, he can see me.
22    Q.    Okay.
23    A.    You can clearly see inside the car
24 and everything in the front.
25    Q.    What do you mean clearly see?  You

1 mean through the tinted gas?
2    A.    If the window is down there is no
3 tinted glass.
4    Q.    I'm just trying to understand what
5 you mean.  Just trying to clarify, not trying to
6 trick you.
7    A.    You can clearly see, you can see me,
8 my hands, the steering wheel, the console, clearly
9 see through the car, the passenger, you can see
10 everything in the front.
11    Q.    With the window down, yes?
12    A.    The window is down, yes.
13    Q.    What if the window is not down, can
14 you see inside the car?
15    A.    If the window is not down you can see
16 a silhouette.
17    Q.    You can not see anything --
18    A.    From the side, you can see me from
19 the side.
20    Q.    From the side if the window's up you
21 cannot see what's going on?
22    A.    You can see a silhouette so you can
23 see people, you can see the silhouette, you can see
24 if there's somebody inside or not, yes.
25    Q.    All right.  So he approached you and

22 (Pages 82 - 85)

1 he said something to the effect of do you know why
2 I pulled you over and you said you didn't pull me
3 over because I was already parked.  What was the
4 next exchange of words between you and Officer
5 Boyd?
6      A.     The next exchange is sir, you didn't
7 pull me over, I've been sitting here.  He asked me
8 for my Social Security number.  I said I cannot
9 provide you that.
10     Q.     Let's back up.
11            Did he ask you for identification?
12     A.     Not at that time, no.
13     Q.     So you're saying the first thing he
14 asked you for was your Social Security number?
15            MR. WALDRON:  Object to the extent it
16 misstates prior testimony.
17     Q.     (BY MR. NORWOOD)  As it relates to
18 identification did he ask you your Social Security
19 number -- well, let me back up, let's back up.
20            Did he ask you your name?
21     A.     No.  Not at this point, no.
22     Q.     So I'm just trying to understand the
23 sequence.  After this exchange about whether or not
24 you were pulled over and you rolled down your
25 window more --

1      A.     You can clearly see me in the car as
2 he pulled up.  The window was already at about
3 halfway.  You can clearly see me in the vehicle.
4      Q.     All right.
5      A.     And again I had already been parked,
6 I wasn't moving, I didn't pull into that spot.
7      Q.     I understand that.
8      A.     Okay.
9      Q.     He -- well.  Did he ask you your
10 name?
11     A.     You're asking me the sequence or are
12 you asking me at some point?
13            MR. WALDRON:  I'm just going to
14 object to form, I just want to be clear that we're
15 within the right sequence.
16     Q.     (BY MR. NORWOOD)  I want to be in the
17 right sequence.  You said he asked you for your
18 Social Security number.
19     A.     That was the first question after his
20 initial contact of do you know why I pulled you
21 over, do you know why I stopped you.
22     Q.     Okay.  So the first question out of
23 his mouth was what's your Social Security number.
24     A.     Yes.  That's what I recall.
25     Q.     I understand his objection.  The

1 first question was do you know why I pulled you
2 over, right?  That's the first question, do you
3 know why I pulled you over, is that a fair
4 statement?
5      A.     Yes.
6      Q.     All right.  And then you responded
7 and what was the next question that you can recall
8 from Officer Boyd?
9      A.     Was the statement give me your Social
10 Security number.
11     Q.     So it wasn't a question, he just said
12 give me year Social Security number, is that right?
13     A.     Yes.
14     Q.     And that was before he asked for your
15 identification?
16     A.     That's correct.
17     Q.     That was before he asked your name?
18     A.     That's correct.
19     Q.     And what did you respond?
20     A.     Sir, I can't provide you that.
21     Q.     Okay.  And then what did he respond
22 next?
23     A.     To my recollection the next thing was
24 he was asking me, or he was giving me
25 hypotheticals, you could be a pedophile, I don't

1 know who you are.
2      Q.     This was before he asked you your
3 name?
4      A.     Before he asked me my name.
5      Q.     So I just want to understand the
6 sequence.  He asked you for your Social Security
7 number, right?
8      A.     As best I remember, yes.  That was
9 the first two things that happened without
10 question.
11     Q.     And you refused to provide it to him,
12 correct?
13     A.     I refused to provide my Social
14 Security number, yes.
15     Q.     All right.  And then he referenced
16 the possibility of you being a pedophile.
17     A.     Yes.
18     Q.     Right.  He didn't call you a
19 pedophile, did he?
20     A.     He said you could be a pedophile, I
21 don't know who you are.
22     Q.     Right.  And that's not calling you a
23 pedophile, is it?
24     A.     I think it is.
25     Q.     He didn't know you were a pedophile,

23 (Pages 86 - 89)

1      A.   So at this point I feel like I'm just
2  being bullied.
3      Q.   I understand what you felt and I
4  don't want to get into your feelings right now, I
5  want to get to what transpired.
6      A.   I was being bullied at that time.
7      Q.   That's your assessment and that's
8  fine.
9      A.   Understood.
10     Q.   I'm trying to get right now to the
11  exchange between the two and whether or not you can
12  recall, because if you don't recall you don't
13  recall.  All right.  After he said could you be a
14  pedophile what was your response to that, as best
15  you can recall?
16     A.   I don't recall my response.
17     Q.   Okay.  That's fair enough.
18     A.   I'm not responsible for -- I don't
19  recall the response.
20     Q.   You don't recall the response.
21  That's fair enough.  All right.  And then what do
22  you recall next in terms of exchange of, between
23  you and Mr. Boyd, verbal exchange?
24     A.   I just recall him, Officer Boyd just
25  making a lot of random statements of things I could

1  be or things that he could do to me, or --
2      Q.   Like what?
3      A.   He told me I could be a pedophile.
4      Q.   Right.
5      A.   He can give me tickets for the tint.
6      Q.   Right.  Okay.
7      A.   I don't recall all the other
8  exchanges.  At some point he was throw your keys
9  out of the car.
10     Q.   Okay.  Let me stop you right there.
11  At some point, and we're going to talk about the
12  keys coming out the car.  But before he asked you
13  to throw your keys out the car had he asked you for
14  your identification?
15          MR. WALDRON:  Object to form.
16     Q.   (BY MR. NORWOOD)  Subject to that
17  objection.
18     A.   What's the question?
19          MR. NORWOOD:  Let's read that one
20  back.
21          MR. WALDRON:  I'm just going to
22  object to the term identification, I don't know if
23  you mean driver's license, I don't know if you mean
24  Social Security number, I don't know if you mean
25  name.

1          MR. NORWOOD:  Can we read that back?
2      (Whereupon, the reporter read from the record)
3      A.   No.  Other than -- well, are we
4  talking about my Social Security number?
5      Q.   (BY MR. NORWOOD)  Any identification.
6      A.   Yes, he asked me for my Social
7  Security number.
8      Q.   Outside of the Social Security number
9  did he ask you for your driver's license?
10     A.   At that point, no.
11     Q.   Stay with me for a minute.  There's a
12  method to my madness.
13          Before he asked you to throw the keys
14  out of the car had he asked you to present any form
15  of identification?
16          MR. WALDRON:  Same objection.
17     A.   He asked me about my name, again I
18  don't recall if it was before the throw the keys
19  out, he asked me for my name, what's your name.
20  This was after the pedophile, this is after the
21  tint, I can write you a ticket for tint, this is
22  -- yeah, that's what I remember.
23     Q.   (BY MR. NORWOOD)  All right.  Did he
24  ask you to present an identification?
25     A.   No.

1      Q.   All right.  Before you threw, before
2  he asked to you throw the keys out of the window he
3  didn't ask you for any identification, is that your
4  testimony?
5      A.   I don't recall him asking me that at
6  the moment, no.
7      Q.   All right.  But now you recall him
8  asking your name, is that right?  Before he asked
9  you to throw the keys out of the window, is that
10  accurate?
11     A.   I don't recall the sequence of those
12  two things.
13     Q.   Okay.  So you don't know if it was
14  before he asked you to throw the keys out or after,
15  is that a fair statement?
16     A.   That is a fair statement.
17     Q.   All right.  And do you recall
18  responding to him when he asked you your name?
19     A.   Yes.
20     Q.   And what did you tell him your name
21  was?
22     A.   Fred Watson.
23     Q.   All right.  So you told him your name
24  was Fred Watson.  Do you know if he made an effort
25  to put the name Fred Watson into a computer system

25 (Pages 94 - 97)

Page 98

1  to find out more information about Fred Watson?
2      A.    After I was in cuffs.
3      Q.    After you were in cuffs what?
4      A.    After I was in cuffs which we fast
5  forward through again the process of what happened.
6      Q.    All right.
7      A.    So again at some point in there he
8  called in on me and made a complaint, he called
9  dispatch and made a complaint against me.
10     Q.    Uh-huh.
11     A.    And said he had a heavily tinted
12 window I believe, it was something going on but he
13 needed backup.  At some point I asked him his name
14 and his badge number, he refused so give me that,
15 told me I didn't need that.
16     Q.    And I understand, we're going to talk
17 about that too, but I'm just trying to find the
18 sequence.
19     A.    You asked me did he enter the
20 information into a computer.
21     Q.    I'm saying do you know, when you told
22 him your name was Fred Watson do you know if he
23 made any effort to find out information about you
24 in any system?
25     A.    At that moment, no.  He's standing

Page 99

1  next to my window.
2      Q.    All right.  So you never saw him call
3  anybody and ask to run a check on Fred Watson or
4  anything like that?
5      A.    I saw him call and make a complaint
6  against me.
7      Q.    All right.  Let's -- okay.  Was that
8  before or after he asked to you throw your keys
9  out?
10     A.    I don't recall.
11     Q.    All right.  So you were sitting in
12 the car, you observed him calling in information to
13 somebody?
14     A.    Yes.
15     Q.    All right.  And do you know if that
16 was a call for backup or was it a call to obtain
17 more information about Fred Watson?
18     A.    I heard him ask for backup.
19     Q.    Okay.  So you heard him ask for
20 backup, and did you hear him provide the name Fred
21 Watson to whoever was on the other end?
22     A.    I don't recall.
23     Q.    So he could have, you just don't
24 recall as you sit here today?
25     A.    Correct.

Page 100

1      Q.    And do you know if Fred Watson shows
2  up in that computer system if he called in to check
3  the name Fred Watson?
4      A.    I don't know.
5      Q.    All right.  You don't know.  Why
6  didn't you identify yourself as Freddie Watson?
7      A.    Because he didn't ask me specifically
8  -- I go by Fred Watson.
9      Q.    Well, sir, you are a very smart,
10 intelligent individual.
11     A.    Uh-huh.
12     Q.    And you understand the difference
13 between short names and full names, you understand
14 that, correct?
15     A.    I do.
16     Q.    All right.  And you have an officer
17 approaching you asking you your name and you
18 decided to use Fred as opposed to your legal name,
19 correct?  That was your decision?
20     A.    I was never asked for my legal name.
21     Q.    Okay.  So if he would have asked you
22 your legal name you would have told him Freddie
23 Watson.
24     A.    That's correct.
25     Q.    But because he just asked you your

Page 101

1  name you decided to tell him Fred Watson.
2      A.    That's correct.
3      Q.    And you don't know how or if Fred
4  Watson appears anywhere in the REGIS system that
5  the Ferguson police department would have checked,
6  correct?
7      A.    I don't know who he called, who he
8  talked to or if they ran my name or not, I do not.
9      Q.    I understand and that wasn't my
10 question.  My question is as you sit here today you
11 don't know if Fred Watson comes up in a computer
12 system that would be checked by the city of
13 Ferguson, correct?
14     A.    It shouldn't come up.
15     Q.    Why not?
16     A.    Because I haven't had any tickets, I
17 haven't had any law enforcement infractions so my
18 name shouldn't come up in those databases.
19     Q.    Well, but you have a driver's
20 license, right?
21     A.    I do.
22     Q.    And your drivers license is in what
23 name?
24     A.    It's in Freddie Watson, and it's a
25 Florida driver's license.

26 (Pages 98 - 101)

Page 102

1     Q.    I understand all of that.  So you're
2  saying though that you understood that Fred Watson
3  wouldn't come up because you didn't have a license
4  under the name of Fred Watson and you didn't have
5  any traffic tickets, right?
6     A.    Yes.
7     Q.    And you knew that at the time you
8  were communicating about Officer Boyd, right?
9     A.    That I didn't have any tickets?
10    Q.    That the name Fred Watson wouldn't
11  come up because your license was in the name of
12  Freddie Watson.
13    A.    So I don't know what you're asking me
14  at this point.  I don't know if he's running my
15  name or why he's running my name or why it's
16  required at this point.  So I don't understand what
17  you're asking me about what you they knew or what
18  came up, I don't have any knowledge of any of those
19  things.
20    Q.    I'm asking what you know.  You knew
21  your name was Freddie Watson and he didn't, right?
22    A.    Yes, I know that.
23    Q.    So he didn't know your name was
24  Freddie Watson, right?
25    A.    No.

Page 103

1     Q.    You knew your name was Freddie
2  Watson, right?
3     A.    I knew may name was Freddie Watson.
4     Q.    You knew your driver license was in
5  the name Freddie Watson, right?
6     A.    Yes.
7     Q.    Yet you didn't tell him I'm Freddie
8  Watson, right?  I mean can we agree with that?  You
9  didn't tell him I'm Freddie Watson.
10    A.    No, I told him I was Fred Watson.
11    Q.    All right.  So, at some point he
12  asked you to throw your keys out of the car,
13  correct?
14    A.    Correct.
15    Q.    And did you throw your keys out of
16  the car?
17    A.    I did not.
18    Q.    Why not?
19    A.    My keys are in the back seat folded
20  up in my clothes, in my pants.
21    Q.    Well the car was running.
22    A.    That's correct.
23    Q.    And it had a start?
24    A.    It's a push start.
25    Q.    So you had push start and so because

Page 104

1  they were in the -- did you ask him if you could
2  get them?
3     A.    So at this point after I asked
4  Officer Boyd, or again I didn't know who he was
5  there, I asked him for his name, his badge number.
6     Q.    Right.
7     A.    He refused to give me that
8  information.
9     Q.    Right.
10    A.    My hands at this point are on the
11  steering wheel.
12    Q.    Right.
13    A.    So again, he's, during this exchange
14  now he's elevated, you know, so he's yelling, he's
15  upset, whatever, I got my hands on the wheel.
16  Again, he's standing close enough to see me so he
17  can see, my hands never, if you look at a clock my
18  hands never dropped below 9 and 3.  So my hands
19  here, my phone's sitting on the console, we're
20  looking at 2 o'clock.  I picked up my phone to
21  punch in my code because I'm going to call the
22  police myself.
23    Q.    All right.
24    A.    He's still yelling and screaming put
25  the phone down, put the fucking phone down, police

Page 105

1  safety and all these things.
2     Q.    He said because of police safety
3  don't start reaching around grabbing stuff.
4     A.    He can clearly see the phone.
5     Q.    I understand that.
6     A.    Yes, I'm not going to make any sudden
7  moves.
8     Q.    And he said because of police safety
9  don't, put the phone down, right?
10    A.    Okay.  And I already have the phone.
11    Q.    Right.  But he told you to put it
12  down.
13    A.    And I put it down.
14    Q.    Well, you didn't have it before you
15  grabbed it, right?  I mean you grabbed, you just
16  grabbed your phone in the middle of the this
17  dialogue with Officer Boyd after he told you to
18  throw the keys out and for whatever reason you
19  didn't do it and then you grabbed your phone,
20  right?
21    A.    No, it didn't go that way.
22    Q.    Tell me how it went.
23    A.    I made no sudden moves in the car.
24  At some point he decided to call to make a
25  compliant against me and again I picked up my phone

27 (Pages 102 - 105)

Page 106

1 because I wanted to know what's going on, why am I
2 being detained, why am I being harassed at this
3 point? I want to call the police. So after he
4 told me to put the phone down I put it back on the
5 console.
6      Q.    How did you get the phone in your
7 hands, did you have your phone in your hands when
8 he walked up to you?
9      A.    I did not.
10     Q.    That's what I'm trying to figure out.
11 During this exchange, verbal exchange with Officer
12 Boyd you reached and grabbed your phone, right?
13     A.    The phone is in plain site.
14     Q.    I understand it's in plain site but
15 to make a call you would have had to put it in your
16 hands at some point.
17     A.    The phone is on the console and
18 again, if we're looking at a clock it's at 3
19 o'clock so my hands didn't go down, my hands went
20 up off the steering wheel. Yes, I picked up the
21 phone.
22     Q.    I'm not suggesting they went down,
23 I'm not suggesting they went up, I'm just trying to
24 establish the fact that you reached and you grabbed
25 your phone to make your phone call as you testified

Page 107

1 to, right?
2      A.    That is correct.
3      Q.    All right. And when you did that he
4 responded by telling you to put it down for safety
5 reasons, right?
6      A.    Correct.
7      Q.    All right. So you put it down,
8 right?
9      A.    Correct.
10     Q.    And this was after he asked you to
11 throw your keys out, right?
12          MR. WALDRON: Objection to the extent
13 it mischaracterizes his testimony.
14     Q.    (BY MR. NORWOOD) Am I
15 mischaracterizing your testimony? Was it before or
16 after the key thing?
17     A.    I don't recall.
18     Q.    All right.
19     A.    I've said to you that this exchange
20 happened and I cannot give you other than those
21 first two the exacts at this moment.
22     Q.    All right. Fair enough. I mean I'm
23 trying to get exacts as you can exactly describe
24 them to me and if you can't say you can't, I
25 understand that, this is a long time ago and

Page 108

1 memories fade.
2          So I want to go back to the keys,
3 right? He asked you to throw your keys out and
4 what did you say in response?
5      A.    I'm not going to do that.
6      Q.    All right. So you told him no, I'm
7 not throwing my keys out, right?
8      A.    That's correct.
9      Q.    Did you tell him why you weren't
10 throwing them out?
11     A.    I don't think I did.
12     Q.    All right. So you just said I'm not
13 doing it, right? You refused his request to throw
14 the keys out, right?
15     A.    Yes.
16     Q.    Okay. And then when you grabbed your
17 phone and he cited safety reasons and he told you
18 to put it back and you put it back, right?
19     A.    Yes.
20     Q.    All right. And at some point then he
21 calls in and he calls for backup, you hear that,
22 right?
23     A.    That was before, that was kind of
24 during the same time the phone, while he's standing
25 next to, he finishes his call.

Page 109

1      Q.    Okay.
2      A.    Yeah. But the phone is already back.
3      Q.    So the phone is back, your hands are
4 on the wheel, right?
5      A.    Yes.
6      Q.    You want to make sure he sees your
7 hands on the wheel, right?
8      A.    Yes.
9      Q.    And he had called in, you heard
10 backup, or something to that effect, that made the
11 impression that he at least called for backup at
12 that time, right?
13     A.    He called to make a complaint, that
14 was his initial contact with dispatch.
15     Q.    All right. Called to make a
16 complaint.
17     A.    Black male in a heavy tinted car or
18 something like that.
19     Q.    Right. What else do you recall?
20     A.    At some point he asked them to send
21 him backup.
22     Q.    This is all during the same call?
23     A.    I believe so.
24     Q.    And you don't recall if he gave the
25 name Fred Watson over the call.

28 (Pages 106 - 109)

Page 110

1    A.   I do not.
2    Q.   And if he did give the name Fred
3 Watson you know if somebody checked and found any
4 information to identify you in terms of who you
5 really were?
6    A.   I do not know what happened on the
7 other end of the car.
8    Q.   All right. And then what happened
9 next? Did he pull his gun?
10   A.   He pulled his gun out on me.
11   Q.   At what point did he pull his gun?
12   A.   After he finished his call.
13   Q.   After he finished the call he pulled
14 his gun, was this in response to you picking up the
15 phone?
16   A.   Phone was already down.
17   Q.   All right. Phone was down, your
18 hands were on the wheel, he called for backup and
19 then he decided to pull his gun, is that what you
20 recall?
21   A.   That is roughly what I recall.
22   Q.   All right. And when he pulled his
23 gun did he say anything?
24   A.   He said I can shoot you right here, I
25 can kill you, nobody will fucking care.

Page 111

1    Q.   Okay.
2    A.   Nobody will give a damn.
3    Q.   So let me write that down as you
4 recall it. He said what? He said I could kill you
5 right now?
6    A.   I could shoot you right here.
7    Q.   Okay.
8    A.   As I recall.
9    Q.   Okay.
10   A.   And nobody will give a shit.
11   Q.   It was a damn or a shit, I just want
12 to make sure?
13   A.   As I recall.
14   Q.   Damn or shit? Which one did he use,
15 as you recall?
16   A.   Shit.
17   Q.   Okay. And did you respond to his
18 suggestion that he could shoot you right here and
19 nobody would give a shit?
20   A.   I did not. Actually you asked me
21 about my ID earlier, he didn't ask me for my ID
22 until after that happened. He didn't ask me to
23 throw my keys out until after that happened.
24   Q.   Until after what happened?
25   A.   After he pulled his gun out on me.

Page 112

1    Q.   Okay. So, but this was after he had
2 called in for backup.
3    A.   This is correct.
4    Q.   All right. So he called in for
5 backup, he pulled his gun out and some time
6 thereafter he asked you to throw your keys out.
7    A.   That's correct.
8    Q.   And you refused.
9    A.   He asked me to turn the car off,
10 throw the keys out of the car, that's correct.
11   Q.   And you refused --
12   A.   I know he asked me to throw the keys
13 out, yes.
14   Q.   Did he ask you to turn the car off?
15   A.   I don't recall that.
16   Q.   Did you turn the car off?
17   A.   I did not at that time.
18   Q.   So if he asked you you didn't do it,
19 right?
20   A.   I did not.
21   Q.   Then at some point you say he did ask
22 you for identification?
23   A.   Yes.
24   Q.   All right. And was this before the
25 backup arrived?

Page 113

1    A.   Yes.
2    Q.   All right. And what did you say in
3 response?
4    A.   I gave him my identification. I told
5 him Fred Watson.
6    Q.   Okay. And that's what I'm trying to
7 clear up. Did he ask you for any identification,
8 form of identification?
9    A.   Did he ask me for my driver's
10 license?
11   Q.   Driver's license, military ID, Social
12 Security card, anything like that?
13   A.   He asked me for my license and
14 registration.
15   Q.   Okay. And what did you say?
16   A.   With my hands on the wheel?
17   Q.   With your hands on the wheel?
18   A.   I told him it's in the back, my
19 license is in my pants in the back.
20   Q.   All right. And what about your
21 registration, did you tell him about that?
22   A.   Registration is in the glove
23 compartment.
24   Q.   You told him that.
25   A.   All of which is outside of my reach.

29 (Pages 110 - 113)

1    Q.    I understand that.  I'm just trying
2  to get what was said between you and Officer Boyd.
3    A.    Yes, sir.
4    Q.    You told him that you had your
5  driver's license in your pants in the back?
6    A.    I believe so.
7    Q.    You told him you had your
8  registration in the glove compartment?
9    A.    Yes.
10   Q.    All right.  Did you make any
11 reference to a military ID?
12   A.    After I was in handcuffs in the car.
13   Q.    What did you say about a military ID?
14   A.    Okay.  So this is, for me this is a
15 long process, this is it seems like forever.
16   Q.    Right.
17   A.    Backup finally comes -- or you don't
18 want that information yet?
19   Q.    No, I wanted to hear what you have to
20 say about it.
21   A.    After the gun is pulled on me and
22 reholstered I'm still here and he asked for
23 driver's license and registration.  In fear for my
24 life I'm not going to move from that spot that I'm
25 at.

1    Q.    Right.
2    A.    My hands are on the steering wheel,
3  that's where I am.
4    Q.    Right.
5    A.    I have no more words now for Officer
6  Boyd until his backup came.  Backup came, K-9 unit
7  came, when I got there they huddled, they
8  conversated, one of the guys came over to the
9  window and he asked me what's going on, I told him
10 what's going on, he tells me I just need to do what
11 he say.
12   Q.    Okay.
13   A.    I need to follow his instructions or
14 it could get worse, he don't want to let the K-9
15 out and run through the car and all these other
16 things.
17   Q.    Who said they didn't want to let the
18 K-9 out?
19   A.    One of the other officers who was
20 driving the truck with the K-9 in it.
21   Q.    When the backup came they asked you
22 to get out of the car, right?
23   A.    No.
24   Q.    They didn't ask you to get out of the
25 car?

1    A.    No.  When they came they had a
2  conversation amongst themselves kind of like off to
3  the side.
4    Q.    Okay.
5    A.    One of the officers came and just
6  told me I need to follow his instructions, I need
7  to do what he say.
8    Q.    Okay.
9    A.    During our exchange, now there's
10 other people in the park paying attention to what's
11 going on.  I let him now I'm going to get out, I'm
12 going to open the door, so I let this officer know
13 what I'm going to do so I don't get killed.
14   Q.    Right.
15   A.    I'm not going to make any sudden
16 moves or turn around and reach in the back of the
17 car and try to grab something, no.
18   Q.    I understand that.
19   A.    So now they're there, I explain to
20 him what's going on, he tell me I just need to do
21 these things, I let him know I'm opening up the
22 door, I opened the door.
23   Q.    What did he tell you you needed to
24 do?
25   A.    I need to do whatever Officer Boyd

1  said, he don't care what it is, just do what he
2  said.  He don't want to let the K-9 unit out to
3  tear my shit out, I don't want that because it can
4  get worse.
5    Q.    That's what some other officer said.
6    A.    Right.
7    Q.    Officer Boyd didn't say that?
8    A.    Officer Boyd -- no.
9    Q.    He didn't say anything about K-9, you
10 heard the other officer who you thought had K-9s in
11 the vehicle when they arrived.
12   A.    I didn't think anything.
13   Q.    You saw it.  Did you see the K-9?
14   A.    I heard the dog.
15   Q.    This other officer referenced K-9s
16 tearing up your car, right?
17   A.    Officer Boyd told them that we can
18 let the K-9 out, sniff around the shit and go in
19 the car.  The other officer comes to me and tells
20 me, as I'm explaining to him what's going on he's
21 telling me he don't want to have to take the K-9
22 out, do whatever he said, it will be over quick,
23 blah, blah, blah.
24   Q.    Okay.
25   A.    This is what I recall about that.  So

1 officer Eddie Boyd, yes, mentioned the K-9 and
2 letting the dogs out on me.
3     Q.    Let's focus on that, I'm trying to
4 understand.  Before the other officers referred to
5 K-9 you heard Officer Boyd tell you or tell
6 somebody else about letting K-9s out.
7     A.    I heard Officer Boyd mention to the
8 other officer, we can take the K-9 out.
9     Q.    Okay.  And tear up your stuff?
10     A.    That's correct.
11     Q.    He used those terms?
12     A.    Tear up the shit.  Sniff around the
13 car and the dogs, this is how he explained it, the
14 dogs will tear up my shit.
15     Q.    He was explaining to the other
16 officers and you heard it.
17     A.    It was explained to me.
18     Q.    So Officer Boyd at some point in this
19 encounter approached you while you had your hands
20 on the wheel while you were in the car saying I can
21 have them let the K-9s out to tear up your shit.
22     A.    Before the K -- Officer Boyd
23 threatened to have the K-9 unit come and bring the
24 dog.  Officer Boyd mentioned to them, other
25 officers, that they can let the K-9 out if I don't

1 want to get out, if I don't want to do any of those
2 other things.  So I don't recall word for word how
3 that went.  I heard Officer Eddie Boyd reference
4 letting the dogs out.  The other officer then came
5 to my car and asked me what was going on, I
6 explained to him the exchange we had earlier,
7 myself and Officer Boyd, he said, he telling me you
8 don't want me or us to let the dogs out, out don't
9 want that.
10     Q.    All right.
11     A.    Looks like a nice car, you don't want
12 the dogs in here tearing your ship up.
13     Q.    Right.
14     A.    no, I don't.  I'm going to get out.
15 This is my exchange back to this other officer.
16 I'm going to open the door, I'm going to let my
17 window up, I'm going to turn the car off because
18 again it's a push button, I have an automatic raise
19 on the window, I open the door while I'm talking to
20 him, he's standing --
21     Q.    He who?
22     A.    The other officer.  Is standing in
23 front.
24     Q.    All right.
25     A.    Officer Boyd is standing over to the

1 side, I would say seven, eight o'clock which as the
2 door open, so again I pushed the door open, I hit
3 the button to let the windows up, I have my hands
4 up, he told me to get out of the car slowly.
5     Q.    Who is he?
6     A.    Officer Boyd told me to get out of
7 the car slowly and put my hands up.
8     Q.    You complied?
9     A.    I did.
10     Q.    All right.
11     A.    The window is coming up, as the
12 window is coming up I hit the button to turn the
13 car off.
14     Q.    Right.
15     A.    I got out, as I'm getting out I got
16 my hands up, he pushed me up against the car, I
17 turned and I closed the door with my foot.  It
18 wasn't an aggressive turn, it wasn't an aggressive
19 kick, I turned, I get out, he pushed me up against
20 the car, as I'm turning I closed door and he cuffed
21 me.  Put me in the back of the squad car.  They go
22 back and talk some more.
23     Q.    Why did you close the door?
24     A.    I don't give them consent to search
25 my car.  I don't want them searching my car.

1     Q.    I understand that.
2     A.    That's why I closed the door.
3     Q.    You closed the door to make sure --
4     A.    Not to that make sure, so they would
5 know I don't give them consent to search my car.
6     Q.    Okay.  So what you are trying to
7 communicate by using your knee to close the door
8 while you're being put in handcuffs was that you're
9 not consenting to them searching your car?
10     A.    I consented that before I got out of
11 the car as I was talking to the other officer.
12 When I told him I'm going to get out, let my window
13 up, I don't give you permission to search my
14 vehicle.
15     Q.    So you said that before you got out.
16     A.    Before I got out.
17     Q.    And you got out and as you were be
18 putting in cuffs you used your knee and closed the
19 door.
20     A.    I closed the door with my foot.
21     Q.    Closed the door with your foot.
22 okay.  Then what happened next?
23     A.    They cuffed me, put me in the back of
24 the squad car.
25     Q.    All right.  And then --

31 (Pages 118 - 121)

Page 122

1    A.    They huddled up again and had some
2  conversation, he came to the car, that's when he
3  first to my understanding tried to run my name.
4    Q.    Okay.  And do you know what name he
5  ran at that time?
6    A.    The only name he could run, Fred
7  Watson, that's what I gave him.
8    Q.    All right.  So, and you don't know if
9  somebody would run the name when he was on the
10 walkie-talkie?
11    A.    I do not.
12    Q.    And so, but you saw him do something
13 running your information on the computer, you saw
14 that?
15    A.    Correct.
16    Q.    Do you know what the results of that
17 was at that time?
18    A.    I know they huddled up again, had
19 some conversation.  He went back to the car, I saw
20 the officer, one or two of the officers look in,
21 kind of look around.
22    Q.    Look into what?
23    A.    Into the car.  They just literally
24 stuck their heads in, stuck in and just kind of
25 stuck their heads in back and forth.

Page 123

1    Q.    So they opened the door.
2    A.    Officer Boyd opened the door.
3    Q.    Okay.  Just trying to get the
4  sequence.  So before the other officers looked
5  around Officer Boyd -- where were you at the time
6  when Officer Boyd opened the car?
7    A.    I was in the back of his car.
8    Q.    And you saw him then go over to your
9  car, open up the front door?
10    A.    Correct.
11    Q.    And what did he do after he opened up
12 the front door?
13    A.    After he opened up the door they kind
14 of had a discussion.
15    Q.    Right.
16    A.    And my understanding is like okay --
17 I don't know what happened.  They had another
18 discussion --
19    Q.    Hold on a second.  I want to stop you
20 there because I want to understand what happened in
21 relation to the vehicle.  He opened the door and
22 did he look in the vehicle, did he sit down in the
23 vehicle, did he move stuff in the vehicle, what did
24 he do when he opened that door?
25    A.    When he opened the first door they

Page 124

1  huddled up and had another conversation.
2    Q.    So before he entered the vehicle he
3  opened the door and then he had a conversation, is
4  that correct?
5    A.    That's correct.
6    Q.    They had a conversation and what
7  happened next as it relates to --
8    A.    He go and open the other door.
9    Q.    Other door meaning the passenger
10 side, left passenger side door.
11    A.    The passenger front door.
12    Q.    The passenger front door, okay.  So
13 he goes to the other side of the vehicle and opens
14 the other side?
15    A.    That's correct.
16    Q.    And then what happened?
17    A.    On that side the other officers kind
18 of stuck their head in, they didn't touch anything,
19 they just looked.
20    Q.    What did you see Officer Boyd do?
21    A.    I see Officer Boyd go in, two knees
22 on the front seat.
23    Q.    Okay.
24    A.    Grab my bookbag off the back seat.
25    Q.    Okay.

Page 125

1    A.    Dump the content out of it.
2    Q.    Okay.
3    A.    Take my pants, bring my pants to the
4  front, just trashing it, just throwing stuff over.
5  I saw him go in the glove compartment and I saw him
6  moving around in the center console.
7    Q.    Okay.  Did you see him pocket any
8  wads of money?
9    A.    I did not.
10    Q.    All right.  And then what else did
11 you see him do in the vehicle other than what
12 you've just described?
13    A.    After a while they was trying to
14 figure out how to get it started because again,
15 it's a push start.  So they had that conversation,
16 I did hear them have that conversation.  And I
17 believe the tow truck is here at this time.
18    Q.    Okay.  Where was your driver's
19 license at this time?
20    A.    It was in my pants on the back seat.
21    Q.    Was it in your wallet or just loose
22 hanging around?
23    A.    It was in my pants on the back seat.
24    Q.    Your pants were in the back seat.
25    A.    Correct.

32 (Pages 122 - 125)

Page 126

1    Q.    And the driver's license was in the
2  pants pocket?
3    A.    Correct.
4    Q.    All right.
5    A.    It was folded up on the seat in my
6  pants.
7    Q.    And where were your keys?
8    A.    In the pocket.
9    Q.    In the pants pocket?
10    A.    Right.  So it's not keys, it's a fob,
11  it's a remote fob, so yes.
12    Q.    Did you have any other keys in your
13  pants pocket?
14    A.    I don't recall.
15    Q.    Was your fob on a key ring with other
16  keys of yours?
17    A.    No.
18    Q.    So you had a key fob and you had a
19  key ring also at that time?
20    A.    There's a key fob for the car.
21    Q.    Right.  But you have other keys, you
22  keys to your house --
23    A.    I don't remember any other keys.  I
24  know for my car I have a key fob.
25    Q.    All right.  But did you have keys to

Page 127

1  your home wherever you were residing at that time
2  on your person at that time?
3    A.    I don't recall.  So I have a
4  programmable garage and I have buttons for that so
5  it opens up and I get in the house.
6    Q.    So sometimes you may not bring your
7  house keys, you just lock up and just take your key
8  fob?
9    A.    Correct.
10    Q.    All right.  I understand that.  All
11  right.  And then what happened next?
12    A.    So I want to go back.  After he was
13  rambling through the car he gets my registration,
14  he comes to his car and try to run my name.  I know
15  I said before he tried to run my name, I believe it
16  was twice he tried to run the name so he comes
17  with, he has my, well he finds, he says he finds my
18  registration and it's not Fred, it's Freddie, and
19  he said some other things and he's running it but
20  during that time I asked him did he see my military
21  or government ID in the console and he looks up in
22  the rear-view mirror and kind of just looks at me
23  and that was the only thing I said to him after the
24  our exchange, after the gun was pulled, that was
25  the last thing that I said to him.

Page 128

1    Q.    What was the last thing you said to
2  him?
3    A.    Did you see my military or government
4  ID and by this time I'm handcuffed in the car, he's
5  already went through my car, I'm handcuffed in the
6  back of his car, he's already went through my car.
7  They didn't find my name even when he ran it then
8  and I heard him ask do they have access to a
9  different system because he can't find anything.
10    Q.    Let me go back though because you had
11  stated earlier that once he pulled his gun out
12  basically you didn't talk to him anymore, is that a
13  fair statement?
14    A.    I believe so, yes.
15    Q.    So once he trained his gun on you --
16    A.    No, he asked -- I think that was
17  before the keys.
18    Q.    At some point after his gun was
19  drawn, whatever sequence that was and before backup
20  arrived you made the decision that you weren't
21  going to talk to him?
22    A.    No, did he ask me other questions, he
23  did.  He asked me, I believe that's, again, when he
24  asked me about the other keys or throwing the keys
25  out and I think, that is, he also asked me about my

Page 129

1  ID.  Yeah.  So I did have other conversations or
2  there was continued dialogue after that.  So I
3  misstated that.
4    Q.    So this is when the gun is out?
5    A.    This is during and after, yes.
6    Q.    All right.  So what was the
7  discussion about the ID?
8    A.    It was, that's when he started asking
9  me about my license and registration.
10    Q.    All right.  And you said something
11  about your military ID, when does that discussion
12  come up?
13    A.    This was after I was handcuffed and
14  in the back of the car.
15    Q.    So after you were handcuffed --
16    A.    This is after he went through the
17  car.
18    Q.    What did you say about the military
19  ID?
20    A.    I just asked him did he sea it in the
21  console when he was in there.
22    Q.    So the military ID you had in the
23  console.
24    A.    Yes, it was with the money.
25    Q.    So the money was in the console, the

33 (Pages 126 - 129)

Page 134

1    Q.    All right.  And then how long were
2 you in jail?
3    A.    Seven, eight hours-ish.  I don't have
4 the exact time.
5    Q.    How did you ultimately get out?
6    A.    I had some relatives come and bond me
7 out.
8    Q.    And how much was that, do you know?
9    A.    $700.
10    Q.    $700.  All right.  And then you were
11 released, is that right?
12    A.    Yes.  I signed some papers and they
13 take the money, yeah.
14    Q.    Okay.  Do you know why Officer Boyd
15 was asking you for your Social Security number?
16    A.    I do not.  I thought it was odd.  I
17 thought it was odd, and again given the line of
18 work I just, it's not something we provide.
19    Q.    Do you know if Officer Boyd was
20 asking for your Social Security number in an effort
21 to identify you?
22    A.    No.  Because he had not asked me to
23 identify myself at that point.
24    Q.    All right.  So you don't think that
25 Officer Boyd was asking you your Social Security

Page 135

1 number in order to run a check on you, is that your
2 belief?
3    A.    That's correct.
4    Q.    All right.  Well, why do you think he
5 would have been asking for your Social Security
6 number?
7    A.    I don't know.  It was weird.  I don't
8 know.
9    Q.    All right.
10    A.    If you want to identify me you
11 normally would ask my name.
12    Q.    So you think he was asking for your
13 Social Security number for some nefarious purpose,
14 is that your belief?
15    A.    I don't know.  It was weird, it was
16 weird to me being a, having worked for the
17 government for so long, so yes, it was very, very
18 alarming, disturbing.
19    Q.    All right.  So to answer my question
20 though you don't know if he was asking for some
21 nefarious purpose, some legitimate purpose.
22    A.    I don't know.
23    Q.    as far as you know it could have been
24 legitimate from his standpoint, right?
25    A.    I do not believe so.

Page 136

1    Q.    What do you believe if you don't
2 believe it was for a legitimate purpose?  What do
3 you believe he was asking for your Social Security
4 number for if it wasn't for a legitimate law
5 enforcement purpose?
6    A.    I don't know.  I don't think it was a
7 legitimate law Enforcement Purpose.
8    Q.    What other reason would somebody ask
9 you for your Social Security number if it wasn't
10 for a legitimate law enforcement purpose, if he's a
11 law enforcement officer?  Do you think he was going
12 to use it to impersonate you?
13    A.    I don't know.  That's happened.
14    Q.    I understand that it has.
15    A.    There's a lot of that that goes on,
16 that's why I try to protect my information as best
17 I can.
18    Q.    I understand.  But when you heard him
19 ask for it was that what you popped in your mind,
20 that somehow this guy's trying to get my Social
21 Security number for some improper purpose?
22    A.    I felt like it was wrong, I felt like
23 it wasn't a normal request of a police officer
24 asking me.
25    Q.    All right.  If he had problems

Page 137

1 figuring out who you were does it make it clear --
2    A.    Completely different story,
3 completely different scenario, completely different
4 scene.
5    Q.    What do you mean?
6    A.    To identify me you have my name --
7    Q.    No, no, I understand that.  What I'm
8 asking is that if he felt for whatever reason he
9 needed your Social Security number to, in order to
10 figure out who you were you have an issue with
11 that, is that right?  Because you don't want to
12 provide your Social Security number.
13    A.    What's the question?
14    Q.    If he felt that he needed your Social
15 Security number in order to try and figure out who
16 you were you have problems with that, correct,
17 because you don't like providing your Social
18 Security number to anybody, is that right?
19    A.    I just didn't think that it was a
20 normal procedure.
21    Q.    All right.  And so therefore you
22 refused.
23    A.    Yes.
24    Q.    All right.
25          Now, let's talk about then you got

35 (Pages 134 - 137)

1 out the next day on August the 2nd, is that right?
2    A.    That's correct.
3    Q.    All right.  And you went to retrieve
4 your vehicle from the impound lot?
5    A.    That's correct.
6    Q.    How did you get to the impound lot?
7    A.    My cousin took me.
8    Q.    Okay.
9    A.    My mom and my cousin.
10   Q.    All right.  Your mom and your cousin
11 took you to the impound lot and what happened when
12 you got to the impound lot?
13   A.    Originally they told me that I needed
14 documentation to retrieve the car.
15   Q.    Okay.
16   A.    And I had --
17   Q.    What documentation?
18   A.    I had to get a tow receipt or
19 something.  So Ferguson police department and the
20 tow yard bounced me back and forth between each
21 other a couple times.
22   Q.    Okay.  Let's walk through it.  So how
23 many times did you have to go back to the tow lot
24 before you actually were able to retrieve your
25 vehicle?

1    A.    Twice.
2    Q.    All right.  So the first time you
3 went they told you that you needed paperwork from
4 Ferguson, right?
5    A.    Correct.
6    Q.    And then you went back to Ferguson
7 and did you get the paperwork when you went back to
8 Ferguson?
9    A.    Right.  I had to pay -- right.  I had
10 to get some receipt to give to the tow yard.
11   Q.    So you got the receipt from the city
12 of Ferguson, right?
13   A.    Correct.
14   Q.    And then you took it back to the tow
15 lot.
16   A.    Yes.
17   Q.    And they gave you your vehicle?
18   A.    No.  I called the police to see if I
19 could get somebody else to help me verify the
20 contents of my vehicle before I took it.
21   Q.    Which police did you call?
22   A.    I called Ferguson.
23   Q.    Okay.
24   A.    Ferguson told me they would not touch
25 it because it's in north county.

1    Q.    Okay.
2    A.    I called north county, one of the
3 officers came in --
4    Q.    You mean the county police?
5    A.    Yes.
6    Q.    Okay.
7    A.    When I say north county, yes, the
8 county police and when the officers got there he
9 said he's not verifying, that's Ferguson, Ferguson
10 towed it, they need to send an officer out here to
11 verify.
12   Q.    All right.  So then what did you do
13 next?
14   A.    I talked to the tow guy to be there
15 as I'm first entering the vehicle.
16   Q.    Where was the vehicle when you first
17 entered it in relationship to the tow lot?
18   A.    It was inside a garage.
19   Q.    All right.
20   A.    So they stored it inside.  He said it
21 was clean, he didn't want to risk leaving it
22 outside and being vandalized and all that.
23   Q.    It was inside when you first got it
24 and tell me what you did.
25   A.    After the police officer said he

1 wouldn't verify the contents or whatever, I think
2 his name was Mike something, he agreed to watch me
3 open the door for the first time.  So as I opened
4 the door I started taking pictures because this is
5 the first time I seen the condition my vehicle was
6 in after it had been towed or after I saw Officer
7 Boyd in there, you know, moving my stuff around.
8    Q.    Was the car locked?
9    A.    It was inside the tow yard.
10   Q.    I understand that.  Was it locked in
11 the tow yard?
12   A.    I don't know.
13   Q.    I mean how did you get in the car?
14   A.    I opened the door.
15   Q.    You just opened it so that means it
16 was unlocked?
17   A.    I don't know if it was locked or not.
18   Q.    If it was locked how would you have
19 gotten in there?
20   A.    The keys are there.
21   Q.    Who gave you the keys?
22   A.    Nobody gave me the keys.
23   Q.    They were already in the car?
24   A.    The keys are in the car.  Remember I
25 said the keys were in the back seat in the pants.

36 (Pages 138 - 141)

Page 142

1    Q.    I understand that.  If the car was
2 locked --
3    A.    I don't know if the car was locked.
4    Q.    All right.  And if it were locked how
5 would you have opened it without the key?  You had
6 another set of keys?
7    A.    I don't know that the car would lock
8 with the keys in it.  I think I got a feature that
9 does not lock the keys inside.
10   Q.    All right.  I've got that feature
11 too.  So you think the car was open because it
12 wouldn't lock with the keys inside.
13   A.    When O got the car or when I first
14 seen the car I just opened the door.
15   Q.    All right.  So you opened the door
16 and the door opened.
17   A.    That's correct.
18   Q.    And you went inside, you took
19 pictures --
20   A.    No.  The tow truck guy who said he
21 drove the car is standing over my shoulders.
22   Q.    You mean drove the car when he towed
23 it in?
24   A.    Towed the car, yes.
25   Q.    All right.

Page 143

1    A.    So I open the door and I'm taking
2 pictures.  I point out my driver's license that's
3 on the floor, I point out my registration.
4    Q.    Okay.
5    A.    Because again, this is my witness
6 that say I didn't trash the car, this was the
7 condition that it was given to me in since the
8 police officer from Ferguson or the county wouldn't
9 come and check.
10   Q.    Right.
11   A.    So I took pictures and I asked him
12 about the money that was in the console and you can
13 see that in the picture as well and he told me
14 that --
15   Q.    See what in the picture?
16   A.    The, well, part of what's left over
17 for the money.
18   Q.    So let's talk about that.  Parts of
19 the money were missing and parts of it remained in
20 the vehicle.
21   A.    I don't know about parts.  Some of
22 the money was missing and there was some left.
23   Q.    How much money was missing?
24   A.    It was about $2,000.
25   Q.    And how much remained in the vehicle?

Page 144

1    A.    So it was approximately 2,700 then I
2 don't have an exact number, I just know that this
3 money was missing.  All of the funds that I left in
4 the vehicle were not there when I retrieved my
5 vehicle.
6    Q.    That's what I'm trying to understand.
7 So whoever took the money took part of the money
8 and left part of the money.  Is that a fair
9 statement?
10   A.    That's correct.
11   Q.    And the monies that were left would
12 have been 700 and change because you had a total of
13 700 and you believe somebody took 2,000.
14   A.    Give or take.
15   Q.    All right.  Now, did you mention that
16 to anybody as related to the missing money?
17   A.    I did.
18   Q.    Who did you mention it to?
19   A.    The tow truck dude, the guy that was
20 there.
21   Q.    All right.
22   A.    And he told me that he didn't go in
23 it, the only person he saw in the vehicle, of
24 course other than himself driving it off the truck
25 was Officer Boyd and he said Officer Boyd must have

Page 145

1 did this.
2    Q.    So he drove it off the truck is your
3 understanding?
4    A.    I was in jail.
5    Q.    I'm just saying.  What did he tell
6 you?  He said he drove it off the vehicle?
7    A.    He said Officer Boyd is the only
8 other person he saw in the vehicle.
9    Q.    But somebody moved it off the truck.
10   A.    Obviously.
11   Q.    Somebody moved it in the garage.
12   A.    Somebody.
13   Q.    Do you know if they drove it in the
14 garage, do you know if they towed it in the garage,
15 do you know what happened?
16   A.    I don't have the slightest idea other
17 than they towed it from the location it was it,
18 that's it.  I was locked up so I don't know who
19 drove it up, if they rolled it in, I don't know.
20   Q.    You don't know?
21   A.    I do not.
22   Q.    And the tow truck driver didn't give
23 you any specifics about that?
24   A.    Tow truck driver told me the only
25 person he saw in the vehicle was Officer Boyd.

37 (Pages 142 - 145)

Page 182

1 don't use your name.
2    A.    I asked them not to.
3    Q.    Okay.  But you know then that there
4 was no reference in that blurb to any missing
5 $2,000, correct?
6    A.    That's correct.
7    Q.    So if you told them about the $2,000
8 for some reason the government decided not to put
9 it into that blurb that was in the DOJ report,
10 correct?
11    A.    Okay.
12    Q.    Is that right?
13    A.    I don't know what they decided, I
14 know I didn't see it there.
15    Q.    It wasn't there and does that suggest
16 you didn't tell them about it?
17    A.    No, I wouldn't say that.
18    Q.    All right.
19    A.    I can't dictate or I can't decide
20 what they put in or not.
21    Q.    I understand that.  But as you sit
22 here today do you recall if you told them about the
23 $2,000?
24    A.    I don't know.  I know I called them
25 about the situation, I don't know that I would not

Page 183

1 have mentioned it.
2    Q.    And if you did mention it for
3 whatever reason they didn't put it in the DOJ
4 report.
5    A.    Yes.
6    Q.    Is that right?
7    A.    I don't know what they put in or why
8 they would take certain things out.
9    Q.    I'm not asking you why.  You read
10 that blurb regarding your case.
11    A.    I did read it.
12    Q.    And you know it doesn't reference
13 $2,000, right?
14    A.    That's correct.
15    Q.    And you don't know why they wouldn't
16 have referenced the $2,000, if you told them.
17    A.    That's correct.
18    Q.    Okay.  Now, you are claiming certain
19 damages in this case, what damages are you seeking
20 to recover against Mr. Boyd and the city of
21 Ferguson?
22    A.    So I don't understand this question.
23    Q.    Well, you're seeking to recover money
24 against my client and Mr. Boyd, correct?
25    A.    Okay.

Page 184

1    Q.    And you've alleged in your lawsuit
2 that you've lost your job, you lost your home, you
3 were homeless, that sort of thing, and I'm trying
4 to figure out what you are seeking to recover
5 against my client.
6    A.    Whatever the law sees fit for this
7 situation.
8    Q.    And that would include loss of
9 income, right?
10    A.    Whatever -- I mean for me, so I'm not
11 a lawyer, whatever the law or the lawyers see fit
12 on that side.
13    Q.    Okay.  Let me hand you what's been
14 marked as Ferguson Exhibit No. 1.  And for the
15 record that is a copy of the complaint filed by
16 your current lawyers on your behalf on  --
17          MR. WALDRON:  Do you have a copy for
18 me or no?
19          MS. GRAVES:  I'm getting it.
20    Q.    (BY MR. NORWOOD)  Complaint filed on
21 July 31, 2017.
22          MR. WALDRON:  Are these pre-marked
23 exhibits?  Is there a chance after the deposition
24 you can send us a pdf?
25          MS. GRAVES:  I don't know they're

Page 185

1 pdf, but.
2          MR. NORWOOD:  You have those fancy
3 new offices, you all can take the hard copies.
4    Q.    (BY MR. NORWOOD)  So Mr. Watson I
5 have in front of you what's been marked as Ferguson
6 Exhibit 1.  Do you recognize that document?
7    A.    I recognize portion of this document.
8    Q.    What portions do you recognize?
9    A.    You want me to go page by page or you
10 want me to just tell you what page number I don't
11 remember?
12    Q.    To save some time, did you review
13 this document before it was filed?
14    A.    You're asking me did I review this
15 document specifically?
16    Q.    Yes.
17    A.    I'm not sure about this document.  I
18 reviewed the complaint.
19    Q.    Okay.  And that includes, I mean the
20 complaint -- okay.  Let's make it easy for you.
21 The document is Bates stamped, rather it's time
22 stamped and Bates stamped and it starts with the
23 case number and then it has document number 1 filed
24 7/31/17 and then it's pages 1 of 23, you see that?
25    A.    Right.  This documents is about 100

47 (Pages 182 - 185)

Page 190

1 says, without reasonable suspicion of any unlawful
2 behavior defendant Boyd immediately shouted quote,
3 put your hands on the steering wheel.  Do you know
4 why I'm stopping you?  Do you know why I pulled you
5 over?  Unquote.
6        Correct?
7    A.   Yes.
8    Q.   And is that accurate in terms of what
9 he told you?
10   A.   I don't recall the put my hand on the
11 wheel at that time.
12   Q.   Okay.
13   A.   The second part, yes.
14   Q.   All right.
15   A.   The second part as in do you know why
16 I'm stopping you, do you know why I pulled you
17 over.
18   Q.   But its putting your hands on the
19 steering wheel, you don't know if that's accurate
20 or not?
21   A.   I don't recall at this time.
22   Q.   Let's go to paragraph 15.  Perplexed,
23 Mr. Watson replied that he had not been pulled
24 over, in fact he had been sitting in his parked car
25 trying to cool off for at least 10 minutes.

Page 191

1        Do you see that?
2    A.   Yes.
3    Q.   Is that accurate?
4    A.   Yes.
5    Q.   Then the next line, it says, next
6 paragraph, paragraph 16, quote, defendant Boyd then
7 demanded Mr. Watson's license, insurance and Social
8 Security number.  Unquote.
9        Do you see that?
10   A.   Yes.
11   Q.   Is that accurate?
12   A.   No.
13   Q.   What's not accurate about that one?
14   A.   The license and insurance.
15   Q.   Okay.  Because basically in your
16 testimony today he just walked up and said I want
17 your Social Security number, correct?
18   A.   After the other two, do you know why
19 I stopped you, do you know why I pulled you over.
20   Q.   After that he asked you for your
21 Social Security number.
22   A.   Correct.
23   Q.   Didn't ask you for your ID.
24   A.   That's correct.
25   Q.   Didn't ask you for your name.

Page 192

1    A.   That's correct.
2    Q.   All right.  Didn't ask you for the
3 license or insurance, correct?
4    A.   That's correct.
5    Q.   All right.  Paragraph 17, Mr., quote,
6 Mr. Watson asked why defendant Boyd needed that
7 information when he had done nothing wrong.
8 Defendant Boyd responded by suggesting that Mr.
9 Watson could be a pedophile for all he knew sitting
10 in the presence of children in the park, unquote.
11       Do you see that?
12   A.   I do.
13   Q.   And is that what he said, that you
14 could be a pedophile for all he knew, and he was
15 referring to children in the park?
16   A.   I recall him making that statement.
17   Q.   Okay.  And then paragraph 18 says --
18   A.   Let me clear, make sure that you
19 understand that at this point on paragraph 17 that
20 the information I was asking about or I may have
21 made the statement about was referencing my Social
22 Security number because that's what he required, or
23 demanded me to give him and I replied that I
24 couldn't give him that.
25   Q.   Okay.  I got you.

Page 193

1        Paragraph 18.  Not believing that
2 defendant Boyd had lawful justification for the
3 request Mr. Watson declined to provide defendant
4 Boyd with his Social Security number, unquote.
5        Do you see that?
6    A.   Yes.
7    Q.   All right.  And what was your basis
8 for -- well, first of all you're not a lawyer,
9 right?
10   A.   That's correct.
11   Q.   And have you had any legal training?
12   A.   No.
13   Q.   All right.  And so what then in your
14 mind led you to believe that Mr. Boyd didn't
15 justification for requesting your Social Security
16 number?
17   A.   Well, he didn't tell me I was under
18 arrest, he didn't tell me that, he didn't read me
19 my rights, he didn't tell me that I didn't have to
20 provide him any information.  I just thought that
21 was uncommon for him to just request my Social
22 Security number without any other information.
23   Q.   Okay.  Paragraph 19, let's go to Page
24 4.  Quote, Mr. Watson did provide defendant Boyd
25 with his full name and Florida address, open paren,

49 (Pages 190 - 193)

Page 194

1  where he was domiciled at the time, close paren,
2  and provided, and offered to provide his driver's
3  license which was located in the back of the car.
4         Do you see that?
5     A.   Yes.
6     Q.   Is that accurate?
7     A.   No.
8     Q.   What's inaccurate about paragraph 19?
9     A.   My full name, I provided him Fred
10 Watson and height, weight, or -- I provided him
11 Fred Watson and my Florida address.
12    Q.   It says where you were domiciled at
13 the time.  Were you domiciled in Florida at the
14 time of this stop?
15    A.   What is domiciled?
16    Q.   Did you live in Florida at the time
17 of this stop?
18    A.   No.
19    Q.   Okay.  Where were you living at the
20 time of this stop?
21         MR. WALDRON:  Objection.  It's been
22 asked and answered.
23    A.   In Illinois.
24    Q.   (BY MR. NORWOOD)  Okay.  And so you
25 weren't domiciled in Florida at the time, is that a

Page 195

1  fair statement?
2         MR. WALDRON:  Objection to the extent
3  it calls for a legal conclusion.
4     Q.   (BY MR. NORWOOD)  You didn't live in
5  Florida at the time, correct?
6     A.   I wasn't staying in Florida at the
7  time.
8     Q.   Were you living in Florida at the
9  time?
10    A.   What do you mean living?
11    Q.   You don't understand what, my
12 question about where were you living at the time?
13    A.   I do not understand your question.
14    Q.   Okay.  Did you have a residence in
15 Florida at the time?
16    A.   Yes.
17    Q.   What residence did you have in
18 Florida at the time?
19    A.   1924 West Little River Street.
20    Q.   And that was the residence of your
21 friend that you said you were staying with at some
22 time, correct?
23    A.   Correct.
24    Q.   And were you staying with him at the
25 time of this stop?

Page 196

1     A.   I'm trying to understand, when I
2  leave the park, are you asking me when I leave the
3  park this day am I going to Florida?
4     Q.   Yeah, let's start with that.
5     A.   No.
6     Q.   When was the last time you were
7  living in Florida before the stop?
8     A.   Living in Florida as?
9     Q.   As in laying down, taking a nap,
10 eating out of a fridge, using a microwave, that
11 sort of living.
12    A.   I don't recall.  I don't remember.
13    Q.   All right.  What else is not correct
14 about that statement?
15    A.   Number 19, correct?
16    Q.   Yes.
17    A.   That's it.
18    Q.   Okay.  Everything else in there is
19 accurate?
20    A.   Yes.
21    Q.   All right.  So you offered to
22 provide --
23    A.   To my memory, yes.
24    Q.   You offered to provide your driver's
25 license at this time, is that right?

Page 197

1     A.   This is one of those sequence of
2  things so I don't recall the exact sequence.
3     Q.   Okay.  So you don't know this is
4  accurate as it relates to the sequence represented
5  by paragraph 19.
6     A.   That's correct.
7     Q.   Then paragraph 20, you see apparently
8  unhappy with Mr. Watson's questioning of him and
9  refusal to provide a Social Security number
10 defendant Boyd ordered Mr. Watson out of his
11 vehicle.
12         Do you see that?
13    A.   Yes, I see it.
14    Q.   All right.  Then the next paragraph,
15 21, you say Mr. Watson, his hands on the steering
16 wheel, asked defendant Boyd for his name and badge
17 number.
18         Do you see that?
19    A.   Yes.
20    Q.   And that's accurate, right?
21    A.   I did ask him for his name and badge
22 number, yes.
23    Q.   While your hands were on the steering
24 wheel, right?
25    A.   Correct.

50 (Pages 194 - 197)

Page 198

1    Q.    Number 22, quote, defendant Boyd now
2  visibly upset refused and quote, no, you don't need
3  that, it will be on your ticket, unquote.
4        Do you see that?
5    A.    Yes.
6    Q.    Is that accurate, is that exactly
7  what he told you?
8    A.    I believe so, yes.
9    Q.    Then the next paragraph, paragraph
10  23, Mr. Watson asked quote, what ticket, I have not
11  broken any law, unquote.
12        Do you see that?
13    A.    Yes.
14    Q.    Was that your response?
15    A.    I believe so.
16    Q.    All right.  And then paragraph 24,
17  defendant Boyd responded quote, well, I think your
18  tint is too dark and I could give you a ticket for
19  that, unquote.
20        Do you see that?
21    A.    Yes.
22    Q.    Then paragraph 25 says quote, Mr.
23  Watson responded quote, okay, sir, that's fine,
24  unquote.  At this point Mr. Watson picked up his
25  phone from his center console with his right hand

Page 199

1  and said he was calling 911 himself.
2        Do you see that?
3    A.    I do.
4    Q.    Is that accurate?
5    A.    I believe this happened.  I don't
6  know I told him I was calling the police.
7    Q.    Okay.  But did you?
8    A.    I think this about happened.  And
9  again, I don't recall the exact sequence that these
10  numbers from 19 to 25 happened in.
11    Q.    But you did pick up your phone from
12  the center console?
13    A.    Yes, I did.
14    Q.    And that was the center console where
15  you had the money in?
16    A.    No, it's not the center console.
17  Actually -- yes, thank you.  Not the center
18  console, it's sitting next to the steering wheel on
19  the, where the GPS or my navigation system is.  So
20  again if you picture a clock it's sitting at 2
21  o'clock.  So we're talking a few inches from the
22  steering wheel.
23    Q.    All right.  So it wasn't in the
24  center console.
25    A.    No.  So that's incorrect.

Page 200

1    Q.    All right.  26.  Defendant Boyd
2  yelled, quote, put your fucking phone down and put
3  your hands on the steering wheel, unquote.
4        Do you see that?
5    A.    Yes.
6    Q.    All right.  Says defendant Boyd also
7  pulled out his gun and pointed it at Mr. Watson as
8  he began calling for backup.
9        Do you see that?
10    A.    I do.
11    Q.    Is that accurate?
12    A.    The items are accurate, again, I
13  don't recall the sequence.
14    Q.    Well, when you say defendant Boyd
15  also pulled out his gun and pointed it at you as he
16  was calling for backup, is that what you're saying,
17  you don't know all of that happened in that
18  sequence?
19    A.    No, I'm saying he definitely made the
20  statement, he definitely pulled his gun out and
21  pointed it at me, I'm saying I'm not sure this is
22  at the time he's finished calling in his complaint
23  against me or not.  That's what I'm saying.  But
24  yes, he did yell, he did scream and cuss, he did
25  pull his gun out.

Page 201

1    Q.    All right.  And you said also in your
2  testimony that he also said something about I could
3  shoot you right here and nobody would give a shit,
4  right?
5    A.    That's correct.
6    Q.    You said that somewhere.
7        Do you reference that anywhere in
8  your complaint?
9    A.    I don't recall.  I don't know.
10    Q.    Do you know why you wouldn't have
11  referenced that in your complaint?
12    A.    No.
13    Q.    Okay.  Let's go to Paragraph 28 --
14    A.    I would -- okay.
15    Q.    Let's go to Paragraph 28.  It says
16  quote, defendant Boyd then ordered Mr. Watson to
17  throw his keys out of the car window and turn off
18  the car, unquote.
19        Do you see that?
20    A.    Yes.
21    Q.    Is that accurate?
22    A.    That did happen.
23    Q.    All right.  And then 29, quote,
24  fearful of how defendant Boyd might respond to any
25  slight movement on his part Mr. Watson replied that

51 (Pages 198 - 201)

1 he was not going to throw the keys out of the
2 window. Instead, he just sat still with his hands
3 on the steering wheel waiting for the backup units
4 to arrive.
5        Do you see that?
6    A.   Yes.
7    Q.   And is that accurate?
8    A.   Yes.
9    Q.   All right. So you told him you
10 weren't going to do it, right?
11    A.   From my understanding there's no way
12 that I could retrieve the keys to the car in the
13 back of the, in the back of my car in the seat on
14 pants that are folded up. At this point Mr., or
15 Officer Boyd is outraged, there's no way that I can
16 satisfy his request at this point.
17    Q.   I understand all that.
18    A.   Without getting myself shot or
19 killed.
20    Q.   I understand all of that.
21    A.   Okay.
22    Q.   I'm just trying to get to what you've
23 alleged. You told him that you weren't going to do
24 it, right?
25    A.   I didn't say, I'm not sure I said I

1 wasn't going to do it.
2    Q.   So when it says Mr. Watson replied
3 that he was not going to throw the keys out of the
4 window is that not accurate?
5    A.   Not accurate.
6    Q.   What did you reply?
7    A.   Keys are in the back seat, I can't
8 throw them out.
9    Q.   Okay.
10    A.   So I didn't tell him no, I'm not
11 going to throw the keys. There's no way I can get
12 these keys.
13    Q.   Okay. I got you.
14        Let's turn to Page 40 -- I'm sorry,
15 Page 6. Paragraph 46. Do you see that?
16    A.   Yes.
17    Q.   And in there you allege that
18 defendant Boyd issued Mr. Watson seven tickets and
19 one of the tickets you identify in 46G, G being on
20 Page 7, is driving while license or driving
21 privilege revoked.
22        Do you see that?
23    A.   Yes.
24    Q.   And are you aware of that charge ever
25 been assessed against you by Officer Boyd?

1    A.   I am not.
2    Q.   Okay. And so --
3    A.   Actually there was a, I don't know
4 that it was called that.
5    Q.   Okay.
6    A.   I think I might have said suspended I
7 can't recall exactly.
8    Q.   I got you.
9        Are you aware of any charge for
10 having a suspended license that was issued against
11 you?
12    A.   I haven't had a suspended license.
13    Q.   I'm saying are you aware of any
14 charge for having a suspended license?
15    A.   No, sir.
16    Q.   By Mr. Boyd or anybody else at
17 Ferguson?
18    A.   No.
19    Q.   All right.
20    A.   Can you repeat the question?
21    Q.   Are you aware of any charges of
22 driving with a suspended license?
23    A.   I recall there was something saying
24 that my license may have been suspended or it
25 referenced a Missouri license. I do recall seeing

1 something about that.
2    Q.   Okay.
3    A.   Again, I haven't had a Missouri
4 license in a good 18 years.
5    Q.   Okay. Let me --
6    A.   As I remember.
7    Q.   Let's do this, I think this might
8 make this easy for us. Turn to Tab 3. Let me hand
9 you a binder of exhibits and I want you to focus on
10 Exhibit No. 3. Do you recognize Exhibit No. 3?
11    A.   (Reviewing document). I believe this
12 is the, your guy's questions and my answers.
13    Q.   Okay. And you reviewed them and
14 signed them under oath, is that correct?
15    A.   Are you asking me to review these
16 now?
17    Q.   Have you reviewed them?
18    A.   At some point, yes.
19    Q.   All right. Let's look at the first
20 page of that document, Ferguson Exhibit No. 3.
21 Now, you identified some individuals that have
22 knowledge about the issues you mention in Arica
23 Jones.
24        Who is Arica Jones?
25    A.   Arica.

Page 210

1 works.
2    Q.    Was this in writing at that time?
3    A.    This is one of the, I don't recall
4 it.  It's one of the documents that you provide
5 when you're sworn in, you know, any infractions,
6 any law enforcement infractions, any of those I
7 have to report that.  So I don't know if they took
8 notes at that time but I know over time there is
9 e-mail communications that I had to provide or I
10 cc'd specifically the NJVC security person and then
11 there was correspondence between myself, him and
12 Lynn Weaver or the security heads out east.
13    Q.    Okay.  And I guess what I'm trying to
14 figure out is this would have been in April, I'm
15 sorry, in August of 2012, the day after your arrest
16 you would have advised various personnel at NJVC
17 and at NGA, is that correct?
18    A.    That's correct.  I would have given
19 them some type of summary of kind of how things
20 took place.
21    Q.    A written summary or oral summary?
22    A.    I believe it was oral.  I don't know
23 that I provided them the written at that time.
24    Q.    Okay.
25    A.    Again, these were minor tickets and

Page 211

1 from what I thought and the same thing that they
2 said, well make sure it gets resolved, make sure we
3 know and it went like that.
4    Q.    And you don't know if in fact they
5 prepared any written documentation for your file --
6    A.    At that time, no, I do not.
7    Q.    All right.  Have you seen any written
8 documentation they prepared in 2012 in your file as
9 it relates to this incident?
10    A.    No.
11    Q.    Let's turn to Tab 3.
12    A.    Tab 3?
13    Q.    I'm sorry, Tab 4.  The Ferguson
14 Exhibit 4.  All right.  Let's turn to Page 12 of
15 Ferguson Exhibit 4.  Do you see that?
16    A.    Not yet.
17    Q.    First of all, have you seen this
18 document before?
19    A.    Yes.
20    Q.    All right.  And did you see it before
21 it was supplied to us in response to certain
22 requests for documents?
23    A.    I don't recall.  I mean this is a lot
24 of information.
25    Q.    Okay.  So you don't know if you saw

Page 212

1 it -- you've seen it before, you just don't know
2 when, is that your testimony?
3    A.    Are these the questions that you guys
4 sent to me to answer?
5    Q.    These are Plaintiff's Objections and
6 Responses to Defendant City of Ferguson's First
7 Request for Production of Documents.  And my simple
8 question to you is --
9    A.    So in short that's your questions to
10 me that I need to provide answers to.
11    Q.    It is a request directed to Mr. Fred
12 Watson to provide certain documentation.
13    A.    Yes.
14    Q.    So you would have received and
15 reviewed this, correct?
16    A.    Yes.
17    Q.    And you would have then assembled
18 documents in response to the request, correct?
19    A.    Yes, sir.
20    Q.    And you would have supplied those
21 documents to your counsel, correct?
22    A.    Yes.
23    Q.    And your counsel would have supplied
24 those documents to us, right?
25    A.    That's correct.

Page 213

1    Q.    All right.  So let's then go to Page
2 12.
3    A.    Okay.
4    Q.    And let's focus on Number 31.  Okay?
5    A.    Okay.
6    Q.    And in this one we asked, quote, all
7 documents related to the purported $2,000 that you
8 allege was missing from your vehicle following your
9 arrest by Officer Boyd.
10        Do you see that?
11    A.    Yes.
12    Q.    All right.  And then in response you
13 say quote, see Navy Federal Credit Union statement
14 of account produced herewith showing a cash
15 withdrawal of $2,100 which cleared Mr. Watson's
16 account on 8/2/12, or 2012.  Do you see that?
17    A.    Yes.
18    Q.    All right.  And you provided to us
19 copies of bank statements, correct?
20    A.    Yes.
21    Q.    Reflecting the withdrawal of $2,100,
22 correct?
23    A.    Yes.
24    Q.    All right.  And is it your position
25 based upon this response that that was the $2,000

54 (Pages 210 - 213)

Page 262

1 anything concrete document wise saying wherever the
2 tickets were.
3      Q.    All right.  Let's read further.  All
4 right.  Let's go to the next item.  Let's go to
5 Ferguson Exhibit 16, and that appears to be a
6 letter dated August 19th, 2014 from Lewis Collins
7 at NJVC.  Who is Lewis Collins?
8      A.    I believe he's one of the HR guys.
9      Q.    Okay.  And he says Dear Freddie,
10 right.
11      A.    Yes.
12      Q.    Okay.  And did you go by Freddie at
13 NJVC or Fred?
14      A.    Fred.
15      Q.    Okay.  But he's referring to you as
16 Freddie.
17      A.    He's well outside of my chain.  He's
18 an HR guy that sits well outside of the building.
19 Everybody who know me at NGA refers to me as Fred.
20      Q.    So he's going by what's in your
21 personnel records which identifies you as Freddie,
22 right?
23      A.    Correct.
24      Q.    All right.  And he's referring to
25 your termination, and why were you terminated at

Page 263

1 NJVC?
2      A.    Well, the document says that -- I
3 believe I was terminated because again I could not
4 get the resolution, I couldn't get the tickets
5 resolved.  Not getting the tickets resolved would
6 not allow them to readjudicate me or revalidate my
7 clearance for the next five years, so without
8 having my clearance NGA says -- yeah, I believe
9 it's not having my, having these tickets resolved
10 or a solution, nothing to provide to the government
11 or NJVC there's no way that they can close that
12 because they, of the criminal charges they say
13 which I believe is the failure to obey or false
14 declaration, that never left Ferguson in the
15 multiple transfers to the county, to Clayton.
16      Q.    Okay.  So really NJVC fired you
17 because you lost your security clearance with NGA,
18 right?
19      A.    That's still gray to me also because
20 NGA says we pulled your clearance because your
21 company fired you, the company says we fired you
22 because NGA pulled your clearance, so again, this
23 is another one of those gray areas.
24      Q.    Let's walk through the gray area.
25 What NGA advised you is that after you lost your

Page 264

1 security clearance with the NGA and after you were
2 fired by the employer that had a contract with NGA
3 it no longer had jurisdiction to try to clean up
4 your security clearance, right, that's what they
5 told you, they said lost the jurisdiction after you
6 were terminated, right?  Isn't that what they told
7 you?  That they had no jurisdiction because you
8 didn't have an employer that would vouch for you to
9 get a security clearance?
10      A.    Something to that nature.
11      Q.    Right.  But that was after you had
12 lost your security clearance, right?
13      A.    This all happened at the same time.
14      Q.    All right.  Let's talk about that
15 then, let's get back to the story as it's relayed
16 in the documents that have been supplied to us,
17 most of them by you.
18            Ferguson Exhibit 17, let's take a
19 look at that.  Now, this is in August of 2014,
20 correct?
21      A.    The document, yes.  August 19th,
22 2014.
23      Q.    And it was written by Mr. Shock on
24 your behalf, correct?
25      A.    I don't know that it was necessarily

Page 265

1 written on my behalf, I believe this document is
2 Bevis trying to understand what's going and asking
3 questions, so that's a legality piece.  It involves
4 me of course.
5      Q.    Well, he's representing you, right?
6      A.    Yes.
7      Q.    You're paying him to represent you?
8      A.    Right.
9      Q.    Right?  And he's referencing you, or
10 one of you, Fred Watson, right?
11            Right?
12      A.    That's correct.
13      Q.    So, and you're saying that he's not
14 speaking for you when he writes this letter to Ms.
15 Stephanie Karr relating to Ferguson versus Fred
16 Watson, is that your testimony?
17      A.    I think when he writes these letters
18 he speaks for himself in reference to me.
19      Q.    All right.  And it includes
20 information you supplied to him, right?
21      A.    This is correct, yes.
22      Q.    All right.  And you would have seen
23 this letter, right?
24      A.    Yes.
25      Q.    All right.  And in fact you saw the

67 (Pages 262 - 265)

Page 346

1    Q.    And during what period of time would
2 you have received the $3,000?
3    A.    This would have been the last, since
4 2017.  So after the story was put in the paper.
5    Q.    Which paper?
6    A.    I believe the New York Times.
7        MS. ARRINDELL:  I don't have any
8 further questions.
9        MR. WALDRON:  If we can break for
10 about two minutes I'll be very quick and then I'll
11 wrap up with some questions.
12    (WHEREUPON, A RECESS WAS TAKEN BY THE PARTIES)
13            EXAMINATION
14 QUESTIONS BY MR. WALDRON:
15    Q.    Fred, I'm your attorney, Chad Waldron
16 as you know, obviously on court forms I sign my
17 name John because that's my legal name, I just want
18 to be clear about our names here.
19        There's been some conversation this
20 evening that, or this afternoon, that what happened
21 was late in the evening, it was around -- what time
22 did Officer Boyd approach your car?
23    A.    I believe this was around 6.  It
24 wasn't late in the evening, still a lot of daylight
25 out.

Page 347

1    Q.    Okay.  So when, you can remember when
2 he approached your car was there daylight?
3    A.    Yes, there was still a lot of
4 daylight.
5    Q.    And it was August, right?
6    A.    Yes.
7    Q.    So not so far away from today, right?
8 Okay.
9        I'm just going to kind of jump
10 around.
11        When Officer Boyd asked you for your
12 name at a certain point in your conversation did he
13 say give me your legal name?
14    A.    No.  He never asked for my legal
15 name.
16    Q.    Okay.  Great.
17        And at a later point when Officer
18 Boyd had his gun pointed at you, where was it
19 pointed?
20    A.    At my head.
21    Q.    How long was it pointed at your head?
22    A.    10 seconds or so.  Or longer.  I'm
23 sitting in the car again with my hands on the
24 wheel, 11 and 1, and he pulls out his gun and
25 pointed it at my head, it was about a foot and a

Page 348

1 half, two feet from the car, my window.  Again, my
2 car sits pretty low and he is close enough vantage
3 point where he can clearly see me and everything
4 else inside the front of the car.
5    Q.    And what were you thinking at this
6 time?
7    A.    I was thinking I better not make a
8 move, don't say anything, don't do anything, other
9 than that I'm going to get killed.  I'm going to
10 get shot in the head.
11    Q.    Where did you grow up in St. Louis?
12    A.    North side, in the city.
13    Q.    What neighborhood?
14    A.    Walnut Park, amongst a couple other
15 places.  Rough neighborhoods.
16    Q.    Rough neighborhoods, right.  You grew
17 up poor?
18    A.    Very Poor.
19    Q.    At one point Officer Boyd asked you
20 to put your key out of the car I believe, or your
21 key fob out of the car, right?
22    A.    Yes, he asked me to throw my keys
23 out.
24    Q.    And you told him that you wouldn't or
25 you couldn't, is that correct?  Did you say

Page 349

1 anything about why you weren't able to do that?
2    A.    I did mention to him that the keys
3 were in the back, again in my pocket with my
4 driver's license folded up on the seat.  There's no
5 way I can turn around and get that key or ID
6 without making it look like I'm reaching for
7 something else.  During that time I wasn't, I
8 didn't want to make any sudden moves or make it
9 appear that I was reaching for something and give
10 him a reason to shoot me in the park.
11    Q.    All right.  A few points I believe
12 Bevis Shock and other letters mention that you,
13 that your fines were paid or that your violations
14 were paid.  To your understanding did you ever --
15 first let's just say this:  Did you ever plead
16 guilty to any of the municipal charges from
17 Ferguson?
18    A.    No I did not.
19    Q.    Did you ever sign any document that
20 said that you would plead guilty to any of the
21 municipal charges from the city of Ferguson?
22    A.    No, I did not.
23    Q.    To your understanding did Freeman
24 Bosley ever sign any documents that authorized him
25 to accept your plea?  Have you ever seen a document

88 (Pages 346 - 349)

Page 358

1 arrested in the back seat of Officer Boyd's car he
2 came into the car with your car registration,
3 right?
4     A.    Yes.
5     Q.    Okay.  Despite that did you receive a
6 ticket for not having registration?
7     A.    I believe I did.
8     Q.    Okay.  At any point during your
9 interaction with Officer Boyd were you operating
10 your vehicle on a roadway of the city of Ferguson?
11     A.    No.
12     Q.    Okay.  Just to be clear, your car was
13 never in drive, right, during the time we're
14 talking about, in your interaction with Officer
15 Boyd?
16     A.    No.
17     Q.    And why weren't you wearing a
18 seatbelt at that point?
19     A.    I wasn't driving, I was parked.
20     Q.    Okay.  Did you believe that Officer
21 Boyd's command to give your Social Security number
22 was lawful?
23     A.    I do not.
24     Q.    Okay.  Why do you have tinted
25 windows?

Page 359

1     A.    I personally actually feel that it
2 decreases the profiling.  I'm not harassed as much.
3     Q.    And can you be a little bit more
4 specific when you talk about, what do you mean
5 profiling?
6     A.    Profiled by police officers, pulled
7 over for traveling while black.
8     Q.    Traveling while black.  And what
9 would go along with traveling while black?
10 Frivolous ticket?
11     A.    Yes.
12     Q.    Just to be clear, you were ticketed
13 with driving without your operator's license in
14 your possession.
15     You had the operator's license in
16 your car, your driver's license in your car,
17 correct?
18     A.    Yes.
19     Q.    Great.  You were charged with
20 financial liability required which relates to
21 insurance.
22     You had proof of insurance with you
23 in your car, correct?
24     A.    Yes.
25     Q.    You were charged with vision reducing

Page 360

1 material applied to windshield or windows.
2     At any point did you see Officer Boyd
3 do any sort of test?
4     A.    No.
5     Q.    You were charged with failure to
6 register vehicle, you've already told me, is that
7 correct, that Officer Boyd saw your car
8 registration?
9     A.    Yes.
10     Q.    You were charged with safety and
11 emission testing inspection sticker required, is
12 that right?
13     A.    Yes.
14     Q.    And we've talked about you were
15 charged with having, not having a seatbelt on, is
16 that right?
17     A.    Yes.
18     Q.    Did you get the feeling that Bevis
19 Shock perfectly understood what had happened in
20 your case?
21     MR. NORWOOD:  Objection.
22     MS. ARRINDELL:  Objection, calls for
23 speculation.
24     MR. NORWOOD:  Join.
25     Q.    (BY MR. WALDRON) Did Bevis Shock

Page 361

1 ever tell you that he understood exactly what was
2 going on in your case?
3     A.    No.
4     Q.    Did he ever express any sort of, any
5 emotion at all or any feeling that he was having
6 trouble understanding what was going on?
7     A.    Yes.
8     Q.    And I'm going to look for Mr.
9 Shock's, one of Mr. Shock's two letters in here.
10     MR. NORWOOD:  14 is one.
11     MR. WALDRON:  Thank you.
12     Q.    (BY MR. WALDRON) Fred, let's look
13 quickly at Exhibit 14.  Let's go to Page 2.
14     A.    Okay.
15     Q.    Right in the middle, you see the
16 paragraph that starts Ms. Friar?
17     A.    Yes.
18     Q.    I'm going to go to the second
19 sentence, and it says that's when she and I learned
20 that way back in January of 2013 Mr. Bosley had
21 resolved the above listed seven traffic tickets by
22 having the prosecuting attorney reduce the moving
23 violations to non-moving violations and that
24 Ferguson had taken Mr. Watson's bond money for the
25 fines for those tickets.

91 (Pages 358 - 361)

Page 452

1 part of the park.  It is the other end of the park in
2 reference to where I was.  So it's not, again, totally
3 on the other end of the park.  Do you understand where
4 I'm at?
5      Q.  I wasn't there, and I didn't write this
6 data dump.
7      A.  So I'm explaining to you the data dump.
8 I'm explaining to you my sentences and what they mean.
9      Q.  Okay.  So when you said "other end of the
10 park" you're saying not really the other end of the
11 park?
12      A.  Correct.
13      Q.  Okay.  Fair enough.  Then we go and we say,
14 "I notice that my car was a nice distance away and I
15 wanted it to be closer.  So I went to retrieve the
16 vehicle."  Is that accurate?
17      A.  Right.  Yes, that happened.
18      Q.  "And move it to the location where I had
19 walked."
20      A.  Right.
21      Q.  All right.  And why did you want to move
22 it?  I'm just trying to see if I understand.  You were
23 hot, you got out of the vehicle, you walked around to
24 cool off some more.  You walked to either the other
25 end or some other part of the park?

Page 453

1      A.  I walked to the baseball field.
2      Q.  And then you walked back?
3      A.  Because I was going to sit at the baseball
4 field and watch the games.
5      Q.  And that's what you did; you pulled your
6 car around and you went to the baseball field and you
7 parked your car so you could see what was happening on
8 the baseball field?
9      A.  I went back from off the track because,
10 again, my car was a little distance back, picked my
11 car up and I come down.
12      Q.  Okay.
13      A.  And I sit in the car and watched the
14 baseball game.
15      Q.  So you pulled up in a manner so you could
16 see the baseball field from how you were parked; is
17 that right?
18      A.  Yes.
19      Q.  And did you back in to the spot to see the
20 baseball field?
21      A.  That's already been stated that I was
22 parked in the spot backwards facing the baseball field
23 several times.
24      Q.  So you back up, you were facing the
25 baseball field, did you have a license plate on the

Page 454

1 front of the vehicle?
2      MR. WALDRON:  I'll object.  It's been asked
3 and answered.
4      Q.  (By Mr. Norwood)  Subject to that?
5      A.  You know I don't have license plates on the
6 front of the car.
7      Q.  I don't know anything.
8      A.  You know that.
9      Q.  How do I know that?  I mean I'm asking you
10 questions, sir.  If you don't like the question,
11 that's fine.  But I'm asking the question because I
12 don't know, all right.  I'm not asking questions I do
13 know; it's a waste of time.  So you didn't have a
14 license plate on the front of the vehicle, you were
15 backed in so you could see the baseball game.  We got
16 that; correct?
17      MR. WALDRON:  Objection; asked and
18 answered.  It's a compound question.
19      Q.  (By Mr. Norwood)  Right?
20      A.  I do not have a front license plate.  The
21 state of Florida does not require me to have a front
22 license plate.
23      Q.  And you weren't living in Florida at the
24 time; correct?
25      A.  I wasn't living in Missouri.

Page 455

1      Q.  And you weren't living in Florida; correct?
2 Were you living in Florida at the time?
3      MR. WALDRON:  Objection.
4      THE WITNESS:  I wasn't living in Missouri.
5      MR. WALDRON:  That has been asked and
6 answered.
7      MR. NORWOOD:  It hasn't been asked and
8 answered.
9      MR. WALDRON:  It has.
10      MR. NORWOOD:  Were you living in Florida at
11 the time?
12      MR. WALDRON:  Same objection.
13      THE WITNESS:  Living in reference to what?
14      MR. NORWOOD:  When you backed into the
15 vehicle (sic) with your Florida license plate on the
16 back and no license plate on the front, were you
17 living in Florida?
18      MR. WALDRON:  Objection; the question has
19 been asked and answered.
20      THE WITNESS:  No.
21      MR. NORWOOD:  No; right?  Right?
22      MR. WALDRON:  Same objection.
23      Q.  (By Mr. Norwood)  Is that a "no"?  I don't
24 know if she got that down on the record.  Is that
25 "no"?

13 (Pages 452 - 455)

Page 456

1     A.  No.  I'm not living in Florida.
2     Q.  No, you weren't living in Florida in 2012,
3  when you were backed into this space; correct?
4     A.  No.
5     Q.  Okay.  Let's go to the last sentence in
6  paragraph three.  "I parked my car about 20 yards from
7  where the aforementioned vehicle had been parked, when
8  the officer, Eddie Boyd, arrested one citizen early."
9  Is that accurate?
10     A.  That happened.
11     Q.  Okay.  Next paragraph, paragraph four.  You
12  say, "Again, I am still trying to cool down, sitting
13  in my car with the AC air condition blowing, listening
14  to the radio."  Is that accurate?
15     A.  Yes.
16     Q.  Okay.  Next sentence, you say, "I sat there
17  for about ten minutes before Officer Eddie Boyd had
18  returned to the park; is that accurate?
19        MR. WALDRON:  Same objection.  It's unclear
20  whether you're asking is the sentence accurate or
21  whether that happened.  I think there is a way you can
22  rephrase the question so we're all on the same page.
23        MR. NORWOOD:  And when you ask him, you can
24  ask him that.
25        MR. WALDRON:  Great.

Page 457

1     Q.  (By Mr. Norwood)  Is that accurate?
2     A.  I did sit in my car for about ten or 15
3  minutes before the officer came back in the park.
4     Q.  Okay.  Fair enough.  You go further -- you
5  say, "I am sitting in my car with the window cracked."
6  Is that accurate?
7     A.  Cracked is a reference, the window was more
8  than cracked.
9     Q.  Okay.  So this is not accurate?
10     A.  It's accurate based on your definition of
11  cracked.
12     Q.  What's your definition of "cracked"?
13     A.  Your definition is different than mine.
14     Q.  I don't have a definition.  Let's go with
15  your definition.
16     A.  I am just explaining.
17     Q.  What's your definition of "cracked" since
18  you wrote it?
19     A.  My definition of cracked is that the window
20  is a quarter of the way down, not an inch or two down.
21     Q.  I'm sorry?
22     A.  Not an inch or two down.
23     Q.  So your definition of cracked is a quarter
24  of the way down?
25     A.  In this reference.

Page 458

1     Q.  Okay.
2     A.  On my paper that I wrote.
3     Q.  Okay.  So a quarter of the way down, that's
4  how you define "cracked"; correct?
5     A.  In this context.
6     Q.  In this context, a quarter of way down; is
7  that right?
8     A.  A quarter of the way down is cracked in
9  this context.
10     Q.  Fair enough.  And continuing reading
11  further, "And I noticed Officer Eddie Boyd enter the
12  park again."  Is that accurate?
13     A.  Yes.  I saw the car come back in, the
14  police officer.
15     Q.  And then we go further and we say, "I know
16  it was the same officer because I saw him as he exited
17  the park with the citizen in the back of the vehicle."
18  Is that accurate?
19     A.  Yes.
20     Q.  Going further, you say, "Officer Eddie Boyd
21  pulled his car in front of my car blocking me in the
22  parking space where I sat for the past ten minutes or
23  so."
24        MR. WALDRON:  I'll object to the extent it
25  mischaracterizes what's written.

Page 459

1     Q.  (By Mr. Norwood)  Is that accurate?
2     A.  He pulled his police car in the front of my
3  car blocking me into a space.
4     Q.  That's accurate?
5     A.  Detaining me, yes, that's accurate.
6     Q.  All right.  He -- and the "he" here is
7  referencing Officer Eddie Boyd; correct?
8     A.  Yes.
9     Q.  "He exits his vehicle and approaches my
10  vehicle unsnapping the strap on his firearm."  Do you
11  see that?
12     A.  I do see that.
13     Q.  Is that accurate?
14     A.  Is what accurate?  Is the statement
15  accurate?
16     Q.  Well, let's break it down again so we're
17  all clear.  Did he exit his vehicle?
18     A.  He did exit his vehicle.
19     Q.  All right.  And did he approach your
20  vehicle?
21     A.  He did approach my vehicle.
22     Q.  All right.  Did he unsnap the snap on his
23  firearm?
24     A.  He did do that.
25     Q.  All right.  We're there.  Let's go to the

14 (Pages 456 - 459)