# Exhibit 3

Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
 2                   EASTERN DIVISION
 3
 4   FRED WATSON,            )
                             )
 5         Plaintiff,        )
                             )
 6         vs.               ) No. 4:17-CV-2187
                             )
 7   CITY OF FERGUSON,       )
                             )
 8         Defendant.        )
 9
10
11
12
13       DEPOSITION OF WILLIAM BEVIS SCHOCK
14       TAKEN ON BEHALF OF THE DEFENDANT
15              NOVEMBER 2, 2018
```

Page 38

1  A.  Then failure to obey and false declaration,
2 they weren't budging on.
3  Q.  All right.  Meaning the City of Ferguson?
4  A.  The City of Ferguson.
5  Q.  All right.  Now, to the left here you have
6 some notes.  It says "car was purchased with tint."
7 What do you mean by that?
8  A.  That's what he told me.  That when he
9 bought the car it had a tint already on it.
10  Q.  Did you know if the tint violated Missouri
11 law?
12  A.  I don't know.  We talked about it a little
13 bit.  It may have been darker than what was allowed.
14  Q.  What do you recall you and he talking about
15 in that regard?
16  A.  I was just asking about this tint and he
17 said, "When I bought the car it was like that."
18  Q.  All right.  And he bought it in Florida; is
19 what you understand?
20  A.  Well, of course, you know, in Florida they
21 have higher tint because of the sunlight.
22  Q.  Right.
23  A.  So I don't recall where he told me he
24 bought it, but that would be logical.
25  Q.  All right.  I got you.  And then you have

Page 39

1 some note that says littering.  Do you see that?
2  A.  Yes.
3  Q.  What does that mean?
4  A.  I don't know.  I think I was trying to get
5 it to littering.
6  Q.  Okay.  Down at bottom it says the officer
7 pulled his weapon.  Do you see that?
8  A.  Yes.
9  Q.  What does that represent?
10  A.  That's what he told me.  He said officer
11 pulled his weapon on him.  And I was using that in my
12 arguments with the City of Ferguson to try to get them
13 to try to lighten up.
14  Q.  Okay.  I'm just going through some of your
15 notes.  You have date written next to false
16 declaration January 27, 2013.  What does that
17 represent?
18  A.  Where is that?
19  Q.  Where you say false declaration.
20     MR. WALDRON:  I'll object as to the number.
21     THE WITNESS:  It looks like February 29th
22 maybe -- January 29th.
23  Q.  (By Mr. Norwood) You think that's January
24 29?
25  A.  I don't know.

Page 40

1  Q.  At the top it says continue to 1-29-13?
2  A.  Okay.
3  Q.  Is that what you understand that the case
4 was going to be continued to January 29, 2013?
5  A.  Yes.
6  Q.  This document is actually dated October 24,
7 2012; correct?
8  A.  Yes.
9  Q.  And is this a response to your request for
10 recommendation?
11  A.  The case was continued to January 29th, so
12 that we could discuss it further because he wasn't
13 going along with it, you know.
14  Q.  All right.  And in the document itself, you
15 would have received this without all the writing, of
16 course?
17  A.  Huh?
18  Q.  You would have received this document
19 without all the handwriting?
20  A.  Yes.  Those are my notes.
21  Q.  So the document, though, which is dated
22 October 24, 2012, directed to you and it says recently
23 you entered your appearance for the above-named
24 department who has been following the cases pending --
25 who has the following cases pending in municipal court

Page 41

1 of Ferguson and requested a recommendation for
2 settlement of said cases; is that right?
3  A.  Yes.
4  Q.  That was based upon a request you made or
5 recommendation?
6  A.  For recommendation, yes.
7  Q.  And it lists all the charges and then it
8 says in the last paragraph -- it says "No
9 recommendation will be given at this time.  Driving
10 while intoxicated, driving while suspended, and
11 driving while revoked cases require a court appearance
12 by the defendant."
13  A.  Yes.
14  Q.  If your client has proof of insurance, has
15 a proof of insurance violation, you may forward a copy
16 of proof that defendant is currently insured and a
17 recommendation will be given.  The cases are continued
18 to -- this says Tuesday, November 20, 2012 at 10 a.m.,
19 do you see that?
20  A.  Yes.
21  Q.  Now, somewhere along the lines, though, it
22 looks like then ultimately the case was continued to
23 January 29 of 2013?
24  A.  Yes.
25  Q.  Based on your notes; is that correct?

Page 62

1  residence. Client registered to vote in St. Louis,
2  Navy discharge 2002, Coast Guard two years. No
3  discharge issues. Insurance card was in the car.
4      Q.  Okay.
5      A.  Client had tinted windows to minimize
6  profiling.
7      Q.  What did he tell you about that?
8      A.  That was a big deal. Mr. Watson told me
9  that he maintained tinted windows so that officers of
10 the law could not see into his car because he believed
11 that black people got pulled over more than white
12 people. And so he had tinted windows so they couldn't
13 tell the coloration of his skin. I have heard from
14 many people of dark skin. That's an issue. I didn't
15 question it. I did tell him it's against the law in
16 Missouri and there is some kind of measuring device
17 that there is some sort of numbers or something that
18 tell the degree of tint. And it's lawful to have so
19 much tint and not so much after that. If you have too
20 much tint or whatever. And idea of that is officer
21 safety. So if an officer, this is my understanding of
22 the rationale for this -- if an officer pulls
23 somebody over, they don't want to walk up to a car
24 with tinted windows because they want to be able to
25 see in the car to see if the guy is pointing a

Page 63

1  revolver at him or something.
2      Q.  Right.
3      A.  Very straightforward thing.
4      Q.  Let me back up, you told him having that
5  tint was a problem because it was illegal in the state
6  of Missouri?
7      A.  It's a huge problem for his case.
8      Q.  Why do you say that? Why did you tell him
9  that?
10     A.  Because under -- it's not Los Altos --
11 there is a Supreme Court case that basically says in
12 civil rights law, if the officers have the smallest
13 illegal activity they can arrest you. Now, tinted
14 windows is about as small as it can get; very, very
15 minor thing. It's an equipment violation. I mean to
16 an officer I can see it would be serious.
17     Q.  Right.
18     A.  But it's not like breaking a bottle over
19 somebody's head.
20     Q.  Right, but what you were communicating to
21 him, if I'm understanding you, is that that would have
22 been justification for the officer to take some action
23 against him because -- let me finish -- at that point
24 he was in violation of Missouri law; correct?
25     A.  It's not just action, he can take him to

Page 64

1  the station under arrest for that.
2      Q.  Just for the tinted windows?
3      A.  You got it.
4      Q.  And that's because that's a violation,
5  clear violation of Missouri law?
6      A.  Yes.
7      Q.  And you told him it was clear violation of
8  Missouri law?
9      A.  Definitely.
10     Q.  And, therefore, you told him that at the
11 time he had this tint and he was approached by Officer
12 Boyd he was in violation of the law?
13     A.  I'm very certain I told him that, yes.
14     Q.  And so when you talked to him, he at least
15 would have known that one of those tickets was a valid
16 ticket, which is one of having improper tinted
17 windows; correct?
18     A.  It depends what you mean by "valid". It's
19 valid in the sense that that is an offense under
20 Missouri law. I have no idea whether his windows were
21 of sufficient darkness as to be in violation, but I
22 think he told me that the windows were tinted. Then
23 you get into this issue -- gosh, I think I resolved
24 this. If the windows are lawful in the state where
25 the car is licensed which was Florida, as I remember,

Page 65

1  because remember his heart is in Florida, that -- can
2  a person drive that car in Missouri lawfully with that
3  tint. And I think the answer to that was no.
4      Q.  All right. So regardless of what Florida
5  said was okay in the Florida sun, in Missouri that's a
6  problem?
7          MR. WALDRON: I'll object to the extent it
8  calls for legal conclusion.
9          MR. NORWOOD: Well, we're talking to a
10 legal individual.
11         MR. WALDRON: I understand.
12     Q.  (By Mr. Norwood) So you rendered that
13 advice to your client based upon what you understand
14 the law was; that it was improper to have this kind of
15 tint in the state of Missouri; correct?
16     A.  Almost correct. Remember I said that I
17 didn't know how dark the windows were, but if they
18 were beyond a certain level of darkness -- I don't
19 know whether an officer just sort of glancing has a
20 sense of whether it's part of their training you look
21 at five cars and say that one is in violation.
22 Because most of these windows are slightly tinted.
23 Even clear ones are slightly tinted because they have
24 film so they don't cut people.
25     Q.  I have some notes. I think we'll refresh

17 (Pages 62 - 65)

Page 127

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
 2                    EASTERN DIVISION
 3
 4   FRED WATSON,             )
                              )
 5         Plaintiff,         )
                              )
 6         vs.                ) No. 4:17-CV-2187
                              )
 7   CITY OF FERGUSON,        )
                              )
 8         Defendant.         )
 9
10
11
12
13       DEPOSITION OF WILLIAM BEVIS SCHOCK
                     Volume Two
14
         TAKEN ON BEHALF OF THE DEFENDANT
15
                 NOVEMBER 8, 2018
16
17
18
19
20
21
22
23
24
25
```

Page 192
1 happened.
2    Q.  But in this case he had a home in Illinois,
3 right, and had an apartment in St. Louis?
4    A.  Correct.
5    Q.  Is what he communicated to you?
6    A.  Correct.
7    Q.  And a P.O. box?
8    A.  Where was the P.O. box?  I can't remember.
9 That was in --
10    Q.  That would have been Illinois; right?  So
11 then number three, having expired operator's license
12 and you have in parens although his driver license
13 from Florida was proper in every way close paren.  Do
14 you see that?
15    A.  Yes.
16    Q.  You know this expired operator's license we
17 just saw a document that references an expired
18 Missouri license; correct?
19    A.  Yes, sir.
20    Q.  And if you pull up this record and it
21 showed an expired license out of Missouri, is that
22 right?  Is that yes?
23    A.  Yes.
24    Q.  That was valid but expired; right?
25    A.  Yes.

Page 193
1    Q.  And you also indicated that that Missouri
2 driver's license wouldn't reflect anything related to
3 Florida; right?
4    A.  Correct.
5    Q.  Do you know if there is a procedure by
6 which you get a new license in a new state when you
7 have an old license that's outstanding in another
8 state?
9    A.  Sure.  It happens all the time.  People
10 move.  You go to your department of revenue equivalent
11 in the new state and say here's my old license.  They
12 look you up and make sure you're not suspended or
13 revoked.  And they say -- I don't know if you have to
14 take a test or not, whatever the reciprocity is and
15 they give you a new license in new place.  People move
16 all the time, no big deal.
17    Q.  Do you know if the license has to be
18 surrendered at some place back in the original state
19 or new state?
20    A.  Not in my experience.
21    Q.  You don't know what the requirement in
22 Florida may be or in Illinois as you sit here right
23 now?
24    A.  Not really in Missouri.  I never heard of
25 anything that being a problem.  I am thinking about my

Page 194
1 own daughter moved to Illinois, I don't know what she
2 did with her Missouri license.  I don't think she had
3 to return it to my knowledge.
4    Q.  To your knowledge -- then let's see,
5 number four.  Not having an operator's license, see
6 prior -- number five, not having an inspection
7 sticker, and you have parens which he did have; right?
8    A.  Yes, sir.
9    Q.  And then number six, you say having tinted
10 windows and in parens you say which admittedly were
11 tinted and so were in violation of Missouri law, but
12 were not in violation of Florida law where the car was
13 properly registered close paren.  Do you see that?
14    A.  Yes, I do.
15    Q.  That's consistent with what we talked about
16 before which was the assessment that he had illegal
17 tinted windows that violated Missouri law even though
18 perhaps they may have been in conformity with Florida
19 law; correct?
20    A.  Correct.
21    Q.  And that was a fact that you communicated
22 to his employer to explain that issue; correct?
23    A.  Well, assuming this is for his employer.
24 It's to whom it may concern.
25    Q.  Or whomever he decided to give that to;

Page 195
1 correct?
2    A.  Correct.
3    Q.  And he would have reviewed this letter and
4 agreed to transmit this information to his employer,
5 correct, regarding the tinted windows?
6    A.  Again, I don't know whether he agreed to
7 give it to his employer.  But I mean it was basically
8 the plan as I recall.  That's what he was going to do
9 with it.
10    Q.  With this information regarding tinted
11 window violation?
12    A.  To try to get his job back.
13    Q.  All right.  Now, let's go to the next page.
14    A.  Now, one thing is, you see it's kind of
15 tricky under the full faith and credit provision in
16 the Constitution.  If a car is valid in terms of its
17 equipment in one state and you move into another
18 state, does it have to conform with the state where
19 you're moving to or where it's registered.  And I
20 can't remember -- I think I might have even looked
21 into that.  That's very important.  To me was an
22 important legal issue in the case.
23    Q.  That was in your research?
24    A.  Perhaps.
25    Q.  And without that research we wouldn't know

Page 232

1  Q.  And the next page, 794, you get to some of
2 the relevant ones it looks like.
3  A.  First one on Page 1 is relevant.
4  Q.  Right.
5  A.  Expired operator's license.
6  Q.  Right.  And then next page, but those
7 disposition dates seem to line up with the first one;
8 right?
9  A.  Yes.
10  Q.  8-26-13 date and that would have been the
11 date based upon your assessment that the amount would
12 have been paid in conjunction with the deal that Mr.
13 Bosley cut?
14  A.  Correct.
15  Q.  Let me check and see -- off the record.
16   (Whereupon, a lunch break was taken.)
17  Q.  (By Mr. Norwood) Let me - there is some
18 notes that we didn't cover in the original batch, 667
19 and 668.  So let's deal -- actually, 669, too.  All
20 right.  Let's look at 667.  Are these more conference
21 notes?
22  A.  Yes, sir.
23  Q.  All right.  Let's just  -- if you can just
24 quickly just read those for us.
25  A.  667, 9-12-14, conference with Fred Watson

Page 233

1 client's clearance is suspended.  Client's job equals
2 zero.  I said failure to appear set for trial, other
3 two in limbo.  Client thinks he wants all charges
4 gone.  Government say paid so pled guilty.  Client
5 says I did nothing wrong.  Client says witness not so
6 good, client suspects their records, client knows,
7 look up.
8  Q.  Let me stop you there.  When you say
9 witnesses not so good.  What does that mean?
10  A.  I don't know.  He said witness not so good.
11 I don't know what he means, who the witnesses are.
12  Q.  Reference to government said paid so pled
13 guilty, what does that mean from what you recall?
14  A.  Well, this must relate to the seven charges
15 that Bosley sort of worked out.  That they are paid so
16 he pled guilty, but I'm not sure anybody understands
17 in the government whether those were original charges
18 or later charges.
19  Q.  Go ahead and continue.
20  A.  It shows  -- I don't know what that means.
21 Client lived there 20 years; client tired of being
22 profiled.  I think that related to tinted windows.  He
23 had tinted windows because he didn't want to get
24 profiled.  One week ago client came through St. Louis
25 city, client's cop  -- I guess whoever stop him said

Page 234

1 lower windows.  Client did so.  Client's kids in car.
2 Client stopped for "not seeing in the car".  I said
3 have to comply with Missouri law.
4  Q.  So what is that about?
5  A.  That's probably about how this measurement
6 of this tint.  My recall is that you do have to have
7 your tint in compliance with Missouri tint law to have
8 it in Missouri.
9  Q.  And that was based on the research that you
10 did?
11  A.  Well, yes, but my memory is very hazy.  It
12 may even be wrong, but that's my memory as I'm sitting
13 here.  I looked it up somehow.  I don't know how.  I
14 haven't spent a lot of my time on tint law, but I did
15 do some inquiry into it somehow.  I don't remember
16 where I looked or what the statute was or whatever.
17  Q.  But there is reference to another episode
18 where he was pulled over in St. Louis City?
19  A.  I think so.
20  Q.  With tinted windows?
21  A.  Yes.
22  Q.  And apparently Mr. Watson told you that he
23 was stopped because the officer in the city couldn't
24 see in the car?
25  A.  Right.

Page 235

1  Q.  And you told him you have to comply with
2 the law.  In other words, just because you're out of
3 Florida with legitimate tint, when you're here you got
4 to comply; right?
5   MR. WALDRON: I'll object to the extent it
6 misstates testimony.
7  Q.  (By Mr. Norwood)  Isn't that true?
8  A.  I think it's true, but I'm not sure.
9  Q.  Based on what you have here, right, you
10 said I said; you said it to him?
11  A.  I did say it to him.  What I don't remember
12 is how I learned that fact.  Did I go to statutes,
13 what did I do, how did I figure it out.  I might have
14 put it on my list server; hey, you guys.
15  Q.  Do you know if he ever complied?  Did he
16 get his tint changed to conform?
17  A.  I have no idea.
18  Q.  If you weren't sure that he wasn't in
19 compliance, would you have told him he wasn't in
20 compliance if you weren't sure?
21  A.  Probably not.
22  Q.  I mean, in other words, if you're going to
23 give a client advice; you got a problem with the
24 tinted windows, you would want to be really certain?
25  A.  My real problem is I can't remember where