IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| FRED WATSON, | ) |
| | ) |
|     Plaintiff, | )   Case No. 4:17-cv-2187-JCH |
| | ) |
| v. | ) |
| | ) |
| CITY OF FERGUSON, MISSOURI, et al. | ) |
| | ) |
|     Defendants. | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT STATEMENT OF MATERIAL FACTS

Plaintiff Fred Watson, pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits the following responses to Ferguson's Statement of Undisputed Material Facts (ECF No. 187).

1.    In his lawsuit, Plaintiff Freddie "Fred" Watson ("Plaintiff" or "Watson") purports to assert various claims under 42 U.S.C. § 1983, including claims against Defendant Eddie Boyd ("Officer Boyd") for Unlawful Search and Seizure (Count I); Unlawful Retaliation (Count II); and Malicious Prosecution (Count III); and a claim against the City for *Monell* municipal liability (Count IV), all resulting from an incident occurring on August 1, 2012. (*See* Plaintiff's First Amended Complaint "FAC") (Doc No. 35), *passim*).

    RESPONSE:

**Admit.**

2.    On August 1, 2012 Officer Boyd was patrolling at Forestwood Park, where there had been a number of recent car break-ins. (*See* Eddie Boyd Deposition ("Boyd Dep."), attached hereto as Exhibit 1, at 195:9–196:16; Deposition of Freddie Watson ("Watson Dep."), attached hereto as Exhibit 2 at 83:8–84:1).

    RESPONSE:

**Deny that there had been a "number" of recent car break-ins. Defendant has produced one**

1

**document alleging such activity on one day.** *See* **Exhibit 1. As to the rest of the statement, admitted.**

      3.     At approximately 8:17 p.m., Officer Boyd observed a vehicle with excessively tinted windows and no front license plate, backed into a parking space against a tree line, idling, headlights on, near a playground where children were playing. (*See* Boyd Dep. 14:23–15:24; 16:19–25; 17:10–25; 26:14–28:25; 35:15–36:3; Watson Dep. 74:18-25; 81:17-83:15; Deposition of Bevis Schock ("Schock Dep"), attached hereto as <u>Exhibit 3</u>, at 38:5–17; 62:4–64:13; 194:9–20).

      RESPONSE:

**Plaintiff denies that Officer Boyd made the preceding observations before approaching his vehicle, as Defendant Boyd did not even note that Mr. Watson's windows were tinted until well into his conversation with Mr. Watson.** *See* **Plaintiff's Statement of Additional Uncontroverted Material Facts ("Pl.'s. Facts"), ¶ 24.**

**Plaintiff denies that his windows were "excessively" tinted. His car windows were legally tinted in the state of Florida, where his car was legally registered.** *See* **Pl.'s Facts ¶¶ 5, 6.**

**Plaintiff denies that he was parked near a playground where children were playing.** *See* **Pl.'s Facts, ¶ 12.**

**Plaintiff denies that the time he was seized by Defendant Boyd was 8:17 p.m. Ferguson records show that other officers arrived at 8:18 p.m (***See* **Pl.'s Facts ¶¶ 44, 45) and the two talked for several minutes before backup officers came.** *See* **Pl.'s Facts Plaintiff's Add. Facts, ¶¶ 1-43.**

      4.     Based on these observations, and in light of the recent break-ins at the park, Officer Boyd decided to investigate, pulling his police cruiser adjacent to the vehicle and then approaching the car on foot. (*See* Boyd Dep. 18:23–19:20; 26:14–28:25; Watson Dep. 83:8–84:5).

      RESPONSE:

**Plaintiff admits that Mr. Boyd approached the car on foot after parking his police vehicle.**

**Plaintiff objects to all of Defendants' purportedly "Uncontroverted" Facts that**

**rely solely on Boyd's testimony. Boyd's credibility is highly suspect. Boyd has been found**

**to have been dishonest in police investigations at least six times throughout his career.** *See* **Pl.'s Facts, ¶¶ 113, 120, 183, 190, 239, 262. "Where the credibility of a witness critical to the movant's summary judgment claim is even partially undermined by the opposing party's evidence, summary judgment should be denied."** *United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.***, 480 F.3d 841, 845 (8th Cir. 2007).**

2

**Plaintiff denies that Mr. Boyd based his seizure of Mr. Watson on the observations and the recent break-ins. The Department of Justice Report on the City of Ferguson described the practice followed by Boyd on the afternoon of August 1:**

> *In reviewing FPD records, we found numerous incidents in which—based on the officer's own description of the detention—an officer detained an individual without articulable reasonable suspicion of criminal activity or arrested a person without probable cause.*

**ECF No. 35-4 at 17.**

**Further, Mr. Watson denies that Mr. Boyd pulled his car adjacent to his vehicle. *See* Pl.'s Facts, ¶ 14.**

    5.    The tinted windows on Watson's car were so dark that Officer Boyd was unsure whether the vehicle was occupied until he exited his vehicle and walked up to it, at which time he saw movement in the car, (*see* Boyd Dep. at 19:21–20:4), which was Watson's intent, as he purposefully drove a car with tinted windows because he thought tinted windows would reduce racial profiling (*see* Watson Dep. 358:24–359:2; Schock Dep. 232:20–22, 233:19–24).

    RESPONSE:

**Plaintiff admits that that Officer Boyd testified that Mr. Watson's windows were tinted and he was unsure whether he saw movement in the car. Plaintiff admits that he obtained tinted windows to reduce racial profiling.**

**Plaintiff denies that Boyd was "unsure whether the vehicle was occupied" or anything related to Boyd's perception of the vehicle, and incorporates as if fully stated herein his objection from Response No. 4.**

    6.    Watson's attorney acknowledged how the existence of tinted windows would raise a justifiable safety concern for any police officer (*see* Schock Dep. at 62:4–63:7) and even advised Watson that the tint was illegal under Missouri law and gave Officer Boyd probable cause to arrest Watson. (*See* Schock Dep. at 63:4–64:13).

    RESPONSE:

**Plaintiff admits that Bevis Schock told him that an individual could be arrested for having overly tinted windows in Missouri. Plaintiff also admits that Mr. Schock testified that he understood that police officers don't want to walk up to vehicles so tinted that they are unable to see inside the vehicle.**

**As to the remainder of this Fact, Mr. Watson denies, as Mr. Schock's testimony in the**

3

above passage does not address a "justifiable safety concern," nor does it state that "the existence of tinted windows" raises this concern.

       7.      Watson was the occupant of that vehicle, where he was sitting in the driver's seat without wearing a seat belt. (*See* Boyd Dep. 38:14–23, 43:3–8; Watson Dep. 83:23–84:1).

       RESPONSE:

**Admitted.**

       8.      Officer Boyd requested Watson to provide his pedigree information, including his name and address, as well as his driver's license and proof of insurance. (*See* Boyd Dep. 47:21–48:22; 57:5–58:25).

       RESPONSE:

**Plaintiff denies the above statement, as many of the so called "requests" came after Boyd had drawn his gun and threatened Watson. *See* Pl.'s Facts, ¶ 38-41. As to the remainder of the Fact, admitted.**

       9.      Watson never provided Officer Boyd with proof of insurance. (*See* Boyd Dep. 43:24–44:7).

       RESPONSE:

**Plaintiff denies the above statement to the extent it implies that Mr. Watson willfully failed to provide his insurance to Boyd. Any request for Watson's documents were made after Boyd pointed his gun at Watson, and Watson testified that he kept his hands on his steering wheel out of fear for his life. *See* Pl.'s Facts ¶¶ 38-44.**

       10.     Watson never provided Officer Boyd with a driver's license. (*See* Boyd Dep. 43:24–44:7).

       RESPONSE:

**Plaintiff denies the above statement to the extent it implies that Mr. Watson willfully failed to provide his insurance to Boyd. Any request for Watson's documents were made after Boyd pointed his gun at Watson, and Watson testified that he kept his hands on his steering wheel out of fear for his life. *See* Pl.'s Facts ¶¶ 38-44.**

       11.     Watson provided Officer Boyd with the name "Fred Watson" when he admittedly knew that if Officer Boyd performed a search under that name, nothing would come up in the system. (*See* Watson Dep. 9:22-10:25; 97:17-102:6).

       RESPONSE:

**Denied. First, Mr. Watson testified that he did not know what would show up in the "system" used by Defendant:**

*Q. And do you know if Fred Watson shows up in that computer system if he called in to check the name Fred Watson?*

*A. I don't know.*

**See Watson Dep. 100:1-4, attached as Exhibit 2.**

**On page 101, Mr. Watson indicates that he understood "the system" to address whether or not a person had previous law enforcement ineratctions:**

*Q. I understand and that wasn't my question. My question is as you sit here today you don't know if Fred Watson comes up in a computer system that would be checked by the city of Ferguson, correct?*

*A. It shouldn't come up.*

*Q. Why not?*

*A. Because I haven't had any tickets, I haven't had any law enforcement infractions so my name shouldn't come up in those databases.*

**Ex. 2, Watson Dep. 101:9-18.**

**Finally, the full excerpt below indicates that Mr. Watson only understood such a "system" to indicate that he did not have any traffic tickets:**

*Q. I understand all of that. So you're saying though that you understood that Fred Watson wouldn't come up because you didn't have a license under the name of Fred Watson and you didn't have any traffic tickets, right?*

*A. Yes.*

*Q. And you knew that at the time you were communicating about Officer Boyd, right?*

*A. That I didn't have any tickets?*

*Q. That the name Fred Watson wouldn't come up because your license was in the name of Freddie Watson.*

*A. So I don't know what you're asking me at this point. I don't know if he's running my name or why he's running my name or why it's required at this point. So I don't understand*

5

*what you're asking me about what you they knew or what came up, I don't have any knowledge of any of those things.*

**Ex. 2, Watson Dep. 102:1-102:19.**

      12.    Watson also provided Officer Boyd with a Florida address when he knew he resided in Illinois, not Florida, and had not resided in Florida since 2005.  (*See* Watson Dep. 25:24–28:15; 193:23-194:23; 455:1–456:4).

      RESPONSE:

**Plaintiff admits that he provided Defendant Boyd with the Florida address on his driver's license and vehicle registration and which was his legal residence.**

**Plaintiff denies that he 'knew he resided in Illinois'-- the testimony quoted by Defendants shows only that Plaintiff stated he was not currently living in Florida when he was detained by Officer Boyd.**

      13.    During the stop, Officer Boyd attempted to locate Watson's name in REJIS, a computer system used by law enforcement agencies to identify individuals, including locating their driver's license information. (*See* Boyd Dep. 60:21–61:3; 65:1–65:6).

      RESPONSE:

**Plaintiff admits only that Boyd *testified* that he attempted to locate Watson's name. Plaintiff denies that Boyd "attempted to locate Watson's name in REJIS" or anything related to Boyd's perception of the events due to Boyd's credibility problems, and incorporates as if fully stated herein his objection from Response No. 4.**

      14.    Officer Boyd reviewed the REJIS system and could not locate an individual with the name "Fred Watson" with the information provided by Watson. (*See* Boyd Dep. 64:19–65:23).

      RESPONSE:

**Plaintiff admits only that Boyd *testified* that he reviewed the REJIS system and could not locate an individual with the name Fred Watson.**

**Plaintiff denies that Boyd was unable to find Watson's name in a search or anything related to Boyd's perception of the events due to Boyd's credibility problems, and incorporates as if fully stated herein his objection from Response No. 4.**

      15.    Officer Boyd may have asked Watson for his social security number after he could

6

not find Watson's name in the REJIS system. (*See* Boyd Dep. 58:18–25; 60:8–12).

RESPONSE:

**Denied. Mr. Watson testified that Boyd asked for his social security number at the beginning of their encounter, before he searched for Mr. Watson's name in the REJIS system.** *See* **Pl.'s Facts ¶ 21.**

16. Watson refused to provide Officer Boyd with his social security number. (*See* Watson Dep. 85:25-88:20).

RESPONSE:

**Admitted.**

17. Watson then reached for his cell phone, which he claims he planned to use to call 911. (*See* Boyd Dep.; 203:13–204:19; Watson Dep. 104:3-106:5; 198:22–199:6; FAC ¶25).

RESPONSE:

**Admitted.**

18. For officer safety purposes, Officer Boyd directed Watson not to use the phone and to keep his hands on the steering wheel. (*See* Boyd Dep. 203:13–204:19; Watson Dep. 104:3-106:5).

RESPONSE:

**Mr. Watson admits that Defendant Boyd told Mr. Watson not to use the phone. Mr. Watson further admits that Mr. Boyd *claimed* this was for officer safety purposes.**

**Mr. Watson further denies any use of the term "officer safety purposes" that implies Mr. Boyd was afraid that Mr. Watson would harm him from the car. Boyd's testimony is that he was afraid Mr. Watson would use his telephone to call someone to ambush Boyd:**

*Q So you believed that he was going to call to ambush -- or to call somebody? A Yeah. Call somebody to ambush me, attack me.*

*See* **Pl.'s Facts, ¶ 37.**

**Mr. Watson denies that motive for Boyd's directive was officer safety. Based on Boyd's demeanor and cursing as he pulled his weapon on Mr. Watson, Mr. Watson believes Boyd's directive was intended to prevent Mr. Watson from reporting Mr. Boyd's harassment:**

*Q. And you said also in your testimony that he also said something about I could shoot you*

7

*right here and nobody would give a shit, right?*
*A. That's correct.*

**Ex. 2, Watson Dep. 201:3- 5.**

19.     Watson claims that at this time, Officer Boyd pulled out his gun and pointed it at Watson for "ten seconds or so" and then re-holstered the gun (*see* Watson Dep. 200:1–200:25; 347:17–25) while Boyd testified that he never pulled a gun on Watson. (*See* Boyd Dep. 95:3–5). RESPONSE:

**Admitted.**

20.     Officer Boyd then directed Watson to throw his keys out of the car window, which Watson repeatedly refused to do without explanation. (*See* Watson Dep. 103:11-17; 108:2–15; 115:1–6; 201:15-203:12; FAC ¶¶28–29).

RESPONSE:

**Mr. Watson admits that he did not throw his keys out of the car.**

**Mr. Watson denies that he "refused" to do so; his testimony clearly indicates that he did not reach to get his keys because he was in fear for his life:**

*Q. No, I wanted to hear what you have to say about it.*

*A. After the gun is pulled on me and reholstered I'm still here and he asked for driver's license and registration. In fear for my life I'm not going to move from that spot that I'm at.*

**Ex. 2, Watson Dep. 114:21-25.**

21.     Officer Boyd repeatedly ordered Watson to exit his vehicle, but Watson again refused without explanation. (*See* Boyd Dep. 55:15–56:5; 68:20–69:7; FAC ¶¶20, 28–29; Watson Dep. 115:1–6).

RESPONSE:

**Mr. Watson admits that he did not exit the vehicle before backup came, for fear of his life.**

**Mr. Watson denies that he "repeatedly" was ordered to exit the vehicle, and testified that when backup arrived, he calmly exited his car:**

*A. Officer Boyd told me to get out of the car slowly and put my hands up.*

*Q. You complied?*

8

*A. I did.*

*Q. All right.*

*A. The window is coming up, as the window is coming up I hit the button to turn the car off.*

*Q. Right.*

*A. I got out, as I'm getting out I got my hands up, he pushed me up against the car, I turned and I closed the door with my foot. It wasn't an aggressive turn, it wasn't an aggressive kick, I turned, I get out, he pushed me up against the car, as I'm turning I closed door and he cuffed me. Put me in the back of the squad car. They go back and talk some more.*

**Watson Dep. 120:6-22.**

      22.    Because of Watson's refusal to exit the vehicle despite requests, Officer Boyd requested backup and two Ferguson officers responded, Officer Mink and Officer Casem. (*See* Boyd Dep. 54:16–56:13, 189:19–23; Watson Dep. 114:19–115:11; 201:23-202:8; FAC ¶¶29).

      RESPONSE:

**Denied as to Defendants' claim that the reason for Boyd's calling backup is undisputed, or anything related to Boyd's perception of the incident, and incorporates as if fully stated herein his objection from Response No. 4.**

**Plaintiff Watson admits that two Ferguson police officers arrived on the scene. Because the remainder of the Fact requires Mr. Watson to speculate on Mr. Boyd's motive, it is denied.**

      23.    After the arrival of Officers Mink and Casem, and after Officer Boyd requested that Watson exit the vehicle multiple times, Watson finally exited the vehicle. (*See* Boyd Dep. 211:7–212:16; Watson Dep. 116:5–22; FAC ¶34).

      RESPONSE:

**Denied. Mr. Watson's testimony indicates that he exited the vehicle when requested by the backup officers:**

*A. So now they're there, I explain to him what's going on, he tells me I just need to do these things, I let him know I'm opening up the door, I opened the door.*

**Watson Dep. 116:19-22.**

9

24. While exiting the vehicle and before he was fully handcuffed, Watson used his leg to kick the car door closed in an effort to prevent the officers from searching his vehicle, which Officer Boyd interpreted as an attempt to conceal something in the vehicle. (*See* Boyd Dep. 212:8–12; Watson Dep. 120:6-121:20; FAC ¶34).

RESPONSE:

**Mr. Watson admits closing his vehicle door with his foot. Mr. Watson admits that Boyd's police report states that Mr. Watson closed his door "in an attempt to lock it as if he was trying to conceal something."** *See* **Exhibit 3, attached.**

**Denied as to Defendants' claim that the manner in which Officer Boyd "interpreted" his actions are undisputed, or that anything related to Boyd's perception of the incident, and incorporates as if fully stated herein his objection from Response No. 4.**

25. Thereafter, the officers tried to run the name "Fred Watson," and after being unable to identify Watson, Officer Boyd entered the vehicle and searched Watson's book bag, pants, glove compartment, and center console. (*See* Watson Dep. 121:21–125:25).

**Admitted that Boyd entered the vehicle and searched Mr. Watson's book bag, pants, glove compartment, and center console.**

**Denied that the officers' tried to run the name "Fred Watson," which is unsupported by the above excerpt.**

**Further Denied as to any insinuation regarding Officer Boyd's motive for searching Mr. Watson's vehicle, and Mr. Watson incorporates as if fully stated herein his objection from Response No. 4.**

26. Officer Boyd searched the vehicle because he believed Watson was attempting to conceal contraband or evidence of criminal activity, including evidence of Watson's identity. (*See* Boyd Dep. 169:19–170:6, 170:17–25; 175:21–176:15; 178:23–179:13; 186:15–23; 212:8–12; Exhibit 5).

RESPONSE:

**Plaintiff denies the entirety of Fact 26, which entirely calls for Mr. Watson to speculate as to Mr. Boyd's motives for searching the vehicle. Mr. Watson incorporates as if fully stated herein his objection from Response No. 4.**

27. During the search, Officer Boyd located documentation indicating that Watson's real name was "Freddie Watson." When Officer Boyd returned to his patrol car where Watson was being held, Officer Boyd told Watson that he found Watson's registration, finally learning that Watson's name was Freddie rather than Fred. (*See* Watson Dep. 127:10–25).

RESPONSE:

**Admit that Boyd located documentation showing that Mr. Watson's legal name was "Freddie Watson."**

**Denied as to any implication from Defendants related to the thoughts or perceptions of Boyd at the time of the incident, such as what he "finally learn[ed]" and when. Mr. Watson incorporates as if fully stated herein his objection from Response No. 4.**

28. Boyd was thereafter able to locate identify Watson through REJIS, which indicated that Watson was a Missouri resident, that he had never surrendered his Missouri license, and that his license was expired. (*See* Boyd Dep. 112:18–25; 119:22–121:2; 212:21–213:6; 217:7–22; Exhibit 3).

RESPONSE:

**Denied as to any implication from Defendants related to the thoughts or perceptions of Boyd at the time of the incident, such as what he purportedly understood about Mr. Watson. Mr. Watson incorporates as if fully stated herein his objection from Response No. 4.**

**Although Defendants claim Mr. Watson was a Missouri resident, they have produced no such documentation of this. A search run by the City of Ferguson on August 1, 2012 clearly shows that Mr. Watson had a valid Florida driver's license, that his vehicle was insured, and that it was licensed in the state of Florida.** *See* **Pl.'s Facts ¶ 57.**

29. Officer Boyd was not able to locate a valid driver's license for Watson in Missouri, Illinois, or Florida, although the car was registered in Florida. (*See* Boyd Dep. 216:14–217:6).

RESPONSE:

**Denied as to any implication from Defendants related to the thoughts or perceptions of Boyd at the time of the incident, such as what he purportedly understood about Mr. Watson. Mr. Watson incorporates as if fully stated herein his objection from Response No. 4.**

**Further denied because a search run by the City of Ferguson on August 1, 2012 clearly shows that Mr. Watson had a valid Florida driver's license, that his vehicle was insured, and that it was licensed in the state of Florida.** *See* **Pl.'s Facts ¶ 57.**

30. Watson's vehicle did not have an inspection sticker. (*See* Boyd Dep. 164:14–20).

RESPONSE:

**Admitted.**

    31. Officer Boyd issued Watson the following citations: (1) driving without operator's license in possession; (2) violation of financial responsibility ordinance; (3) vision-reducing materials applied to windshield (illegal window tint); (4) failure to register vehicle (because he believed Watson to be a Missouri resident and the car was registered in Florida); (5) no inspection sticker (safety & emission testing); (6) no seatbelt; (7) expired driver's license (as reflected by the REJIS report); (8) failure to comply (for failing to provide pedigree information and refusing to exit vehicle when advised he was under arrested); and (9) making a false statement (giving the name "Fred Watson" and stating that he did not have identification, but a government ID was later located in the vehicle). (*See* Boyd Dep. 128:16–129:11; 218:16–219:2; Exhibit 4; Exhibit 6).

    RESPONSE:

**The aforementioned "Fact" seems to ask Mr. Watson to admit to not only the charges, but the justification for those charges, and therefore Mr. Watson denies this Fact. Furthermore, the above facts request that Watson admit to being charged with vaguely-named violations that are not those Ferguson's charging documents indicate he was charged with.**

**Mr. Watson admits that Ferguson records show he was charged with the following violations:**

- "No operators license in possession"

- "No proof of insurance"

- "Vision reducing material applied to windshield"

- "Expired state operators license"

- "No seat belt"

- "Failure to register an out of state mot-veh within 30 days of residence"

- "No vehicle inspection"

*See* **Pl.'s Facts ¶ ¶ 80. Mr. Watson was also charged with Failure to Comply.** *See* **Pl.'s Facts ¶ 82.**

**Plaintiff denies that Ferguson charged Mr. Watson with "making a false statement". Ferguson court records show that Mr. Watson was charged with violation of ordinance 29.21, "False Reports."** *See* **Pl.'s Facts ¶ ¶ 87-89.**

### Relevant City Code

    32. On August 1, 2012, Ferguson Code of Ordinances ("City Code") 44-404 provided

as follows:

### Sec. 44-404. - Vision-reducing material applied to windshield or windows.

(a) Any person may operate a motor vehicle with front sidewing vents or windows located immediately to the left and right of the driver that have a sun screening device, in conjunction with safety glazing material, that has a light transmission of thirty-five (35) percent or more plus or minus three (3) percent and a luminous reflectance of thirty-five (35) percent or less plus or minus three (3) percent. Except as provided in subsection (c) of this section, any sun-screening device applied to front sidewing vents or windows located immediately to the left and right of the driver in excess of the requirements of this section shall be prohibited without a permit pursuant to a physician's prescription as described below. A permit to operate a motor vehicle with front sidewing vents or windows located immediately to the left and right of the driver that have a sun-screening device, in conjunction with safety glazing material, which permits less light transmission and luminous reflectance than allowed under the requirements of this subsection, may be issued by the department of public safety to a person having a serious medical condition which requires the use of a sun-screening device if the permittee's physician prescribes its use. The director of the department of public safety shall promulgate rules and regulations for the issuance of the permit. The permit shall allow operation of the vehicle by any titleholder or relative within the second degree by consanguinity or affinity, which shall mean a spouse, each grandparent, parent, brother, sister, niece, nephew, aunt, uncle, child, and grandchild of a person, who resides in the household. Except as provided in subsection (b) of this section, all sun-screening devices applied to the windshield of a motor vehicle are prohibited.

(b) This section shall not prohibit labels, stickers, decalcomania, or informational signs on motor vehicles or the application of tinted or solar screening material to recreational vehicles as defined in RSMo 700.010, provided that such material does not interfere with the driver's normal view of the road. This section shall not prohibit factory-installed tinted glass, the equivalent replacement thereof or tinting material applied to the upper portion of the motor vehicle's windshield which is normally tinted by the manufacturer of motor vehicle safety glass.

(c) Any vehicle licensed with a historical license plate shall be exempt from the requirements of this section.

(d) Any person who violates the provisions of this section is guilty of an ordinance violation.

RESPONSE:

**Admitted.**

13

33. On August 1, 2012, City Code 44-81 provided as follows:

**Sec. 44-81. - License required.**

(a) It shall be unlawful for any person to drive any motor vehicle or motorized bicycle in the city unless such person shall have a driver's license or chauffeur's license as required by state law, and shall have such license in possession at all times while so driving on the streets of the city.

(b) It shall be unlawful for the owner of any motor vehicle or motorized bicycle to permit any person to drive such vehicle on the streets of the city unless such driver shall have a driver's license or chauffeur's license as required by state law, and shall have such license in possession at all times while so driving on the streets of the city.

(c) Failure to produce a driver's or chauffeur's license upon lawful demand shall give a police officer probable cause to arrest the driver for driving a motor vehicle or motorized bicycle on the streets of the city without a state driver's or chauffeur's license, as required under subsection (a) or (b) above.

(d) Any person whose license and driving privilege as a resident or a nonresident has been canceled, suspended, or revoked under the laws of this state or the issuing state who drives any motor vehicle in the city while such license and privilege is canceled, suspended, or revoked and before an official reinstatement notice is issued or limited driving privileges granted by state officials, is guilty of a violation of an ordinance of this city

RESPONSE:

**Admitted**

34. On August 1, 2012, City Code 29-16 provided as follows:

**Sec. 29-16. - Failure to obey, obstructing, resisting, etc., city officials.**

It shall be unlawful for any person to willfully and knowingly obstruct, resist, oppose or fail to obey a lawful command of any police officer or city official charged with enforcement of this Code, or any other person duly authorized in executing or attempting to execute and carry into effect any provision of this Code or other ordinances of the city or order passed or made by the proper authorities of this city, or in serving or attempting

to serve any legal writ, warrant, process or order issued by the mayor or other officer of the city.

RESPONSE:

**Admitted.**

14

35. On August 1, 2012, City Code 44-66 provided as follows:

**Sec. 44-66. - Financial responsibility required in operation of motor vehicles.**

(a) No person shall operate a motor vehicle registered in this state, whether owned by such operator or by another, upon the streets, alleys, or highways of this city, unless such operator, or the owner of the vehicle, maintains financial responsibility which covers the operation of that vehicle by such operator.

(b) No person shall operate a motor vehicle registered in this state, whether owned by such operator or by another, upon the streets, alleys, or highways of this city unless such operator exhibits proof of financial responsibility upon demand of a police officer, which proof covers the operation of that vehicle by such operator.

(c) For purposes of this section, the term "financial responsibility" shall mean the ability to respond in damages for liability occurring after the effective date of proof of such financial responsibility arising out of the ownership, maintenance, or use of a motor vehicle in the amount of twenty-five thousand dollars ($25,000.00) because of bodily injury to or death of one (1) person in any one (1) accident, and subject to said limit for one (1) person, in the amount of fifty thousand dollars ($50,000.00) because of bodily injury to or death of two (2) or more persons in any one (1) accident, and in the amount of ten thousand dollars ($10,000.00) because of injury to or destruction of property of others in any one (1) accident.

(d) Proof of financial responsibility may be shown by any of the following:

   (1) An insurance identification card issued by a motor vehicle insurer, or by the Director of Revenue of the State of Missouri for self insurance, as provided by RSMo 303.024. A motor vehicle insurance policy, a motor vehicle liability insurance binder, or receipt which contains the name and address of the insurer, the name and address of the named insured, the policy number, the effective dates of the policy, and a description by year and make of the vehicle, or at least five (5) digits of the vehicle identification number, or the word "fleet" if the insurance policy covers five (5) or more vehicles, shall be satisfactory evidence of insurance in lieu of an insurance identification card.

   (2) A certificate of the Treasurer of the State of Missouri of a cash deposit as provided by RSMo 303.240.

   (3) A surety bond filed with the Director of Revenue of the State of Missouri as provided by RSMo 303.230.

(e) Proof of financial responsibility shall be carried at all times in the insured motor vehicle, or by the operator of the motor vehicle if the proof of financial responsibility is effective as to the operator rather than to the vehicle. The operator of the motor vehicle shall exhibit

the proof of financial responsibility on the demand of any police officer who lawfully stops such operator while that officer is engaged in the performance of the duties of his/her office.

(f) No person shall alter a legitimate document evidencing the financial responsibility required and described in this section. No person shall produce, manufacture, sell or otherwise distribute a fraudulent, altered, or counterfeit document intended to serve as an insurance identification card or document. No person shall possess a fraudulent, altered or counterfeit document intended to serve as an insurance identification card or document.

(g) Penalty. Any person who shall violate any provision of this section shall, upon conviction thereof, be deemed guilty and subject to punishment as described in section 1-15 of this Municipal Code.

RESPONSE:

**Admitted.**

36. On August 1, 2012, City Code 44-387 provided as follows:

**Sec. 44-387. - License plates required.**

(a) It shall be unlawful for any person to operate or park a motor vehicle on any roadway in this city unless there is an unexpired, valid state license plate or temporary permit/tag registered to that vehicle and displayed on such vehicle in accordance with state law.

(b) It shall be unlawful for any person to operate or park a motor vehicle within this city if such license plate or temporary permit/tag is wholly or partially obscured, is not reasonably clean, is not properly fastened or is not properly lit as required by state law.

(c) No person shall operate or park a motor vehicle or trailer on which there is displayed on the front or rear thereof any other plate, temporary permit/ tag or placard bearing any number except the plate furnished by the state director of revenue or appropriate official of the issuing state, nor shall there be displayed on any motor vehicle or trailer a placard, sign or tag bearing the words "license lost," "license applied for," or words of similar import, as a substitute for such number plates or permit/tag.

(d) No person shall alter a legitimate license plate or temporary permit/tag required and described in this section. No person shall produce, manufacture, sell or otherwise distribute a fraudulent, altered, or counterfeit license plate or temporary permit/tag intended to serve as a license plate or temporary permit/tag as required by this section. No person shall possess a fraudulent, altered or counterfeit license plate or temporary permit/tag or display such fraudulent, altered or counterfeit license plate or temporary permit/tag on any motor vehicle within this city.

RESPONSE:

**Admitted.**

37. On August 1, 2012, City Code 44-406 provided as follows:

**Sec. 44-406. - State safety and emissions testing required; display of inspection stickers required**.

(a) It shall be unlawful for any person to operate a motor on the streets of the city of for any owner of a motor vehicle to have his motor vehicle parked on the streets of the city unless such vehicle has been subject to all safety and emissions testing as required for such vehicle under state law.

(b) All motor vehicles required to undergo safety and emissions testing shall display current inspection stickers as required by state law.

(c) No person shall alter a legitimate document, report, certificate or sticker evidencing the safety and emissions inspections required and described in this section. No person shall produce, manufacture, sell or otherwise distribute a fraudulent, altered, or counterfeit document, report, certificate or sticker intended to serve as a safety or emissions inspection report, certificate or sticker. No person shall possess a fraudulent, altered or counterfeit document, report, certificate or sticker intended to serve as a safety or emissions inspection report, certificate or sticker.

RESPONSE:

**Admitted.**

38. On August 1, 2012, City Code 44-402 provided as follows:

**Sec. 44-402. - Seat belts.**

(a) As used in this section, the term "passenger car" means every motor vehicle designed for carrying ten (10) persons or less and used for the transportation of persons; except that, the term "passenger car" shall not include motorcycles, motorized bicycles, motor tricycles, and trucks with a licensed gross weight of twelve thousand (12,000) pounds or more. As used in this section, the term "truck" means a motor vehicle designed, used or maintained for the transportation of property.

(b) Each driver, except persons employed by the United States Postal Service while performing duties for that federal agency which require the operator to service postal boxes from their vehicles, or which require frequent entry into and exit from their vehicles, and front seat passenger of a passenger car manufactured after January 1, 1968, operated on a street or highway in this city, and persons less than eighteen (18) years of age operating or riding in a truck, as defined in subsection (a) of this section, on a street or highway of this city shall wear a properly adjusted and fastened safety belt that meets federal National Highway, Transportation and Safety Act requirements.

17

No person shall be stopped, inspected, or detained solely to determine compliance with this subsection. The provisions of this section and section 44-403 shall not be applicable to persons who have a medical reason for failing to have a seat belt fastened about their body, nor shall the provisions of this section be applicable to persons while operating or riding a motor vehicle being used in agricultural work-related activities. Noncompliance with this subsection shall not constitute probable cause for violation of any other provision of law. The provisions of this subsection shall not apply to the transporting of children under sixteen (16) years of age, as provided in section 44-403

(c) Each driver of a motor vehicle transporting a child less than sixteen (16) years of age shall secure the child in a properly adjusted and fastened restraint under section 44-403

(d) No person under the age of eighteen (18) years of age shall be permitted or allowed to ride in the unenclosed bed of a truck with a licensed gross weight of less than twelve thousand (12,000) pounds operated on a street or highway in the city.

(e) Except as otherwise provided for in section 44-403, each person who violates the provisions of subsection (b) of this section is guilty of an infraction for which a fine not to exceed ten dollars ($10.00) may be imposed. All other provisions of law and court rules to the contrary notwithstanding, no court costs shall be imposed on any person due to a violation of subsection (b) of this section.

(f) Each person who violates the provisions of subsection (d) of this section is guilty of an ordinance violation punishable under the general penalty provisions of this Code.

(g) If there are more persons than there are seat belts in the enclosed area of a motor vehicle, then the passengers who are unable to wear seat belts shall sit in the area behindthe front seat of the motor vehicle unless the motor vehicle is designed only for a front-seated area. The passenger or passengers occupying a seat location referred to in this subsection is not in violation of this section. This subsection shall not apply to passengers who are accompanying a driver of a motor vehicle who is licensed under RSMo 302.178.

RESPONSE:

**Admitted.**

39. On August 1, 2012, City Code 44-1 defined "street or highway" as follows:

*Street* or *highway* shall mean every way or place open for vehicular travel by the public and regardless of whether it has been legally established by constituted authority or used for the statutory period of time as a public highway.

RESPONSE:

**Admitted.**

Dated: January 21, 2021　　　　　　　　**ARCHCITY DEFENDERS, INC.**

By: */s/ John M. Waldron*
　Blake A. Strode (MBE #68422MO)
　John M. Waldron (MBE #70401MO)
　Maureen G.V. Hanlon (MBE # 70990MO)
　440 N. 4th Street, Suite 390
　Saint Louis, MO 63102
　855-724-2489 ext. 1021
　314-925-1307 (fax)
　bstrode@archcitydefenders.org
　jwaldron@archcitydefenders.org
　mhanlon@archcitydefenders.org
　*Attorneys for Plaintiffs*