Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

FRED WATSON,

    Plaintiff,

vs.        Case No. 4:17-CV-2187

CITY OF FERGUSON,

MISSOURI, et al.,

    Defendants.

DEPOSITION OF FRED WATSON

Taken on behalf of the Defendants

August 16, 2018

Page 100

1    Q.    And do you know if Fred Watson shows
2    up in that computer system if he called in to check
3    the name Fred Watson?
4    A.    I don't know.
5    Q.    All right.  You don't know.  Why
6    didn't you identify yourself as Freddie Watson?
7    A.    Because he didn't ask me specifically
8    -- I go by Fred Watson.
9    Q.    Well, sir, you are a very smart,
10   intelligent individual.
11   A.    Uh-huh.
12   Q.    And you understand the difference
13   between short names and full names, you understand
14   that, correct?
15   A.    I do.
16   Q.    All right.  And you have an officer
17   approaching you asking you your name and you
18   decided to use Fred as opposed to your legal name,
19   correct?  That was your decision?
20   A.    I was never asked for my legal name.
21   Q.    Okay.  So if he would have asked you
22   your legal name you would have told him Freddie
23   Watson.
24   A.    That's correct.
25   Q.    But because he just asked you your

Page 101

```
 1   name you decided to tell him Fred Watson.
 2        A.    That's correct.
 3        Q.    And you don't know how or if Fred
 4   Watson appears anywhere in the REGIS system that
 5   the Ferguson police department would have checked,
 6   correct?
 7        A.    I don't know who he called, who he
 8   talked to or if they ran my name or not, I do not.
 9        Q.    I understand and that wasn't my
10   question.  My question is as you sit here today you
11   don't know if Fred Watson comes up in a computer
12   system that would be checked by the city of
13   Ferguson, correct?
14        A.    It shouldn't come up.
15        Q.    Why not?
16        A.    Because I haven't had any tickets, I
17   haven't had any law enforcement infractions so my
18   name shouldn't come up in those databases.
19        Q.    Well, but you have a driver's
20   license, right?
21        A.    I do.
22        Q.    And your drivers license is in what
23   name?
24        A.    It's in Freddie Watson, and it's a
25   Florida driver's license.
```

Case: 4:17-cv-02187-RLW Doc. #: 194-2 Filed: 01/21/22 Page: 4 of 14 PageID #: 3692
Case: 4:17-cv-02187-RLW Doc. #: 135-2 Filed: 06/28/19 Page: 4 of 14 PageID #: 2085

Page 102

1     Q.    I understand all of that.  So you're
2  saying though that you understood that Fred Watson
3  wouldn't come up because you didn't have a license
4  under the name of Fred Watson and you didn't have
5  any traffic tickets, right?
6     A.    Yes.
7     Q.    And you knew that at the time you
8  were communicating about Officer Boyd, right?
9     A.    That I didn't have any tickets?
10    Q.    That the name Fred Watson wouldn't
11 come up because your license was in the name of
12 Freddie Watson.
13    A.    So I don't know what you're asking me
14 at this point.  I don't know if he's running my
15 name or why he's running my name or why it's
16 required at this point.  So I don't understand what
17 you're asking me about what you they knew or what
18 came up, I don't have any knowledge of any of those
19 things.
20    Q.    I'm asking what you know.  You knew
21 your name was Freddie Watson and he didn't, right?
22    A.    Yes, I know that.
23    Q.    So he didn't know your name was
24 Freddie Watson, right?
25    A.    No.

Case: 4:17-cv-02187-RLW Doc. #: 194-2 Filed: 01/21/22 Page: 5 of 14 PageID #: 3692
Case: 4:17-cv-02187-RLW Doc. #: 135-2 Filed: 06/28/19 Page: 5 of 14 PageID #: 2086

Page 114

1  Q. I understand that. I'm just trying
2  to get what was said between you and Officer Boyd.
3  A. Yes, sir.
4  Q. You told him that you had your
5  driver's license in your pants in the back?
6  A. I believe so.
7  Q. You told him you had your
8  registration in the glove compartment?
9  A. Yes.
10 Q. All right. Did you make any
11 reference to a military ID?
12 A. After I was in handcuffs in the car.
13 Q. What did you say about a military ID?
14 A. Okay. So this is, for me this is a
15 long process, this is it seems like forever.
16 Q. Right.
17 A. Backup finally comes -- or you don't
18 want that information yet?
19 Q. No, I wanted to hear what you have to
20 say about it.
21 A. After the gun is pulled on me and
22 reholstered I'm still here and he asked for
23 driver's license and registration. In fear for my
24 life I'm not going to move from that spot that I'm
25 at.

Case: 4:17-cv-02187-RLW Doc. #: 135-2 Filed: 06/28/19 Page: 6 of 14 PageID #: 2087
Case: 4:17-cv-02187-RCW Doc. #: 194-2 Filed: 01/21/22 Page: 6 of 14 PageID #: 3604

Page 115

```
 1        Q.    Right.
 2        A.    My hands are on the steering wheel,
 3   that's where I am.
 4        Q.    Right.
 5        A.    I have no more words now for Officer
 6   Boyd until his backup came.  Backup came, K-9 unit
 7   came, when I got there they huddled, they
 8   conversated, one of the guys came over to the
 9   window and he asked me what's going on, I told him
10   what's going on, he tells me I just need to do what
11   he say.
12        Q.    Okay.
13        A.    I need to follow his instructions or
14   it could get worse, he don't want to let the K-9
15   out and run through the car and all these other
16   things.
17        Q.    Who said they didn't want to let the
18   K-9 out?
19        A.    One of the other officers who was
20   driving the truck with the K-9 in it.
21        Q.    When the backup came they asked you
22   to get out of the car, right?
23        A.    No.
24        Q.    They didn't ask you to get out of the
25   car?
```

Case: 4:17-cv-02187-RLW Doc. #: 194-2 Filed: 01/21/22 Page: 7 of 14 PageID #: 3605
Case: 4:17-cv-02187-RLW Doc. #: 135-2 Filed: 06/28/19 Page: 7 of 14 PageID #: 2088

Page 116

```
 1        A.    No.  When they came they had a
 2   conversation amongst themselves kind of like off to
 3   the side.
 4        Q.    Okay.
 5        A.    One of the officers came and just
 6   told me I need to follow his instructions, I need
 7   to do what he say.
 8        Q.    Okay.
 9        A.    During our exchange, now there's
10   other people in the park paying attention to what's
11   going on.  I let him now I'm going to get out, I'm
12   going to open the door, so I let this officer know
13   what I'm going to do so I don't get killed.
14        Q.    Right.
15        A.    I'm not going to make any sudden
16   moves or turn around and reach in the back of the
17   car and try to grab something, no.
18        Q.    I understand that.
19        A.    So now they're there, I explain to
20   him what's going on, he tell me I just need to do
21   these things, I let him know I'm opening up the
22   door, I opened the door.
23        Q.    What did he tell you you needed to
24   do?
25        A.    I need to do whatever Officer Boyd
```

Page 120

1  side, I would say seven, eight o'clock which as the
2  door open, so again I pushed the door open, I hit
3  the button to let the windows up, I have my hands
4  up, he told me to get out of the car slowly.
5      Q.  Who is he?
6      A.  Officer Boyd told me to get out of
7  the car slowly and put my hands up.
8      Q.  You complied?
9      A.  I did.
10     Q.  All right.
11     A.  The window is coming up, as the
12 window is coming up I hit the button to turn the
13 car off.
14     Q.  Right.
15     A.  I got out, as I'm getting out I got
16 my hands up, he pushed me up against the car, I
17 turned and I closed the door with my foot.  It
18 wasn't an aggressive turn, it wasn't an aggressive
19 kick, I turned, I get out, he pushed me up against
20 the car, as I'm turning I closed door and he cuffed
21 me.  Put me in the back of the squad car.  They go
22 back and talk some more.
23     Q.  Why did you close the door?
24     A.  I don't give them consent to search
25 my car.  I don't want them searching my car.

Case: 4:17-cv-02187-RLW Doc. #: 194-2 Filed: 01/21/22 Page: 9 of 14 PageID #: 3607
Case: 4:17-cv-02187-RCW Doc. #: 135-2 Filed: 06/28/19 Page: 9 of 14 PageID #: 2090

Page 121

1    Q.    I understand that.
2    A.    That's why I closed the door.
3    Q.    You closed the door to make sure --
4    A.    Not to that make sure, so they would
5 know I don't give them consent to search my car.
6    Q.    Okay. So what you are trying to
7 communicate by using your knee to close the door
8 while you're being put in handcuffs was that you're
9 not consenting to them searching your car?
10    A.    I consented that before I got out of
11 the car as I was talking to the other officer.
12 When I told him I'm going to get out, let my window
13 up, I don't give you permission to search my
14 vehicle.
15    Q.    So you said that before you got out.
16    A.    Before I got out.
17    Q.    And you got out and as you were be
18 putting in cuffs you used your knee and closed the
19 door.
20    A.    I closed the door with my foot.
21    Q.    Closed the door with your foot.
22 okay. Then what happened next?
23    A.    They cuffed me, put me in the back of
24 the squad car.
25    Q.    All right. And then --

Case: 4:17-cv-02187-JCW Doc. #: 194-2 Filed: 01/21/23 Page: 10 of 14 PageID #: 3608
Case: 4:17-cv-02187-RLW Doc. #: 135-2 Filed: 06/28/19 Page: 10 of 14 PageID #: 2091

Page 194

1  where he was domiciled at the time, close paren,
2  and provided, and offered to provide his driver's
3  license which was located in the back of the car.
4              Do you see that?
5        A.    Yes.
6        Q.    Is that accurate?
7        A.    No.
8        Q.    What's inaccurate about paragraph 19?
9        A.    My full name, I provided him Fred
10 Watson and height, weight, or -- I provided him
11 Fred Watson and my Florida address.
12       Q.    It says where you were domiciled at
13 the time.  Were you domiciled in Florida at the
14 time of this stop?
15       A.    What is domiciled?
16       Q.    Did you live in Florida at the time
17 of this stop?
18       A.    No.
19       Q.    Okay.  Where were you living at the
20 time of this stop?
21             MR. WALDRON:  Objection.  It's been
22 asked and answered.
23       A.    In Illinois.
24       Q.    (BY MR. NORWOOD)  Okay.  And so you
25 weren't domiciled in Florida at the time, is that a

Case: 4:17-cv-02187-JCW   Doc. #: 194-2   Filed: 01/21/22   Page: 11 of 14 PageID #: 3609
Case: 4:17-cv-02187-RLW   Doc. #: 135-2   Filed: 06/28/19   Page: 11 of 14 PageID #: 2092

Page 201

1       Q.      All right.  And you said also in your
2  testimony that he also said something about I could
3  shoot you right here and nobody would give a shit,
4  right?
5       A.      That's correct.
6       Q.      You said that somewhere.
7               Do you reference that anywhere in
8  your complaint?
9       A.      I don't recall.  I don't know.
10      Q.      Do you know why you wouldn't have
11 referenced that in your complaint?
12      A.      No.
13      Q.      Okay.  Let's go to Paragraph 28 --
14      A.      I would -- okay.
15      Q.      Let's go to Paragraph 28.  It says
16 quote, defendant Boyd then ordered Mr. Watson to
17 throw his keys out of the car window and turn off
18 the car, unquote.
19              Do you see that?
20      A.      Yes.
21      Q.      Is that accurate?
22      A.      That did happen.
23      Q.      All right.  And then 29, quote,
24 fearful of how defendant Boyd might respond to any
25 slight movement on his part Mr. Watson replied that

Page 325

1   clearances?
2       A.    Okay.  So I did not make that
3   statement --
4       Q.    You did not make that statement?
5       A.    I did not make that statement.
6       Q.    Okay.
7       A.    and I wanted to make sure that clear.
8   If I'm not illegally prosecuted for these two years
9   or so at that time.
10      Q.    Right.
11      A.    For those bogus charges.
12      Q.    Right.
13      A.    I'm never in that situation.
14      Q.    Okay.  Never in your situation for
15  somebody to lie on you at the NGA in the personnel
16  security division attributing a false statement to
17  you to the effect of what if I went out there and
18  started telling the government secrets on my own
19  time.
20      A.    I don't understand the question.
21            MR. NORWOOD:  Let's read it back.
22     (Whereupon, the reporter read from the record)
23      A.    Can you rephrase that question?
24      Q.    (BY MR. NORWOOD)  I can rephrase it,
25  yes.

Page 327

1  difficult but let's read the question and let's get
2  the truth.
3        (Whereupon, the reporter read from the record)
4        A.    Wrong.  Ferguson, having the tickets
5  in Ferguson, being illegally detained in Ferguson,
6  not being allowed to go before the judge or have a
7  trial led to my security clearance being suspended.
8  That is the underlying reason why I'm reporting
9  twice a month, why I'm being pulled in the office
10 every day when I go to work.  What I also want to
11 state to you is I never made this statement that's
12 on this document, amongst the other inaccurate
13 information.  There are two security people that I
14 have to report to, again, feels like daily.  This
15 is a, at this point a little over two years, it's a
16 drawn out process while I'm reporting and
17 reporting, I'm frustrated, I'm begging the
18 government to give me a lawyer that I'll pay for
19 out of my pocket because I have money.  I'm asking
20 them to reach out to Ferguson and see if they can
21 get any information on any of the tickets because
22 moving back and forth from Ferguson to Clayton, the
23 county, those tickets does not move with the case.
24 They're just held.  The government can not resolve
25 that clearance.  So while I'm explaining this in

Page 328

1  this frustration with my security personnel about
2  how I'm being bounced between all these different
3  places and being reported, I'm frustrated, I'm
4  tired, I'm exhausted.  The statement that was made
5  was I am being treated as if I am taking action,
6  I'm being treated as if I am like Edward Snowden,
7  that is the statement that was made.  I've been
8  around this outfit for 20 years, never have I taken
9  classified information and shared with anybody.
10 I take my job serious, I take defending my country
11 serious.  I have dune this for many years, I don't
12 play with the classified information, I don't play
13 with sharing any of that information.  Passwords,
14 Social Security numbers, all of those things, I
15 take security very seriously.  Never have I made a
16 statement that I would go and tell government
17 secrets.
18         Q.     Right.  I understand. And maybe you
19 did, maybe you didn't.  But somebody quoted, I mean
20 this is not a summary, it says quote, what if I
21 went out there and started telling the government
22 secrets on my own time, that's a quotation.  You
23 see that in quotation marks?
24         A.     I see that.
25         Q.     You see that.  Okay.  And you were